## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION,
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,

               Plaintiffs,

     v.                                     No. 1:13-cv-01870-JEB

CENTRAL INTELLIGENCE AGENCY,

               Defendant.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### PRELIMINARY STATEMENT

This dispute concerns a Freedom of Information Act ("FOIA") request for a single document in the CIA's possession and control: a 6,300-page report concerning the CIA's post-9/11 program of rendition, secret detention, torture, and other abuse of detainees (the "Report").[1] The Report is the result of more than three years of investigative work by the Senate Select Committee on Intelligence ("SSCI" or "Committee"), and it is the most comprehensive account to date of the CIA's unlawful program. It also illuminates the Agency's misrepresentations regarding that program to Congress, the White House, and the American public.

The issue now before this Court is a simple one: whether the Report is an "agency record" subject to FOIA. Under Supreme Court and D.C. Circuit precedent, which turns on the

---

[1] In an agreement so-ordered by the Court on January 22, 2014, the CIA agreed to process for release to Plaintiffs by May 22, 2014, the two other documents at issue in this case: the CIA's response to the Report, and the so-called Panetta Report.

agency's control of the document, the clear answer is: yes.  In arguing to the contrary, the CIA does not meet its burden to show otherwise.

The CIA's claim that the Report is not an agency record essentially relies upon two communications from the SSCI to the CIA.  According to the Agency, these communications demonstrate the SSCI's intent to retain control over the Report.  Neither does so.  The first, a June 2009 letter, concerns only the SSCI's intent to control its internal work product created in the preparation of the Report.  In other words, the letter does not assert congressional control over the Report itself.  In any event, it does not satisfy the D.C. Circuit's requirements for evidence of congressional, as opposed to agency, control.  The second document, a December 2012 email, similarly does not evince SSCI control over the Report, or constrain the CIA's handling of it.  All the other factors considered in this Circuit's control analysis—the ability of the agency to use the document, the extent to which the agency read the document, and the extent to which it was integrated into the agency's files—indicate that the CIA controls the Report, and it is thus an agency record subject to FOIA.

Accordingly, the Court should deny the CIA's motion to dismiss.  In the alternative, if the Court has any question whether agency control exists, it should order limited discovery to resolve the matter.

## FACTUAL BACKGROUND

In the years following September 11, 2001, the CIA systematically captured, detained, and tortured suspected terrorists, including in a network of secret overseas prisons known as "black sites."  This torture program, developed and authorized by officials at the highest levels of government, was eventually halted by President George W. Bush in 2008.  In 2009, President Barack Obama ordered the black sites closed.  Compl. ¶ 2.

Because of the extraordinary public interest in and controversy surrounding the CIA's rendition, torture, and secret detention program, in March 2009, the SSCI initiated a comprehensive review of the CIA's post-9/11 conduct.  Over the course of three years, the SSCI examined six million pages of government records documenting the CIA's treatment of detainees.  At the end of 2012, the SSCI completed its report, *Study of the CIA's Detention and Interrogation Program*, which spans more than 6,000 pages, includes 35,000 footnotes, and cost $40 million to produce.  Compl. ¶ 13.  On December 13, 2012, the SSCI formally adopted the Report by a vote of 9 to 6.  S. Rep. No. 113-7, at 13 (Mar. 22, 2013).

The Report has been described by those involved as the most extensive investigation of the CIA's program thus far conducted.  Compl. ¶ 3.  Upon the Committee's adoption of the report, the Chairman of the SSCI, Senator Dianne Feinstein, stated: "I am confident the CIA will emerge a better and more able organization as a result of the committee's work.  I also believe this report will settle the debate once and for all over whether our nation should ever employ coercive interrogation techniques such as those detailed in this report."  Press Release, Sen. Feinstein, Feinstein Statement on CIA Detention, Interrogation Report (Dec. 13, 2012), http://1.usa.gov/SXEWHH.  Specifically, she explained that the Report "uncovers startling details about the CIA detention and interrogation program and raises critical questions about intelligence operations and oversight. . . . [T]he creation of long-term, clandestine 'black sites' and the use of so-called 'enhanced-interrogation techniques' were terrible mistakes."  *Id.*

In addition to detailing the CIA's illegal practices, the Report explores how the CIA misled the White House, the Department of Justice, Congress, and the public about the "effectiveness" of waterboarding, wall-slamming, shackling in painful positions, and other methods of torture and abuse.  *See, e.g.*, Mark Mazzetti & Scott Shane, *Senate and C.I.A. Spar*

*Over Secret Report on Interrogation Program*, N.Y. Times, July 19, 2013,

http://nyti.ms/1lldyPU; Press Release, Sen. Udall, Udall Presses CIA Nominee on Brutal

Detention, Interrogation Program, Alleged Discrepancies Between Official, Internal Agency

Accounts (Dec. 17, 2013), http://1.usa.gov/1kG9koT.  Following the SSCI's adoption of the

Report, the Committee sent an unknown number of physical copies of the Report to the CIA.

