# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, and AMERICAN CIVIL LIBERTIES UNION FOUNDATION, )<br><br>Plaintiffs, )<br><br>v. )<br><br>CENTRAL INTELLIGENCE AGENCY, et al. )<br><br>Defendants. ) | Civil Action No. 1:13-cv-01870 (JEB) |

## GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT

The government hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56.

The reasons for this motion are set forth in the accompanying memorandum.

Dated: January 21, 2015

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

RONALD C. MACHEN, Jr.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division

  _/s/ Vesper Mei_
VESPER MEI (D.C. Bar 455778)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch

20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 514-4686
Fax:  (202) 616-8470
E-mail: vesper.mei@usdoj.gov

***Counsel for the Government***

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION, and AMERICAN CIVIL LIBERTIES UNION FOUNDATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:13-cv-01870 (JEB) |
| v. | ) ) | |
| CENTRAL INTELLIGENCE AGENCY, et al. | ) ) ) | |
| Defendants. | ) ) | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

**STATEMENT**

Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, plaintiffs

American Civil Liberties Union and American Civil Liberties Union Foundation seek from the

Central Intelligence Agency ("CIA") records constituting what they refer to as the "Panetta

Report," an alleged CIA report concerning its former detention and interrogation program, which

Senator Mark Udall referred to on December 17, 2013, during the confirmation hearing for the

CIA's General Counsel (referred to as "Request II" in plaintiffs' complaint).[1]  As described

below, these records are pre-decisional, deliberative draft documents, and are fully exempt from

release under FOIA Exemption 5.  In addition, portions of them are also exempt from disclosure

---

[1] The Declaration of Martha Lutz, filed as Exhibit 1 to this motion, refers to the documents comprising the "Panetta Report" as "Draft Reviews" or "Reviews."  For consistency and ease of reference, this motion will refer to them in the same way.

under FOIA Exemptions 1 and 3.  Accordingly, summary judgment should be granted to the

government on plaintiffs' claim for the Panetta Report in this case.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   PROCEDURAL BACKGROUND

By letter dated December 19, 2013, plaintiffs submitted a FOIA request for what they

called the "Panetta Report."  Their FOIA request specifically sought the following:

> a report commissioned by former Central Intelligence Agency ("CIA") Director Leon
> Panetta on the Agency's detention and interrogation programs (the "Panetta Report"),
> which was referred to by Senator Mark Udall on December 17, 2013, during the
> confirmation hearing for CIA General Counsel Caroline Krass.

Lutz Decl. ¶ 5; Exhibit A thereto.

By letter dated December 24, 2013, the CIA indicated that it would accept and process

the plaintiffs' request, but that it was unlikely that the CIA would be able to respond to the

request within 20 working days.  Lutz Decl. ¶ 6; Exhibit B thereto.

On January 27, 2014, plaintiffs amended their complaint in this lawsuit to include a claim

relating to the "Panetta Report."  Lutz Decl. ¶ 7; Pls' Amended Complaint (ECF No. 15).  At

that time, the CIA had not yet issued a substantive response to the ACLU's request.  The CIA

interprets plaintiffs' request to be seeking the most current version of what plaintiffs call the

"Panetta Report."  *Id.*

---

[2] In this lawsuit, plaintiffs also seek the release from the CIA, the Department of Defense
("DOD"), the Department of Justice ("DOJ"), and the Department of State ("DOS"), of the full
Senate Select Committee on Intelligence ("SSCI") report concerning the CIA's former detention
and interrogation program ("SSCI Report").  That claim is addressed in the Government's
Motion to Dismiss, filed separately today.  In addition, plaintiffs also initially sought the CIA's
Response to the SSCI Report.  It, along with the Executive Summary and Findings and
Conclusions of the SSCI Report (which plaintiffs did not separately seek), was released on
December 9, 2014.  By email dated December 11, 2014, plaintiffs notified the government that
they do not intend seek any further relief with respect to either the CIA Response or the SSCI
Report Executive Summary.

## II.      NATURE OF THE RECORDS AT ISSUE

### A.      Purpose of the Draft Reviews.

What plaintiffs have called the "Panetta Report" is a series of more than forty draft documents related to the CIA's former detention and interrogation program.  Lutz Decl. ¶ 8.  These drafts were envisioned as background briefing documents on different topics that Director Panetta and other senior CIA leaders could consult when making policy decisions in connection with SSCI's study of the former detention and interrogation program.  *Id.* ¶¶ 8, 10.

In March 2009, SSCI announced that it intended to study the CIA's former detention and interrogation program.  Lutz Decl. ¶ 11.  In connection with this study, SSCI and the CIA reached an inter-branch accommodation that allowed designated Committee staff to have unprecedented direct access to millions of pages of unredacted CIA documents.  *Id.*  This posed unique challenges.  First, the CIA had to locate relevant documents and make them available to the SSCI while protecting the security of the classified information contained in the documents.  Second, given the immense volume of documents being produced, the CIA sought a means to efficiently keep track of significant information contained in the documents in order to inform the Director and other senior leaders.  *Id.*

The CIA delegated responsibility for the both issues to an office called the Director's Review Group for Rendition, Detention, and Interrogation.  Lutz Decl. ¶¶ 12-13.  That office was responsible for facilitating SSCI's access to CIA documents.  Two of its primary functions in that regard were: (1) coordinating the search for and collection of documents within CIA and (2) making responsive documents available to SSCI staff.  *Id.* ¶ 12.  Responsibility for tracking information being made available to SSCI also fell to the Director's Review Group.  *Id.* ¶ 13.  A team was formed to review and summarize the documents that had been produced.  *Id.* ¶ 14.