The Report is of clear and enormous public importance.  In order to inform public debate

and build a historically accurate record of the CIA's torture of detainees, Plaintiffs submitted a

FOIA request on February 13, 2013 to the CIA ("Request"), seeking disclosure of the Report.

By letter dated February 22, 2013, the CIA denied the Request, stating that "[The ACLU has]

requested a Congressionally generated and controlled document that is not subject to the FOIA's

access provisions."  The ACLU appealed from the CIA's determination on April 25, 2013.  After

the CIA failed to respond timely to the appeal, *see* 5 U.S.C. § 552(a)(6), and to two related FOIA

requests, the ACLU filed this action.  Currently before the Court is the CIA's motion to dismiss

the ACLU's claim for the release of the Report.

## ARGUMENT

**I. The Report is an agency record subject to FOIA.**

**A. FOIA standards and the burden of proof.**

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a

democratic society, needed to check against corruption and to hold the governors accountable to

the governed."  *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242

(1978).  Its basic purpose is "to open agency action to the light of public scrutiny."  *Dep't of Air

Force v. Rose*, 425 U.S. 352, 372 (1976) (internal quotation marks omitted).  To that end, in

assessing whether the Report is an "agency record," "[t]he burden is on the agency to

demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989); *see also Judicial Watch v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013) (any uncertainty as to whether a document is an agency record "redound[s] to the benefit of" the FOIA requester).

When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court must draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982) ("Even under Rule 12(b)(1), procedural safeguards equivalent to those in Rule 56 are required . . . ."); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982).[2] Ultimately, "[d]ismissal for lack of subject-matter jurisdiction because of the inadequacy of a federal claim is proper only when the claim is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *see also, e.g.*, *Citizens for Responsibility and Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 221, 225 (D.C. Cir. 2009) (district court erroneously dismissed FOIA lawsuit under Rule 12(b)(1) because it was not "implausible" that the defendant was a FOIA-covered agency).

Under the Supreme Court and D.C. Circuit precedent discussed below, the Report is an "agency record," and the CIA has not met its burden of showing otherwise.[3]  Accordingly, the

---

[2] While the Court may consider subject matter jurisdiction *sua sponte*, the CIA's motion under Federal Rule of Civil Procedure 12(b)(1) is technically improper, as the Agency has already answered the complaint.  *See* Def. Answer to Am. Compl., ECF No. 16.

[3] As a general matter, plaintiffs bear the burden of establishing that the Court has subject matter jurisdiction; however, because the jurisdictional question here is predicated entirely on whether the Report is an agency record, the burden properly rests with the CIA.  *See Tax Analysts*, 492 U.S. at 142 n.3.

Agency's motion to dismiss for lack of subject matter jurisdiction should be denied.  *See* 5

U.S.C. § 552(a)(4)(B).

### B. The Report is an agency record, and the CIA has not met its burden to show otherwise.

Although FOIA does not define the term "agency record," *see* 5 U.S.C. § 552, the

Supreme Court has supplied a clear definition.  *See Tax Analysts*, 492 U.S. at 144.  A record is an

"agency record" for FOIA purposes if it satisfies two requirements: first, the agency must have

created or obtained the requested material, and second, the agency must be in control of the

material at the time of the FOIA request.  *See id.*  By "control," the Supreme Court means that

"the materials have come into the agency's possession in the legitimate conduct of its official

duties."  *Id.* at 145.  Here, it is undisputed that the CIA obtained the Report and that it did so in

the legitimate conduct of its official duties.  *See* Def. Mot. 5, 7.  Thus, the Report meets the

Supreme Court's test for an "agency record."

Citing case law from the D.C. Circuit that is in some tension with Supreme Court

precedent, the government argues that the Report is not an agency record because it is

"controlled" by the SSCI.  *See* Def. Mot. 7–12.[4]  But even assuming that the D.C. Circuit's test

governs the analysis, each of the factors it applies favors Plaintiffs.