3

That team, known as the Special Review Team, created the Draft Reviews at issue here.  The Special Review Team's primary mission was to review and summarize key information found in the documents being produced to SSCI.  Lutz Decl. ¶ 14.  Around the time SSCI began its study, Director Panetta had expressed a desire to remain informed about what was contained in the millions of pages of documents that would be made available to the Committee.  *Id.* ¶ 13.  The Draft Reviews were prepared in response to Director Panetta's request as a means of informing the Director and other senior CIA leaders of the key information found in the produced documents.  *Id.*  ¶ 13.  The Special Review Team generally tended to consist of approximately ten employees and contractors with varying backgrounds and levels of experience, who were temporarily detailed from other CIA components.  *Id.* ¶ 14.

The Draft Reviews were intended to inform policy decisions in connection with the Committee's multi-year inquiry into the former detention and interrogation program.  Lutz Decl. ¶ 8.  Congressional inquiries of such significance and magnitude require substantial engagement by an agency's senior leadership, who may have to make a broad range of decisions regarding the appropriate agency response to issues as they arise.  *Id.*  The drafts were intended to inform CIA leaders' decision-making by highlighting the most noteworthy information contained in the millions of pages of documents being made available to SSCI in connection with its study.  *Id.* For example, the Reviews could have been used to prepare an accurate and timely response to the Committee's eventual report; to anticipate developments that might arise in connection with the Committee's study; to inform interactions with the Committee; and to prepare for interagency discussions within the Executive Branch regarding the study.  Lutz Decl. ¶ 22**.**

However, the project never reached fruition.  The Special Review Team worked on the drafts between mid-2009 and mid-2010, at which point work was suspended.  The records

generated by the Special Review team remain in draft form, were never completed, and were not presented as final products to the Director or other senior CIA leaders.  Lutz Decl. ¶ 9.

###### B.    Description of Draft Reviews.

The format and focus of the Draft Reviews varied over time, but the central purpose remained essentially the same.  Lutz Decl. ¶ 15.  The leaders of the Special Review Team assigned each team member one or more research topics.  *Id.*  The team members searched for documents provided to SSCI related to their assigned topic, reviewed those documents, and determined whether certain contents of those documents might inform senior CIA leaders in connection with SSCI's study.  *Id.*  When the team members identified information they believed was significant on a given topic, they described that information in their Draft Review.  The intent, over time, was for each Draft Review to become a rough guide to noteworthy information on a particular topic.  *Id.*  The Special Review Team anticipated that it would eventually disseminate the Reviews to senior CIA leaders – and ultimately the Director – for their use in making policy decisions related to the SSCI study.  *Id.*

In creating the Draft Reviews, the Special Review Team members necessarily had to make judgments about what information would best inform senior CIA leaders and what information could be omitted.  Lutz Decl. ¶ 16.  Their purpose was to review the vast number of documents being made available to SSCI, extract and summarize what they saw as the most pertinent information from those documents, and organize that information in a way that would be most useful to senior CIA officials.  Lutz Decl. ¶ 16.

When the Special Review Team stopped its work in 2010, the Reviews remained incomplete, covered less than half of the millions of pages of documents that the CIA ultimately made available to the SSCI, and had not been reviewed or relied upon by the CIA's senior

leadership.  Lutz Decl. ¶ 19.  Some of the Draft Reviews contained only rough notes regarding

some relevant documents; others had undergone preliminary editing and formatting in

preparation for their review by the Chief of the Director's Review Group.  *Id.*  If the Special

Review Team's efforts had gone on, team members would have continued to update their drafts

as they reviewed new documents and learned new information.  *Id.*  The documents would likely

have been reviewed and edited by a number of senior CIA officials – including the Deputy

General Counsel for Litigation and Investigations, the General Counsel, the Director's Chief of

Staff, the Executive Director, and the Deputy Director – before being presented to the Director as

finished products.  *Id.*  Because the project was suspended, however, that senior review of the

Drafts was never commenced.  *Id.*

 Each of the Draft Reviews is stamped "DELIBERATIVE PROCESS PRIVILEGED

DOCUMENT" at the top of every page, and most of the documents are marked "DRAFT" on

every page as well.  Lutz Decl. ¶ 20.  Each document also bears the following language at the top

of the first page:

> This classified document was prepared by the CIA Director's Review Group for
> Rendition, Detention, and Interrogation (DRG-RDI) for DRG-RDI's internal discussion
> purposes and should not be used for any other purpose, nor may it be distributed without
> express permission from DRG-RDI or CIA's Office of General Counsel.  This document
> contains [certain classified information].  This document also contains material protected
> by the attorney-client and attorney work-product privileges.  Furthermore, this document
> constitutes deliberative work product, protected by the deliberative-process privilege, and
> is not a final, conclusive, complete, or comprehensive analysis of DRG-RDI or CIA.
> Rather, it was created to suit the needs of DRG-RDI, in support of informing senior
> Agency officials about broad policy issues.  While every effort was made to ensure this
> document's accuracy, it may contain inadvertent errors.  For this reason, and because this
> document selectively summarizes, draws inferences from, or omits information from the
> sources it cites, it should not be relied upon by persons outside DRG-RDI.

Lutz Decl. ¶ 20.