The D.C. Circuit has considered four factors in evaluating whether a document

constitutes an "agency record" for the purposes of FOIA:

---

[4] The Supreme Court was presented with the opportunity to rely on the four-factor control test
the D.C. Circuit now typically uses, *see Tax Analysts v. Dep't of Justice*, 845 F.2d 1060, 1069
(D.C. Cir. 1988), but it declined to do so and instead employed a much simpler test.  *See Tax
Analysts*, 492 U.S. at 145.  Unlike the Supreme Court's test, the D.C. Circuit case law focuses on
the intention of the creator of the document.  This is fundamentally at odds with the Supreme
Court's statement in *Tax Analysts* that the agency record inquiry should not "turn on the intent of
the creator of a document relied upon by an agency.  Such a *mens rea* requirement is nowhere to
be found in the Act."  *Id*. at 147.

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.

*Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).[5]  Recently, in *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221 (D.C. Cir. 2013), the D.C. Circuit noted in dictum that the four-factor test does not apply to congressionally-created documents.  In such a case, the first two factors are "effectively dispositive."  *Id.*  Regardless of whether this Court treats the first two factors as effectively dispositive, however, the Court's analysis must take into consideration the totality of the circumstances surrounding the creation, transfer, and possession of the document.  *See, e.g.*, *United We Stand Am., Inc. v. Internal Revenue Serv.*, 359 F.3d 595, 597, 602 (D.C. Cir. 2004).  And it must deny the motion to dismiss unless the Agency's evidence establishes a "*clear* assertion of congressional control" over the Report.  *Id.* at 602 (emphasis added).

     1.   <ins>The CIA has not shown a clear assertion of congressional control over the Report.</ins>

The first *Burka* factor weighs in favor of Plaintiffs, because the CIA cannot show that Congress asserted its intent to control the Report in terms that were clear, contemporaneous, and specific.  *See, e.g.*, *United We Stand*, 359 F.3d at 602.

---

[5] The CIA contends that "policy considerations" provide a separate justification for treating the Report as a congressional record.  *See* Def. Mot. 12–13.  But the Supreme Court's and D.C. Circuit's "agency record" tests already accommodate those policy considerations.  *See, e.g.*, *Judicial Watch*, 726 F.3d at 221 (where Congress's intent to control is clearly and affirmatively expressed, policy factors weigh in favor of due deference to that intent); *see also, e.g.*, *United We Stand*, 359 F.3d at 599 (describing how "policy considerations unique to the congressional context" resulted in the D.C. Circuit's rejection of a simple "agency possession" test for agency records).  Accordingly, this Court's only task is to determine whether the Report is an "agency record" within the meaning of that precedent.

The CIA's factual presentation essentially consists of two documents: a June 2009 letter, and a December 2012 email. Neither communication provides a clear expression of congressional intent to control the Report. *Cf., e.g.*, *Holy Spirit Ass'n for the Unification of World Christianity v. Cent. Intelligence Agency*, 636 F.2d 838, 842 (D.C. Cir. 1980) (requiring a "clear assertion" of congressional control), *vacated in part on other grounds*, 455 U.S. 997 (1982).

As described in the Higgins Declaration, the June 2009 letter is utterly irrelevant: it limits the CIA's use of SSCI documents *created* at CIA facilities and *stored* on a CIA computer system. *See* Higgins Decl. ¶ 8. Under the circumstances—whereby the SSCI was forced to store its "internal work product"[6] with the Agency it was monitoring—it is wholly unsurprising that the SSCI imposed restrictions on CIA access to that work product. *See* Higgins Decl. ¶ 8 ("One key principle necessary to this inter-branch accommodation . . . was that the materials created by SSCI personnel *on this segregated shared drive* would not become 'agency records' even though this work product was being *created and stored on a CIA computer system*." (emphasis added)).

Conclusively for the purposes of this motion, the Higgins Declaration makes plain that the Report is not one of "these records" created and stored at the Agency:

> As sections of the report reached a certain stage, the SSCI worked with the CIA information technology and security personnel to transfer these drafts from the segregated shared drive to the SSCI's secure facilities at the U.S. Capitol complex so that the Committee could complete the drafting process in its workspaces. Presumably, the SSCI made additional changes to these draft sections following the transfers. Thus, it is the Agency's understanding that the adopted version of the Report that SSCI subsequently provided to the Agency does not reside on the segregated shared drive . . . .