## ARGUMENT

FOIA, 5 U.S.C. § 552, represents a balance struck by Congress "'between the right of the public to know and the need of the Government to keep information in confidence.'"  *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (quoting H.R. Rep. No. 89-1497 (1966), reprinted in 1966 U.S.C.C.A.N. 2418).  Thus, while FOIA requires agency disclosure under certain circumstances, the statute recognizes "that public disclosure is not always in the public interest."  *Baldrige v. Shapiro*, 455 U.S. 345, 352 (1982).  Consequently, FOIA "provides that agency records may be withheld from disclosure under any one of the nine exemptions defined in 5 U.S.C. § 552(b)."  *Id.*  "These exemptions reflect Congress' recognition that the Executive Branch must have the ability to keep certain types of information confidential."  *Hale v. DOJ*, 973 F.2d 894, 898 (10th Cir. 1992), *vacated on other grounds*, 509 U.S. 918 (1993).  As the Supreme Court has stressed, the statutory exemptions must be construed "to have [a] meaningful reach and application."  *John Doe*, 493 U.S. at 152.

In a judicial review of an agency's response to a FOIA request, the agency has the burden of justifying nondisclosure, and the court reviews de novo the agency's action.  *See* 5 U.S.C. § 552(a)(4)(B); *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007).  Summary judgment is appropriate in a FOIA case when the agency's affidavits or declarations describe "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981).  In this case, the CIA has withheld the Draft Reviews in full under Exemption 5, and portions of the Reviews under Exemptions 1 and 3.  Or course, if the

Court were to determine that Exemption 5 applies, it need not address the applicability of Exemptions 1 and 3.

## I.   THE CIA PROPERLY WITHHELD THE DRAFT REVIEWS IN FULL PURSUANT TO EXEMPTION 5 AND THE DELIBERATIVE PROCESS PRIVILEGE.

FOIA Exemption 5 exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).   If a record qualifies under this standard, it is exempt from disclosure if it would be "normally privileged in the civil discovery context."  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see also United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799-800 (1984) (Exemption 5 incorporates civil discovery privileges).   Accordingly, Exemption 5 has been held to incorporate the privileges that are available to an agency in civil litigation, including the deliberative process privilege, the attorney-client privilege, and the attorney work-product doctrine.  *NLRB*, 421 U.S. at 148-49.   Here, the CIA withheld the Draft Reviews in full pursuant to Exemption 5, based upon the deliberative process privilege.

The deliberative process privilege exempts from mandatory disclosure documents that reflect pre-decisional agency deliberations, and has been recognized to fall under the auspices of Exemption 5.  *See NLRB*, 421 U.S. at 150-52; *Baker & Hostletler LLP v. Dep't of Commerce*, 473 F.3d 312 (D.C. Cir. 2006).   The privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *Department of Interior v. Klamath Water Users Protective Assoc.*, 532 U.S. 1. 8 (1998) (internal quotations omitted).   Consistent with these goals, the deliberative process privilege protects (among other

things) "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Disclosure of such documents "would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Id.*

Courts have typically said that the deliberative process privilege covers documents that are both "pre-decisional" and "deliberative." *E.g.*, *Nat'l Security Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014). A document is "pre-decisional" if it was "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Information Corp. v. U.S. Dept. of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992). A document is "deliberative" if it is intended to "facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Security Archive*, 752 F.3d at 463.

The Draft Reviews satisfy both criteria. To begin, they are pre-decisional because they were prepared to help the CIA Director and other senior agency leaders make policy decisions in connection with SSCI's study of the detention and interrogation program. Lutz Decl. ¶ 22. A congressional inquiry of this significance requires substantial engagement by an agency's senior leadership, who may need to make a broad range of decisions regarding the appropriate agency response to issues as they arise. *Id.* ¶ 8. But senior agency leaders do not have the time to personally review every document that might be relevant to their decision-making processes. Instead, they must rely on briefing documents like the Draft Reviews to highlight the information that is likely to be most relevant to whatever policy issues may arise. *Id.* Such documents are pre-decisional because they are designed to serve as aids to future decision-making rather than as official justifications for past or present decisions-making.

Because the Reviews were drafted with an eye toward a wide variety of policy issues that could have arisen over the course of SSCI's multi-year study, it is not possible to isolate a single, discrete agency decision to which the Reviews contributed.  But the deliberative process privilege does not turn on an agency's ability to pinpoint a specific decision; an agency need only identify the decision-making *process* to which the document would have contributed. *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991).  Here, the Draft Reviews would have contributed to the CIA's process of deciding how to respond to various policy issues that might have arisen in connection with an important congressional investigation. For example, senior CIA leaders could have consulted the Reviews to help prepare an accurate and timely response to the SSCI's eventual report; to anticipate developments that might arise in connection with the SSCI's study; to inform interactions with the SSCI; and to prepare for interagency discussions within the Executive Branch regarding the study.  Lutz Decl. ¶ 22.  That is all that is needed to bring the Reviews within the deliberative process privilege. *See, e.g.*, *Judicial Watch, Inc. v. CFPB*, --- F. Supp. 2d ----, 2014 WL 1245303, at *6 (D.D.C. Mar. 27, 2014) ("internal communications as part of an Executive Branch decision-making process regarding Congressional hearings are protected under the deliberative process privilege").