---

[6] Press Release, Sen. Feinstein, Statement on Intel Committee's CIA Detention, Interrogation Report (Mar. 11, 2014), http://1.usa.gov/1cyQxJo. Senator Feinstein's recent speech defending separation of powers principles focused on the CIA's access to this preliminary "internal work product" created and stored at a CIA facility.

Higgins Decl. ¶ 9.  In other words, the restrictions imposed by the SSCI on access to its materials

in the June 2009 letter do not govern the Report.  Indeed, the Higgins Declaration admits as

much: "the restrictions governing the information on that shared drive have *informed* how the

CIA has treated all versions of the SSCI's work product . . . including the version of the Report

adopted by the SSCI."  Higgins Decl. ¶ 9 (emphasis added).  If these restrictions governed the

SSCI-approved Report, the letter would "restrict"—not merely "inform"—the CIA's treatment

of the Report.

      The CIA argues that the SSCI "has provided no indication" that the Agency should treat

the Report differently from the draft documents on the CIA shared drive.  Def. Mot. 4.  But this

is not the relevant legal test.  The CIA must show that Congress has clearly asserted its intent to

control the Report.  The June 2009 letter does not evidence such a clear assertion.  In fact, it

undermines the CIA's argument: it shows that the SSCI understood how to assert control over

documents it intended to control.  The absence of a similar statement by the SSCI concerning the

Report compels the conclusion that the Report is an agency record.  *See, e.g.*, *United We Stand*,

359 F.3d at 602 (congressional objections to disclosure failed to "manifest the clear assertion of

congressional control that our case law requires").

      Recent events have dramatically confirmed this understanding of the June 2009 letter.

The Chairman of the SSCI recently accused the CIA of having interfered with the Committee's

investigation by searching the Committee's CIA-provided computer system, which contained the

Committee's internal work product.  *See* Press Release, Sen. Feinstein, Statement on Intel

Committee's CIA Detention, Interrogation Report (Mar. 11, 2014), http://1.usa.gov/1cyQxJo.

The SSCI has expressed no similar concerns over the CIA's review and reliance upon the Report,

however—indicating that the restrictions governing the SSCI's internal work product do not govern the Report.

Even if the June 2009 letter could be construed as addressing the Report, it is insufficient evidence of control for two reasons: it was not contemporaneous with the transmission of the Report, and it is too general in its prohibitions.  In *Paisley v. Cent. Intelligence Agency*, 712 F.2d 686 (D.C. Cir. 1983), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984), the D.C. Circuit rejected the CIA's argument that a series of letters between the SSCI and the CIA were sufficient evidence of congressional intent to control certain documents.  The letters "indicate[d] the Committee's desire to prevent release without its approval of any documents generated by the Committee . . . .  However, there is no discussion of any *particular* documents or of any *particular criteria* by which to evaluate and limit the breadth of this interdiction."  *Id.* at 695 (emphasis added); *see also Holy Spirit*, 636 F.2d at 842 & n.5 (transfer memorandum from Congress applying to one set of documents sent to the CIA did not apply to a second set of documents about the same investigation).  Like the letters in *Paisley*, the June 2, 2009 letter from the SSCI to the CIA refers in the abstract to "draft and final recommendations, reports, or other materials generated by Committee staff or Members."  Higgins Decl. ¶ 8.  This letter is "too general and sweeping," *Paisley*, 712 F.2d at 695, to provide sufficient proof of congressional intent to control the Report.

The CIA's second piece of evidence, the SSCI's December 2012 email, stated simply that the Committee "will only provide copies of the report to specific individuals who are identified in advance."  Higgins Decl. Ex. D.[7]  It placed no limits on the CIA's distribution of the Report.

---

[7] Although the CIA's memorandum states that the email "not[ed], by way of reference, that another agency had a mere two names on its list of cleared individuals," Def. Mot. 9, this is

*See id.*  In other words, the SSCI imposed no more than a notice requirement, and a weak one at that; it did not even request identification of all personnel who would *access* the Report.  *See id.*

Although the CIA later authorized additional Agency personnel to access the Report, the Higgins Declaration notably omits any discussion of whether the CIA first requested permission from the SSCI or even informed it of that fact.  *See* Higgins Decl. ¶ 12 & n.5.  Either could be evidence of SSCI, as opposed to Agency, control; neither is in the record before the Court.