Several other features confirm the pre-decisional character of the Draft Reviews.  The CIA created the Special Review Team to review the documents being provided to the SSCI.  The members of the Special Review Team had no authority to speak on behalf of the entire Agency. Lutz Decl. ¶ 23.  Their work product—the Draft Reviews—simply reflected their personal judgments about what information might be useful to the CIA's senior leaders.  *Id*. ¶ 16.  The Reviews were not, and were never intended to be, official agency histories.  *Id*. ¶ 23.  Nor did the CIA ever adopt the Draft Reviews as its formal position, either directly or by reference.  The

CIA can call upon its staff of professional historians when an official history is needed.  *Id.*  That

is not what happened here.  Instead, this is exactly the type of subordinate-to-senior advisory

material that falls within the core of the deliberative process privilege.  *See Renegotiation Bd. v.*

*Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184-90 (1975) (documents are protected by the

deliberative process privilege if their authors have "no legal authority" to make a final decision

on behalf of the agency); *Coastal States*, 617 F.2d at 868 (documents prepared by a

"subordinate" for a "superior official" are "more likely to be predecisional").

There is a second, independent reason why the Draft Reviews are pre-decisional:  They

are *drafts*.  A draft document is by definition preliminary; because it is subject to revision, it

necessarily precedes any "final agency decision on the relevant matter."  *Nat'l Security Archive*,

752 F.3d at 463.  The Draft Reviews at issue here are no exception.  Had the Special Review

Team's efforts continued, the Draft Reviews would likely have undergone substantial editing as

the team members continued to review new documents and as senior CIA officials provided

feedback.  Lutz Decl. ¶ 24; *see also id.* ¶ 19.  Indeed, the language at the top of the Draft

Reviews makes this clear:  "This document constitutes deliberative work product, protected by

the deliberative-process privilege, and is not a final, conclusive, complete, or comprehensive

analysis of [the Director's Review Group] or CIA."  *Id.* ¶ 24.  Compulsory disclosure of raw,

unvetted documents like these would discourage staff members from thinking independently and

lead to public confusion about an agency's position—precisely what the deliberative process

privilege is designed to prevent, *see Petroleum Information Corp. v. U.S. Dep't of Interior*, 976

F.2d 1429, 1433 n.5 (D.C. Cir. 1992).

In addition to being pre-decisional, the Draft Reviews are also deliberative.  They were

plainly "intended to facilitate or assist development of the agency's final position" on the many

11

issues that might arise in connection with the SSCI study.  *Nat'l Security Archive*, 752 F.3d at

463.  And the authors' drafting decisions reflect the exercise of policy-oriented judgment.  To be

sure, the Reviews discuss factual material, and some cases have suggested that "purely factual"

material is not protected by the deliberative process privilege.  *See, e.g.*, *Dudman Commn's v.*

*Dep't of Air Force*, 815 F. 2d 1565, 1567-68 (D.C. Cir. 1987).  But the D.C. Circuit has made it

clear that the supposed distinction between facts and opinions should not be applied reflexively.

*Id.* at 1568; *Petroleum Information Corp.*, 976 F.2d at 1435.  The critical question is not whether

the material in question is factual, but rather whether "the selection or organization of facts is

part of an agency's deliberative process."  *Ancient Coin Collectors Guild v. Dep't of State*, 641

F.3d 504, 513 (D.C. Cir. 2011).

There is no question that the selection and organization of facts in the Draft Reviews was

part of the deliberative process here.  The members of the Special Review Team were asked to

review the vast number of documents being made available to SSCI, extract what they saw as the

most pertinent information from those documents, and organize that information in a way that

would be most useful to senior CIA officials.  Lutz Decl. ¶¶ 16, 25.  Indeed, that was the whole

point of the Reviews: to present senior CIA leaders with a carefully curated selection of a vast

body of facts.  *Id.*  To do that, the team members had to continually make judgments about what

information would best inform senior CIA leaders and what information should be omitted.  *Id*. ¶

16.  Each judgment about the salience of a particular fact, in turn, was guided by the team

members' understanding of the larger policy issues that senior CIA leaders might face in

connection with the SSCI's study.  Lutz Decl. ¶ 25.  And the same would have been true for the

additional layers of review that the Draft Reviews would have undergone:  Every set of revisions

would have involved countless policy-oriented judgments about what facts should be brought to the attention of senior CIA officials.

The D.C. Circuit has held that documents of this nature are shielded by the deliberative process privilege even though they could be described as "factual."  In *Montrose Chemical Corporation v. Train*, 491 F.2d 63 (D.C. Cir. 1974), for example, the court applied the privilege to two summaries of a 9,200 page administrative record prepared for the Administrator of the EPA by his staff.  It was undisputed that the summaries were "in large part compilations of facts introduced in evidence at the hearings, and on the public record."  491 F.2d at 67.  Yet, the D.C. Circuit nevertheless held that the summaries were deliberative.  "The work of the assistants in separating the wheat from the chaff," it reasoned, "is surely just as much part of the deliberative process as is the later milling by running the grist through the mind of the administrator."  *Id.* at 71.