In any event, the CIA has not shown that the SSCI sought the list of names for its own purposes, rather than at the CIA's behest.  Indeed, prior CIA statements suggest that the SSCI kept such a list because it was required to do so by the *CIA*, in order to protect the Agency's asserted classification authority.  *See, e.g.*, Decl. of Leon E. Panetta, Director, Central Intelligence Agency ("Panetta Decl.") ¶ 30, *Am. Civil. Liberties Union v. Dep't of Def.*, No. 04-cv-4151 (S.D.N.Y. Jun. 8, 2009), ECF No. 352, http://1.usa.gov/1iH7Ydv ("As the executive agent for implementing the terrorist detention and interrogation program, the CIA is responsible for limiting access to such information[.]").

The CIA also asserts that, because the SSCI might create a second version of the Report, the SSCI controls the Report at issue here.  *See* Def. Mot. 9.  But the Agency's conclusion does not follow.  Contrary to the CIA's characterizations, the Report is not a draft document.  It was formally adopted by a majority vote of the SSCI, and according to Senator Feinstein, it is a "comprehensive review of the CIA's detention program," complete with 20 findings and conclusions.  Press Release, Sen. Feinstein, Feinstein Statement on CIA Detention, Interrogation Report (Dec. 13, 2012), http://1.usa.gov/SXEWHH; *see also* S. Rep. No. 113-7, at 14 (Mar. 22, 2013) (noting that the six SSCI members who voted against approving the Report "explained

---

inaccurate.  *See* Higgins Decl. Ex. D.  The CIA appears to be referring to an email exhibit in the related case, *Leopold v. Department of Justice*, 13-cv-1324 (JEB).

their reasons for opposing the final report").  Similarly, Senator Mark Udall's (and others')

requests to the Executive Branch to declassify the Report underscore its status as a complete

document in its own right. [8]  *See, e.g.*, Press Release, Sen. Udall, Video at Bush Presidential

Library Underscores Need for CIA, White House to 'Come Clean' About Detention,

Interrogation Program (Apr. 26, 2013), http://1.usa.gov/1qkuGcr (describing Sen. Udall's efforts

"to ensure that the [CIA] corrects the record on the Bush administration's detention and

interrogation program and declassifies the Senate Select Committee on Intelligence's more than

6,000-page report on the program").  Moreover, the fact that the SSCI might approve a second,

*updated* document does not evidence control over the Report that it has already officially

approved.

* * * * *

In short, the CIA has not clearly demonstrated that Congress intended to retain control of

the Report.  Rather, the only evidence it points to is either irrelevant (because it does not address

the Report) or insufficient (because it does not demonstrate control).  Because the CIA has not

---

[8] The CIA rightly does not contend that the Report's classification markings are indicative of
congressional control, *see* Def. Mot. 8–10, likely because those markings reflect only the CIA's
classification of the underlying content.  *Cf. Goland v. Cent. Intelligence Agency*, 607 F.2d 339,
343, 346 (D.C. Cir. 1978) (where Congress, relying on its own power "rooted in the
Constitution, longstanding practice, and current congressional rules" had designated a transcript
as "Secret," and where the transcript could be revealed only by Congress, this weighed in favor
of a finding that the document was a congressional record), *vacated in part on other grounds*,
607 F.2d 367 (D.C. Cir. 1979).  Instead, the Higgins Declaration refers to the Report's
"additional access restrictions noted based on the sensitive compartmented information contained
therein."  Higgins Decl. ¶ 12.  These access restrictions, however, were in all likelihood imposed
by the National Security Council or the CIA itself.  *See, e.g.*, Panetta Decl. ¶ 30 (CIA is
responsible for limiting access to information about its "detention and interrogation program");
*see also, e.g.*, Exec. Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009) (Congress is not an
"original classification authority").  In other words, the CIA's classification of the Report
suggests CIA—not congressional—control.

shown a "clear assertion" of congressional control over the Report, the first *Burka* factor weighs in favor of Plaintiffs.

2.   The CIA can freely use the Report.

While the CIA contends that the SSCI provided the Report to the Agency for the "specific and limited purpose of soliciting edits and comments," Def. Mot. 9, the CIA's actions reveal that it has used and will use the Report for far broader purposes.  Accordingly, the second *Burka* factor—which assesses the agency's ability to use the document—weighs in Plaintiffs' favor.  *See Burka*, 87 F.3d at 515.