In a similar vein, the court held in *Mapother v. Department of Justice*, 3 F.3d 1533 (D.C. Cir. 1993), that a report summarizing the evidence of an alleged Nazi's activities during World War II was privileged.  The court rejected a wooden fact/opinion dichotomy, looking instead to the larger purposes behind the deliberative process privilege.  *Mapother*, 3 F.3d at 1537-38.  It remarked that, in keeping with those purposes, it had previously "felt bound to shelter [from disclosure] factual summaries that were written to assist the making of a discretionary decision."  *Id.* at 1539.  That was because "the selection of the facts thought to be relevant" was itself part of the deliberative process, involving "'the formulation or exercise of . . . policy-oriented *judgment*' or 'the process by which *policy* is formulated,' in the sense that it requires 'exercises of discretion and judgment calls.'"  *Id.*  Because compilation of the World War II report involved

such policy-oriented judgments, the court concluded that most of the report's factual material was privileged under the same rationale.  *Id.*

Like the summaries at issue in *Montrose Chemical*, *Mapother*, and other cases,[3] the Draft Reviews were "assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action."  *Mapother*, 3 F.3d at 1539.  They are, accordingly, privileged.  Consideration of the policies behind the deliberative process privilege buttresses that conclusion.  Compelled disclosure of documents like the Draft Reviews would thwart one of Exemption 5's core purposes: Facilitation of sound agency decision-making through the protection of candid internal communications.  Background briefing documents are most useful to senior decision-makers when they include unvarnished discussions of the relevant facts.  Yet staff members may be tempted to portray the facts in the most flattering light, or to gloss over unfavorable facts, if they know their internal discussions will become public.  Self-censorship of that sort serves neither the policies behind the deliberative process privilege nor the FOIA's broader good-governance goals.  For all of these reasons, it is clear that the Draft Reviews are covered in their entirety by the deliberative process privilege.

Finally, Exemption 5 requires applies only to "inter-agency or intra-agency" material.  *See* 5 U.S.C. 552a(b)(5); *Klamath Water Users Protective Assoc., supra*.  There is no question that the Draft Reviews meet this criterion.  Moreover, as FOIA requires, the CIA reviewed the Draft Reviews to determine whether any portion of them was reasonably segregable.  5 U.S.C. 552 (b).  However, the CIA determined that it is not possible to segregate any non-deliberative,

---

[3] *See, e.g., Nat'l Security Archive*, 752 F.3d at 465; *Ancient Coin Collectors Guild*, 641 F.3d at 513-14; *Dudman Commn's*, 815 F.2d at 1569; *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1049 (D.C. Cir. 1982).

purely factual material because the selection of facts is part and parcel of the deliberative assessment.  Lutz Decl. ¶ 26; *see also Nat'l Security Archive*, 752 F.3d at 465 (draft agency history reflecting the "selection of the facts thought to be relevant" should not be "dissected by the courts" in an attempt to isolate non-deliberative factual material).  Requiring disclosure of any portion of these Reviews could well discourage such future candid reflection with respect to materials provided to Congress and to other agencies, and falls within the core of the type of information that the deliberative process privilege is designed to protect.  *Klamath Water Users Protective Ass'n*, 532 U.S. at 8-9.  Moreover, as drafts, the Draft Reviews fall entirely within the deliberative process privilege.  Accordingly, the CIA has correctly withheld them in full under Exemption 5.

## II.    THE CIA PROPERLY WITHHELD INFORMATION PURSUANT TO EXEMPTION 1.

While the CIA is withholding the Reviews in their entirety under Exemption 5 and the deliberative process privilege, the Draft Reviews also contain discrete pieces of information that are currently and properly classified up to the TOP SECRET level and are being withheld under Exemption 1.[4]  Lutz Decl. ¶ 36; E.O. 13526, §§ 1.4(c), 1.4(d).  Revelation of any of this information could reasonably be expected to cause damage, up to and including exceptionally grave damage to the national security of the United States.[5]  Lutz Decl. ¶ 36.  The CIA was fully justified in withholding this national security information.

---

[4] The CIA is not asserting Exemption 1 with respect to any information that has been declassified in connection with the December 9, 2014 release of the Executive Summary of SSCI's report. Lutz Decl. ¶ 29.

[5] The description in the public declaration of the potential harm to national security is necessarily general in nature.  If the Court requires more detail, the CIA can provide a supplemental classified declaration for the Court's review *in camera* and *ex parte*.  If, however, the Court

A.       **Requirements under Exemption 1.**

In a case concerning questions of national security, such as this one, the D.C. Circuit has instructed district courts to give "substantial weight to an agency's affidavit concerning the details of the classified status of the disputed record." *Salisbury v. United States*, 690 F.2d 966, 970 (D.C. Cir. 1982); *see also Gardels v. CIA*, 689 F.2d 1100, 1104-05 (D.C. Cir. 1982); *Assassination Archives and Research Ctr. v. CIA*, 177 F. Supp. 2d 1, 5-6 (D.D.C. 2001), *aff'd*, 334 F.3d 55 (D.C. Cir. 2003). This is because "the Executive departments responsible for national defense and foreign policy matters have unique insights into what adverse affects [sic] might occur as a result of a particular classified record." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009) (*quoting Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003)). Thus, in the national security context, "the government's burden is a light one." *ACLU v. Dep't of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011). And, "[t]he CIA's arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *Id.*

Exemption 1 protects records that are: (1) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (2) are in fact properly classified pursuant to Executive Order. *See* 5 U.S.C. § 552 (b)(1). Substantial weight is accorded to an agency's determination that potential harm merits classification of particular information. *See, e.g., Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999); *Military Audit Project*, 656 F.2d at 745; *Washington Post v. Dep't of Defense*, 766 F. Supp. 1, 6-7 (D.D.C. 1991). A court should be reluctant to second-guess such agency determinations in a FOIA case implicating national security. *Students Against Genocide v. Dep't*

---

agrees that the Draft Reviews are protected in their entirety under Exemption 5, the Court need not reach Exemption 1, and a supplemental classified declaration would be unnecessary.