Not only has the Agency "conducted a thorough review of the Report" and "drafted a lengthy response," Higgins Decl. ¶ 12, but it appears to have instituted certain reforms in response to the Report's findings.  *See* Jane Mayer, *Top C.I.A. Lawyer Sides with Senate Torture Report*, The New Yorker, Oct. 17, 2013, http://nyr.kr/1dlZ42k (according to a CIA spokesperson, though the Agency disputed aspects of the Committee's study, it "agreed with a number of the Senate study's findings and had taken steps to address shortcomings identified by the report").  This is not surprising.  The SSCI produced the Report in part to ensure various reforms by the CIA.  The CIA's litigation position in this case—that it may do nothing more with the Report than review it for accuracy—would surely surprise the SSCI.  Indeed, during a hearing on his nomination to serve as CIA Director, John Brennan indicated that he would make portions of the Report required reading for senior personnel at the Agency, as the critical portions he had read raised "very serious issues," and he was "looking forward to taking advantage of whatever lessons come out of this chapter in our history and this Committee's report."  U.S. Senate Select Committee on Intelligence, Transcript, *Open Hearing on the*

*Nomination of John O. Brennan to be Director of the Central Intelligence Agency* ("Brennan

Transcript") 23:2–4; 44:7–9 (Feb. 7, 2013), http://1.usa.gov/Ph7rCk.

The CIA does not dispute that it has used the Report, arguing instead that the use was

"limited."  Def. Mot. 11.  But the statements by Director Brennan and the CIA spokesperson

belie that characterization; the Report was read at the uppermost echelon of the Agency, and it

has apparently resulted in institutional reforms.  This "nexus between the agency's work and the

record[]" supports an agency record finding.  *Wash. Post v. Dep't of Homeland Sec.*, 459 F.

Supp. 2d 61, 71 (D.D.C. 2006) (quoting *Bureau of Nat. Affairs, Inc. v. U.S. Dep't of Justice*, 742

F.2d 1484, 1491 (D.C. Cir. 1984)).

The CIA also offers the conclusory assertion that it cannot disclose the Report without

the SSCI's approval.  *See* Def. Mot. 11; Higgins Decl. ¶ 15.  It provides no evidence, however, to

support such a conclusion.[9]  Even if the CIA believes that it cannot use the Report without the

SSCI's authorization, that belief is irrelevant: what matters is not the CIA's belief about what is

permitted, but whether the Agency actually has the authority to use the Report.  As explained

above, the CIA has not shown that the SSCI controls the document.

3.  CIA personnel, including its Director, have read and relied upon the Report.

Several of the considerations relevant to the second *Burka* factor are also relevant to the

third *Burka* factor, which concerns the extent to which agency personnel have read or relied upon

the document.  *See Burka*, 87 F.3d at 515.  These considerations support a finding of agency

control.  Specifically, the CIA's thorough review and lengthy response to the Report, the fact that

the CIA increased the number of officers with access to the Report for the review and response,

[9] The record actually supports the opposite inference: that the Agency can use the Report.
Specifically, the CIA "increas[ed] the number of officers who had access to the Report," Higgins
Decl. ¶ 12—and there is no evidence that it requested permission to do so or notified the SSCI of
that fact.

and Director Brennan's public commitment to assigning portions of the Report as required

reading for senior CIA personnel, all demonstrate that the Agency read and relied upon the

Report.

The contexts in which courts have found that an agency has not read or relied on a report

are quite different from this one.  *See, e.g.*, *Judicial Watch, Inc. v. Fed. Hous. Fin. Agency*, 646

F.3d 924, 928 (D.C. Cir. 2011) (third *Burka* factor weighed against FOIA requester where the

agency had never consulted the records, and "disclosure of the requested records would reveal

nothing about decisionmaking" at the agency); *Cause of Action v. Nat'l Archives & Records

Admin.*, 926 F. Supp. 2d 182, 188–89 (D.D.C. 2013) (third *Burka* factor weighed against FOIA

requester where the agency was "merely a repository" for the records, and its personnel did not

act in reliance on the documents).