*of State*, 257 F.3d 828, 837 (D.C. Cir. 2001); *Halperin v. CIA*, 629 F.2d 144, 148 (D.C. Cir. 1980).  Accordingly, summary judgment for the government in an Exemption 1 FOIA action should be granted on the basis of agency affidavits if they simply contain "reasonable specificity" rather than conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.  *Halperin*, 629 F.2d at 148.  Further, if after putting as much information on the public record as possible, it is still not possible to address adequately the withheld material without risking disclosure, the agency may submit additional explanations *in camera* and *ex parte*.  *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976); *Pub. Citizen, Inc. v. Dep't of State*, 100 F. Supp. 2d 10, 27 (D.D.C. 2000), *aff'd in part, rev'd in part on other grounds*, 276 F.3d 634 (D.C. Cir. 2002).

The relevant Executive Order currently in effect is E.O 13526, "Classified National Security Information."  E.O. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009).  Section 6.1(i) of the Executive Order defines "classified national security information" or "classified information" as "information that has been determined pursuant to this order or any predecessor order to require protection against unauthorized disclosure and is marked to indicate its classified status when in documentary form."  Section 6.1(cc) of the Order defines "national security" as the "national defense or foreign relations of the United States."

An agency can demonstrate that it has properly withheld information under Exemption 1 if it establishes that it has met the requirements of E.O. 13526.  Under E.O. 13526, information may be classified if:

> (1) an original classification authority is classifying the information;
>
> (2) the information is owned by, produced by or for, or is under the control of the United States Government;

17

(3) the information falls within one or more of the categories of information listed in section 1.4 of this order; and

(4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security, which includes defense against transnational terrorism, and the original classification authority is able to identify or describe the damage.

E.O. 13526, §1.1 (a); Lutz Decl. ¶ 28. The Executive Order also mandates that records be properly marked and that they cannot be classified for an improper purpose. E.O. 13526, § 1.7(a); Lutz Decl. ¶ 28.

**B.     The CIA Followed the Mandated Procedures.**

In determining that the information withheld under Exemption 1 is classified, the CIA has adhered to the mandated procedures. Ms. Lutz has been delegated original TOP SECRET classification authority by a written delegation of authority.  E.O. 13256, § 1.3(c)(2); Lutz Decl. ¶¶ 2, 30.  The information classified is within the control of the United States, and falls within the categories of information listed in E.O. 13256, § 1.4. Lutz Decl. ¶¶ 31, 32.  In this case, the documents contain information regarding the CIA's intelligence sources (including human and foreign government sources), intelligence methods (including cover, field installations, code words and pseudonyms, foreign intelligence relationships, and dissemination-control information), intelligence activities, and foreign relations or foreign activities.  Lutz Decl. ¶¶ 37-57.  Ms. Lutz properly determined that "the unauthorized disclosure of the information . . . reasonably could be expected to result in damage to the national security," and both identified and described that damage. E.O. 13526, § 1.1(a); Lutz Decl. ¶¶ 33, 37-57.  She also ensured that the procedural requirements were followed: that the documents were properly marked and classified for a proper purpose. Lutz Decl. ¶¶ 34-35.

**C.     The CIA Properly Withheld Information Concerning its Intelligence Sources, Methods, and Activities.**

### 1.    Intelligence Sources.

Information in the Draft Reviews is classified and withheld on the grounds that it

revelation of this information would disclose intelligence sources.  One of the major functions of

the CIA is to gather intelligence from around the world for the President and other United States

Government officials to use in making policy decisions. Lutz Decl. ¶ 37.  To accomplish this, the

CIA must rely on information from knowledgeable sources that it can obtain only under an

arrangement of absolute secrecy.  Intelligence sources will rarely furnish information unless they

are confident that they are protected from retribution or embarrassment by the absolute secrecy

surrounding the source-CIA relationship.  In other words, intelligence sources must be certain

that the CIA can and will do everything in its power to prevent the public disclosure of their

association with the CIA.  *Id*.  In this case, the information classified and withheld under

Exemption 1 includes information about human sources and foreign liaison and government

information.

### a.    Human sources.

The CIA cannot be an effective espionage agency if it cannot recruit and retain human

sources and keep their identities a secret.  Lutz Decl. ¶ 37-40.  If word were to spread that the

CIA had revealed the names of its sources and the information they provided, current human

sources would potentially cease working with the CIA.  *Id.* ¶ 39-40.  For such sources, disclosure

of their CIA relationship could cause hostile governments or organizations to take retaliatory

action against themselves or their families or associates, and could jeopardize individuals with

whom the source has had contact.  *Id. ¶* 38.  Further, those who might consider becoming

sources for the CIA might decide not to do so out of concern that the Agency would be unable to

protect their identities.  *Id.* ¶ 40.  That result would seriously and adversely affect the national security of the United States.