The CIA cites *McErlean v. Department of Justice*, No. 97-cv-7831, 1999 WL 791680, at

*11 (S.D.N.Y. Sept. 30, 1999), a case in which the use of records by only two attorneys weighed

against an agency record finding.  *McErlean* is inapposite for two reasons.  First, setting aside

the actual number of CIA personnel with access to the Report, this case involves a critically

important document, read and relied upon at the highest level of the Agency—including by the

Director himself.  *See* Brennan Transcript at 23:2–4 ("I have read the Findings and Executive

Summary of the 6,000-page report, which raises a number of very serious issues.").  Second,

although the CIA has not disclosed the number of Agency personnel who have been granted

access to the Report, the Higgins Declaration suggests that the number is considerably greater

than two.  *See* Higgins Decl. ¶¶ 10–11 & n.4.

The CIA also contends that the Report was not "relied upon in the course of unrelated

CIA business."  Def. Mot. 12.  That is irrelevant.  *Cf. Judicial Watch*, 726 F.3d at 219 (even

where agency read documents for "limited purposes," "the agency read[] and relie[d] upon the documents for those purposes without restriction, and the third factor requires no more").  The Report concerns one of the most significant programs of the Agency of the past decade.  The CIA continues to deal with the repercussions of its decision to torture detainees, and it has apparently agreed with several of the Report's recommendations for reform.  These facts strongly support a finding of CIA reliance on the Report.  Thus, the third *Burka* factor weighs in favor of Plaintiffs.

    4.   <u>The CIA appears to have integrated the Report into its files.</u>

The record before the Court strongly suggests that the CIA has integrated the Report into its files, and consequently, the fourth *Burka* factor also weighs in favor of a finding of agency control.  *See Burka*, 87 F.3d at 515.  In particular, the CIA's thorough review and response to the Report, *see* Higgins Decl. ¶ 12, at the very least imply some degree of integration into the Agency's computer systems.  Similarly, the fact that the CIA has "taken steps to address shortcomings identified by the report" also indicates that the Report's content has been integrated into the Agency's files.  *See* Mayer, *Top C.I.A. Lawyer Sides with Senate Torture Report*, http://nyr.kr/1dlZ42k.

The CIA's sole argument to the contrary is its conclusory assertion that "the CIA has not integrated the SSCI Report into the CIA files or records systems."  Higgins Decl. ¶ 12; *see also* Def. Mot. 5.  However, without more specific information about what the CIA means by "not integrated," this Court cannot find that the fourth *Burka* factor favors the CIA.  *See Consumer Fed. of Am. v. Dep't of Agric.*, 455 F.3d 283, 290–91 (D.C. Cir. 2006) (where requested documents were accessed by agency officials and "not just 'stored'" in agency offices, it was "not at all clear" whether the documents were integrated into agency files).

Finally, as explained *supra*, there is no evidence that the June 2009 letter—which prohibited the CIA from integrating the SSCI's internal work product into its files—governs the terms under which the CIA stores and uses the Report, which was transmitted from the SSCI to the Agency over three years later.  *See* Higgins Decl. ¶ 8.  Accordingly, the CIA has failed to show that this factor weighs in favor of finding that the SSCI has clearly asserted control over the Report.

**II. In the alternative, Plaintiffs are entitled to limited discovery.**

Because the Agency has failed to meet its burden of showing that the Report is not an agency record, the Court should order the CIA to process the Report for release.  If the Court disagrees, however, or if it decides the record is inconclusive, it should permit Plaintiffs limited discovery.  *See, e.g.*, *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001) ("We have previously required that plaintiffs be given an opportunity for discovery of facts necessary to establish jurisdiction prior to decision of a 12(b)(1) motion."); *El-Fadi v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996) (although plaintiff's jurisdictional allegations were insufficient, "he has sufficiently demonstrated that it is possible that he could supplement them through discovery"); *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992) ("[T]his Court has previously indicated that ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts necessary to establish jurisdiction."); *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 361 (D.C. Cir. 1982) (on a Rule 12(b)(1) motion, "a court need not consider matters outside the pleadings at all.  But once it decides to consult such matters it should so inform the parties and set a schedule for submitting additional affidavits and documents if the parties wish.").