### b.      Foreign government sources.

The Draft Reviews contain foreign government information that is classified and withheld under Exemption 1.  The CIA relies on foreign governments as sources of intelligence. Lutz Decl. ¶ 41.  Both foreign intelligence services and individual foreign government officials provide sensitive information in strict confidence to the CIA on issues of importance to U.S. foreign relations and national security.  These services and officials of such services convey information to the CIA with the CIA's express agreement that the content of the information, as well as the mere fact of the relationship through which they have provided the information, will remain secret.  *Id.* ¶ 41.  If the CIA were to violate this express agreement, it could cause the foreign liaison service or foreign government official to limit or even end the CIA relationship, causing the U.S. Government to lose valuable foreign intelligence, and could compel the foreign government to take defensive actions against the CIA.  *Id.* ¶ 42.  This could result in a significant loss of foreign intelligence information for the U.S. Government.  *Id.*

### 2.      Intelligence Methods.

The Draft Reviews contain classified information that would disclose intelligence methods.  Generally, intelligence methods are the means by which the CIA accomplishes its mission.  Lutz Decl. ¶ 43.  The Director of the CIA has broad authority for protecting intelligence methods.  *Id.*  Knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States.  The result of disclosure of a particular method can lead to the neutralization of

that method, whether the method is used for the collection of intelligence information, the

conduct of clandestine activities, or the analysis and evaluation of intelligence information. *Id.* ¶

44.  Specific intelligence methods in the Draft Reviews that are classified and covered by

Exemption 1 include:  cover, field installations, code words and pseudonyms, foreign

intelligence relationships (discussed under intelligence sources, above), and dissemination-

control markings. *Id.* ¶¶ 45-53.

### a.      Cover.

One specific intelligence method used by the CIA is cover.  Lutz Decl. ¶ 45.  In order to

carry out its mission of gathering and disseminating intelligence information, the CIA places

individual CIA employees under cover to protect the fact, nature, and details of the CIA's

interest in foreign activities and the intelligence sources and methods employed to assist those

activities.  *Id.*  Disclosing the identity of an undercover employee could expose the intelligence

activities with which the employee has been involved, the sources with whom the employee has

had contact, and other intelligence methods used by the CIA.  *Id.* ¶ 47.  Compromise of an

officer's cover not only reveals his or her intelligence officer status, but also allows hostile

intelligence services and terrorist organizations to find out precisely the location in which that

person works.  Disclosing the identity of an undercover employee could jeopardize the life of the

employee, his or her family, his or her sources, and even innocent individuals with whom he or

she has had contact.  *Id.*

### b.      Field installations.

Another intelligence method used by the CIA is to operate covert installations abroad.

Lutz Decl. ¶ 48.  Official acknowledgment that the CIA has or had an installation in a particular

location could cause the government of the country in which the installation is located to take

countermeasures in order to eliminate the CIA presence within its borders, or otherwise to retaliate against the U.S. Government, its employees, or agents.  Revelation of this information also could result in terrorists and foreign intelligence services targeting that installation and persons associated with it.  *Id.* ¶ 55.

### c.    Code words and pseudonyms.

The use of code words is an intelligence method whereby words and letter codes are substituted for actual names, identities, or programs in order to protect intelligence sources and other intelligence methods.  Lutz Decl. ¶ 49.  The CIA uses code words in cables and other correspondence to disguise the true name of a person or entity of operational intelligence interest, such as a source, a foreign liaison service, or a covert program.  The CIA also uses pseudonyms, which are essentially code names, in many of its internal communications.  *Id.* When obtained and matched to other information, code words and pseudonyms possess a great deal of meaning for someone able to fit them into the proper framework.  For example, the reader of a message is better able to assess the value of its contents if the reader can identify a source, an undercover employee, or an intelligence activity by the code word or pseudonym.  By using these code words, the CIA adds an extra measure of security, minimizing the damage that would flow from an unauthorized disclosure of intelligence information.  *Id.* ¶ 51.  The disclosure of code words and pseudonyms can permit foreign intelligence services and other groups to fit disparate pieces of information together and to discern or deduce the identity or nature of the person or project for which the code word or pseudonym stands.  *Id.* ¶ 51.

### d.    Dissemination-control information.

The CIA employs a number of intelligence methods to protect and disseminate information, which include procedures for marking documents to indicate procedures for, and

indicators restricting dissemination of, particularly sensitive information contained in the

documents.  Lutz Decl. ¶ 53.  This also includes some internal routing and administrative

information that is used to control the flow of information.  *Id.*  Disclosure of this type of

information can reveal or highlight areas of particular intelligence interest, sensitive collection

sources or methods, foreign sensitivities, and procedures for gathering, protecting, and

processing intelligence.  *Id.* ¶ 53.

### 3.      Intelligence Activities.

The Draft Reviews also contain classified information that relates to intelligence

activities.  Intelligence activities refer to the actual implementation of intelligence methods in the

operational context.  Lutz Decl. ¶ 54.  Intelligence activities are highly sensitive because their

disclosure can often reveal specific intelligence methods which could, in turn, provide America's

current adversaries with valuable insight into CIA operations that would impair the effectiveness

of CIA's intelligence methods.  *Id.*  If a hostile entity learns that its activities have been targeted

by, or are of interest to, the CIA, it can take countermeasures to make future intelligence

collection activities less effective and more dangerous.  *Id.* ¶ 55.  Foreign intelligence services

and terrorist organizations also seek to glean from the CIA's interests what information the CIA

has received, why it is focused on that type of information, and how it will seek to use that

information for further intelligence collection efforts and clandestine intelligence activities.  *Id.*

If foreign intelligence services or hostile groups were to discover what the CIA has learned or

not learned about certain individuals or groups, that information could be used against the CIA to

thwart future intelligence operations, jeopardize human sources, and otherwise derail the CIA's

intelligence collection efforts.  *Id.*

### 4.      Foreign Relations or Foreign Activities.

Finally, the Draft Reviews contain classified information that would reveal the foreign

relations or foreign activities of the United States.  Lutz Decl. ¶ 56.  The Draft Reviews address

confidential discussions between the United States government and various foreign governments,

and contain other confidential information about the foreign relations of the United States.  *Id.*

Public disclosure of this information could disrupt the United States' relations with the countries

in question and generally make it more difficult for the United States to engage in activities

abroad.  *Id.*

For all of these reasons, the CIA properly withheld information pursuant to Exemption 1.