Both this court and the D.C. Circuit have recognized that discovery is appropriate in FOIA litigation where the defendant seeks to dismiss for lack of subject matter jurisdiction and the record is insufficiently developed.  *See, e.g.*, *Citizens for Responsibility and Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 221, 225 (D.C. Cir. 2009) (in FOIA lawsuit, district court allowed the parties limited discovery on jurisdictional question; the defendant "produced more than 1300 pages of records about its responsibilities, provided a sworn declaration by its general counsel, and submitted its director to a deposition"); *see also Cong. Info. Serv., Inc. v. U.S. Gov't Printing Office*, No. 86-3408, 1987 WL 9509, at *1 (D.D.C. Apr. 7, 1987) (denying government's motion to dismiss FOIA suit under Fed. R. Civ. P. 12(b)(1) and (b)(6) because "further discovery may shed light on the jurisdictional issue," and "the question of document control would be more intelligently decided after factual discovery").[10]  For the same reasons that Rule 12(b)(1) motions should be "granted sparingly"—"to make certain that the plaintiff is not improperly denied a right to have his claim adjudicated on the merits"—Plaintiffs are at least entitled to limited discovery into the CIA's control of the Report.  *Neighborhood Assistance Corp. of Am. v. Consumer Fin. Prot. Bureau*, 907 F. Supp. 2d 112, 121 (D.D.C. 2012) (internal quotation marks omitted).

---

[10] Courts have permitted discovery during the litigation of other questions under FOIA as well. *See, e.g.*, *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976) (noting that, on remand, the requester "should be allowed to seek appropriate discovery when necessary to clarify the Agency's position or to identify the procedures by which [its withholding] position was established"); *see also id.* at 1014 n.12 (describing the scope of discovery); *Scudder v. Cent. Intelligence Agency*, No. 12-cv-807, 2014 WL 954830, at *23–25 (D.D.C. Mar. 12, 2014) (granting plaintiff's motion for discovery and/or an evidentiary hearing to resolve disputed material facts); *Military Audit Project v. Bush*, 418 F. Supp. 880, 880 (D.D.C. 1976) (assessing defendants' response to interrogatories served by FOIA plaintiffs; defendants' inadequate response warranted *in camera* inspection of documents covered by plaintiffs' request).

Plaintiffs anticipate that a limited set of interrogatories would provide sufficient clarification of the record. Those interrogatories would include:

- When the SSCI sent the Report to the CIA after its adoption, did the SSCI expressly state that it intended the Report to remain a "congressional record" within the meaning of FOIA? (Relevant to *Burka* factor one.)

- Does the CIA contest whether its personnel relied on the Report and took steps to address shortcomings identified by the Report? If so, explain how and why. (Relevant to *Burka* factors two, three, and four.)

- How was the Report shared within the CIA? (Relevant to *Burka* factors one, two, three, and four.)

  - How many individuals' names were initially provided to the SSCI in response to the December 13, 2012 email? (Relevant to *Burka* factors two and three.)

  - How many individuals at the CIA eventually gained access to the Report or portions of the Report? (Relevant to *Burka* factors two, three, and four.)

  - Did the SSCI ask the CIA to seek its consent and/or provide notice before authorizing additional Agency personnel to access the Report? (Relevant to *Burka* factors one and two.)

  - Did the CIA request permission from the SSCI prior to any expansion of the list of personnel with access to the Report? (Relevant to *Burka* factors one, two, and three.)

  - When the CIA expanded the list of personnel with access to the Report, did the CIA give prior notice to the SSCI? If yes, did the CIA contemporaneously provide the SSCI with an updated list of those names? (Relevant to *Burka* factors one and two.)

- What limits did the CIA's (or Executive Branch's) classification of information in the Report place on the SSCI's ability to disclose or disseminate the Report to others? (Relevant to *Burka* factors one and two.)

  - Did the CIA (or Executive Branch) impose any other constraints on the SSCI's use or dissemination of the Report? (Relevant to *Burka* factors one and two.)

- The CIA has stated that it has not integrated the Report into its records systems or files. Describe how the Agency could thoroughly review and respond to the Report without integrating the Report into its files. (Relevant to *Burka* factors two, three, and four.)

## CONCLUSION

For the foregoing reasons, the Court should deny the CIA's motion to dismiss in part for lack of jurisdiction.  In the alternative, it should permit limited discovery into the relevant facts. Plaintiffs respectfully request oral argument.

Respectfully submitted,

*/s/ Hina Shamsi*

Hina Shamsi (D.C. Bar No. MI0071)
Alex Abdo (*pro hac vice*)
Ashley Gorski (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2500
Fax: (212) 549-2654
hshamsi@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
  of the Nation's Capital
4301 Connecticut Ave. NW, Suite 434
Washington, D.C. 20008
Phone: (202) 457-0800
Fax: (202) 457-0805
artspitzer@aclu-nca.org

*Counsel for Plaintiffs*

Dated: March 14, 2014