## III.    THE CIA PROPERLY WITHHELD INFORMATION PURSUANT TO EXEMPTION 3.

The information withheld from disclosure under Exemption 3 concerns CIA intelligence

sources, intelligence methods, as well as names, titles, functions, and other identifying

information of CIA personnel.  Lutz Decl. ¶¶ 59-60. Under Exemption 3, FOIA does not require

disclosure of information that is:

> specifically exempted from disclosure by statute (other than section 552b of this title) if
> that statute (A)(i) requires that the matters be withheld from the public in such a manner
> as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding
> or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3). "Exemption 3 differs from other FOIA exemptions in that its applicability

depends less on the detailed factual contents of specific documents; the sole issue for decision is

the existence of a relevant statute and the inclusion of withheld material within the statute's

coverage." *Fitzgibbon v. CIA*, 911 F.2d 755, 761-62 (D.C. Cir. 1990).  Thus, with respect to the

CIA's Exemption 3 claim, the sole task for the court "is to determine whether or not the material

withheld falls within the exemption claimed i.e., whether it relates to intelligence sources and

methods." *Id*. at 762.  In making this determination, the court is to "accord substantial weight and due consideration to the CIA's affidavits." *Id*.

The CIA and Ms. Lutz reviewed the documents responsive to plaintiffs' FOIA request, and determined that two withholding statutes apply to the information withheld under Exemption 3: the National Security Act of 1947, and the Central Intelligence Agency Act of 1949 ("CIA Act").

### A.      National Security Act of 1947

Section 102A(i)(1) of the National Security Act, 50 U.S.C. § 3024(i)(1) (previously codified at 50 U.S.C. § 403-1(i)(1)), as amended, provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure."  This statute qualifies as a withholding statute under Exemption 3.  *ACLU*, 628 F.3d at 619; *Larson*, 565 F.3d at 865.  In this case, Ms. Lutz reviewed the Draft Reviews and determined that disclosure of the information withheld would reveal intelligence sources and methods.  Lutz Decl. ¶ 59.  The CIA thus relies on the National Security Act to withhold any information that would reveal intelligence sources and methods, much of which is described in connection with Exemption 1.  *Id*.

### B.      Central Intelligence Agency Act of 1949

Section 6 of the CIA Act, 50 U.S.C. § 3507 (previously codified at 50 U.S.C. § 403g), as amended, provides further authority for withholdings under Exemption 3.  That provision provides:

> In the interests of the security of the foreign intelligence activities of the United States and in order to further implement section 3024(i) of this title that the Director of National Intelligence shall be responsible for protecting intelligence sources and methods from unauthorized disclosure, the . . . [CIA] shall be exempted from . . . the provisions of any other law which require the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the Agency.

Like section 102(A)(i)(1) of the National Security Act, section 6 of the CIA Act also meets the requirements for withholding information under FOIA Exemption 3. *See, e.g., Military Audit Project*, 656 F.2d at 737 n.39; *Morley v. CIA*, 453 F. Supp. 2d 137, 150-151 (D.D.C. 2006) (protecting CIA employee names and personal identifiers under section 6 of the CIA Act and Exemption 3), *rev'd on other grounds*, 508 F.3d 1108 (D.C. Cir. 2007); *Judicial Watch, Inc. v. Dep't of Commerce*, 337 F. Supp. 2d 146, 167-68 (D.D.C. 2004) (same). Section 6 of the CIA Act is asserted in this case to protect information that would tend to reveal the names, titles, functions, and other identifying information of CIA personnel. Lutz Decl. ¶ 60.

In contrast to the analysis for Exemption 1, and under Executive Order 13256 ("Classified National Security Information"), neither the National Security Act's statutory requirement to protect intelligence methods nor the CIA Act's statutory requirement to further protect intelligence sources and methods by protecting CIA organization and functions, requires the CIA to identify or describe the damage to national security that reasonably could be expected to result from unauthorized disclosure. *See, e.g., Hayden v. Nat'l Sec. Agency/Central Sec. Serv.*, 608 F.2d 1381, 1390 (D.C. Cir. 1979) (stating that specific showing of potential harm to national security was unnecessary under Exemption 3, because in enacting withholding statute Congress had already decided that disclosure of information covered by statute was potentially harmful). Nonetheless, Ms. Lutz notes that release of the information covered under Exemption 3 could damage the national security. Lutz Decl. ¶ 61. Thus, the determination that Exemption 3 applies to preclude disclosure of information within the Draft Reviews at issue in this case that would lead to disclosure of intelligence sources and methods, as well as CIA employees' identifying information, is entitled to substantial weight, and should be upheld.

## CONCLUSION

For the foregoing reasons, the government's motion for summary judgment should be granted.

Dated: January 21, 2015

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

RONALD C. MACHEN, Jr.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division


  _/s/ Vesper Mei_
VESPER MEI (D.C. Bar 455778)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 514-4686
Fax:  (202) 616-8470
E-mail: vesper.mei@usdoj.gov

**Counsel for the Government**