IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                              )
ACLU and ACLU Foundation,     )
                              )
        Plaintiffs,           )
                              )
            v.                )        Case No. 13-cv-1870
                              )        (JEB)
CENTRAL INTELLIGENCE AGENCY,  )
                              )
        Defendant.            )
_____)

**DECLARATION OF MARTHA M. LUTZ**
**CHIEF OF THE LITIGATION SUPPORT UNIT**
**CENTRAL INTELLIGENCE AGENCY**

I, MARTHA M. LUTZ, hereby declare and state:

1.      I am the Chief of the Litigation Support Unit of the Central
Intelligence Agency ("CIA or "Agency").  I have held this position since
October 2012.  Prior to assuming this position, I served as the Information
Review Officer for the Director's Area of the CIA for over thirteen years.
In that capacity, I was responsible for making classification and release
determinations for information originating within the Director's Area, which
includes, among other offices, the Office of the Director of the CIA, the
Office of Congressional Affairs, and the Office of General Counsel.  I have
held other administrative and professional positions within the CIA since
1989.

2.      As the Chief of the Litigation Support Unit, I am responsible for
the classification review of CIA documents and information that may be the
subject of court proceedings or public requests for information under the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  I am a senior CIA
official and hold original classification authority at the TOP SECRET level
under written delegation of authority pursuant to section 1.3(c) of Executive
Order No. 13526.  Because I hold original classification authority at the TOP

SECRET level, I am authorized to assess the current, proper classification of CIA information, up to and including TOP SECRET information, based on the classification criteria of Executive Order 13526 and applicable regulations.

3.     Pursuant to authority delegated by the Executive Director of the CIA, I also have been appointed as a Records Validation Officer.  As a Records Validation Officer, I am authorized to sign on behalf of the CIA regarding searches for records and the contents of any located or referred records that are under the cognizance of any or all CIA directorates or areas.

4.     Through the exercise of my official duties, I have become familiar with this civil action and the underlying FOIA request.  I make the following statements based upon my personal knowledge and the information made available to me in my official capacity.

## I.     <u>PLAINTIFFS' FOIA REQUEST</u>

5.     This declaration focuses on one particular FOIA request: plaintiffs' December 19, 2013 request for a supposed "Panetta Report" regarding the CIA's former detention and interrogation program.  Plaintiffs' FOIA request specifically asked for the following:

> a report commissioned by former Central Intelligence Agency ("CIA") Director Leon Panetta on the Agency's detention and interrogation programs (the "Panetta Report"), which was referred to by Senator Mark Udall on December 17, 2013, during the confirmation hearing for CIA General Counsel Caroline Krass.

A true and correct copy of plaintiffs' request is attached as <u>Exhibit A</u> to this declaration.

6.     The CIA indicated in a letter dated December 24, 2013 that it would accept and process the plaintiffs' request, but that it was unlikely that the CIA would be able to respond to the request within 20 working days.  A true and correct copy of the CIA's response is attached as <u>Exhibit B</u> to this declaration.

7.    When plaintiffs amended their complaint in this lawsuit on January 27, 2014 to include a claim relating to the supposed "Panetta Report," the CIA had not yet issued a substantive response to the ACLU's request.  The CIA interprets plaintiffs' request to be seeking the most current version of the supposed "Panetta Report."

## II.    THE RECORDS AT ISSUE

8.    What plaintiffs call the "Panetta Report" is actually a series of more than forty draft documents relating to the CIA's former detention and interrogation program.  Those drafts were originally envisioned as providing summaries of the documents being provided to the Senate Select Committee on Intelligence ("SSCI" or "Committee") that Director Panetta and other senior CIA leaders could consult to inform policy decisions in connection with the Committee's multi-year inquiry into the former detention and interrogation program.  Congressional inquiries of this significance and magnitude require substantial engagement by an agency's senior leadership, who may have to make a broad range of decisions regarding the appropriate agency response to issues as they arise.  The drafts were intended to inform CIA leaders' decision-making by highlighting the most noteworthy information contained in the millions of pages of documents being made available to the SSCI in connection with its study.

9.    The project never reached fruition, however.  A team of CIA employees and contractors worked on the drafts between mid-2009 and mid-2010, at which point work was suspended.  The documents remain in draft form, were never completed, and were not presented as final products to the Director or other senior CIA leaders.

10.    Although these draft background briefing documents were colloquially referred to by various names, they were never given an official name within the CIA.  For convenience, I will refer to them in this declaration as the "Draft Reviews," or simply "the Reviews."  The CIA located

the records responsive to plaintiffs' FOIA request by contacting the office that maintains the Draft Reviews and asking that office to provide the most current version of each Review.

**A.    Origin of the Draft Reviews**

11.    In March 2009, the Senate Select Committee on Intelligence announced that it intended to study the CIA's former detention and interrogation program.  In connection with this study, the SSCI and the CIA reached an inter-branch accommodation that allowed designated Committee staff to have unprecedented direct access to millions of pages of unredacted CIA documents.  This inter-branch accommodation posed unique challenges.  First, the CIA had to locate relevant documents and make them available to the SSCI while protecting the security of the classified information contained in the documents.  Second, given the immense volume of documents being produced, the CIA sought a means to efficiently keep track of significant information contained in the documents to inform the Director and other senior leaders of the Agency.

12.    The CIA delegated responsibility for the first issue to an office called the Director's Review Group for Rendition, Detention, and Interrogation.  That office was responsible for facilitating the SSCI's access to CIA documents.  Two of its primary functions in that regard were: (1) coordinating the search for and collection of documents within CIA and (2) making responsive documents available to the SSCI staff.

13.    Responsibility for handling the second issue -- tracking information being made available to the SSCI -- also fell to the Director's Review Group.  Around the time the SSCI began its study, Director Panetta expressed a desire to remain informed about what was contained in the millions of pages of documents that would be made available to the Committee.  Specifically, Director Panetta and other senior CIA leaders wished to be

informed of noteworthy information from the produced documents in order to inform other policy decisions related to the Committee's study.

14.   The leaders of the Director's Review Group formed a team to implement Director Panetta's request.  This new team, called the Special Review Team, focused exclusively on (1) reviewing documents that had been made available to the SSCI and (2) preparing summaries of certain key information in those documents.  The Special Review Team varied in size and structure over the course of its existence.  It generally tended to consist of approximately 10 employees and contractors with varying backgrounds and levels of experience, who were temporarily detailed from other CIA components.

**B.   Description of the Draft Reviews**

15.   The format and focus of the Draft Reviews varied over time, but the central purpose remained essentially the same.  The leaders of the Special Review Team assigned each team member one or more research topics. Some topics focused on individual detainees and other topics focused on overarching programmatic subject-matters.  The team members searched for documents provided to the SSCI related to their assigned topic, reviewed those documents, and determined whether certain contents of those documents might be relevant to informing senior CIA leaders in connection with the SSCI's study.  When the team members identified information they believed was significant on a given topic, they described that information in their Draft Review.  The intent, over time, was for each Draft Review to become a rough guide to noteworthy information on a particular topic.  The Special Review Team anticipated that it would eventually disseminate the Reviews to senior CIA leaders -- and ultimately the Director -- for their use in making policy decisions.

16.   The Draft Reviews were the work product of individual members of the Special Review Team.  In creating that work product, the team members

necessarily had to make judgments about what information would best inform senior CIA leaders and what information could be omitted.  Their goal was to review the vast number of documents being made available to the SSCI, summarize what they saw as the most pertinent information from those documents, and organize that information in a way that would be most useful to senior CIA officials.

17.   The team members were acutely aware that their Draft Reviews were ultimately intended to aid CIA decision-making in connection with the SSCI's study.  Early drafting reflected that awareness by attempting to identify for senior leaders "significant issues" on which the SSCI might focus.

18.   The Special Review Team worked on the Draft Reviews for approximately one year.  They ceased their efforts in 2010, when the CIA concluded that continued work on the Reviews could potentially complicate a separate criminal investigation by the Department of Justice into the detention and interrogation program.

19.   When the Special Review Team stopped its work in 2010, the Reviews were still incomplete, covered less than half of the millions of pages of documents that the CIA ultimately made available to the SSCI, and had not been formally reviewed or relied upon by the CIA's senior leadership. Some of the Draft Reviews were at a preliminary stage when the Special Review Team ceased its work; they contain only rough notes regarding some relevant documents.  Other Draft Reviews were in a more polished form.  Those had undergone preliminary editing and formatting in preparation for their review by the Chief of the Director's Review Group.  But even the most polished versions remained drafts and were subject to change.  If the Special Review Team's efforts had gone on, team members would have continued to update their drafts as they reviewed new documents and learned new information.  And if the CIA's senior leadership had eventually had an opportunity to review the drafts, the team members almost certainly would have revised the drafts to

reflect the leadership's feedback.  Given that the Drafts' purpose was to

inform decision-making by the Director and other senior leadership, had the

project continued, the documents would likely have been reviewed and edited

by a number of senior CIA officials -- including the Deputy General Counsel

for Litigation and Investigations, the General Counsel, the Director's Chief

of Staff, the Executive Director, and the Deputy Director -- before being

presented to the Director as finished products.  Because the project was

suspended, that senior review of the Drafts was never commenced.

　　　　20.　　The markings on the Reviews confirm that even the most polished

versions were still considered drafts.  Each document is stamped

"DELIBERATIVE PROCESS PRIVILEGED DOCUMENT" at the top of every page, and most

of the documents are marked "DRAFT" on every page as well.  Each document

also bears the following language at the top the first page:

> This classified document was prepared by the CIA Director's
> Review Group for Rendition, Detention, and Interrogation (DRG-
> RDI) for DRG-RDI's internal discussion purposes and should not be
> used for any other purpose, nor may it be distributed without
> express permission from DRG-RDI or CIA's Office of General
> Counsel.  This document contains [certain classified
> information].  This document also contains material protected by
> the attorney-client and attorney work-product privileges.
> Furthermore, this document constitutes deliberative work product,
> protected by the deliberative-process privilege, and is not a
> final, conclusive, complete, or comprehensive analysis of DRG-RDI
> or CIA.  Rather, it was created to suit the needs of DRG-RDI, in
> support of informing senior Agency officials about broad policy
> issues.  While every effort was made to ensure this document's
> accuracy, it may contain inadvertent errors.  For this reason,
> and because this document selectively summarizes, draws
> inferences from, or omits information from the sources it cites,
> it should not be relied upon by persons outside DRG-RDI.

## III.　　EXEMPTION (B)(5): THE DELIBERATIVE PROCESS PRIVILEGE

　　　　21.　　The CIA is withholding the Draft Reviews in full under

Exemption (b)(5) because they are protected by the deliberative process

privilege.  Exemption (b)(5) provides that FOIA shall not apply to "inter-

agency or intra-agency memorandums or letters which would not be available by

law to a party other than an agency in litigation with the agency."  This

includes documents subject to the deliberative process privilege.  The

deliberative process privilege protects the internal deliberations of the government by exempting from release those recommendations, analyses, and discussions -- both factual and legal -- prepared to inform, or in anticipation of, agency decision-making.

22.    First, the Reviews were generated to help the Director of the CIA and other senior Agency leaders make policy decisions related to the SSCI's ongoing study.  For example, senior leaders could have used the Reviews to prepare an accurate and timely response to the Committee's eventual report; to anticipate developments that might arise in connection with the Committee's study; to inform interactions with the Committee; and to prepare for interagency discussions within the Executive Branch regarding the study. Although the Special Review Team's efforts were cut short before it was able to formally present any of the Draft Reviews to the CIA's senior leadership, the Reviews were always designed and intended to aid those leaders' decision-making processes.

23.    Second, the CIA never adopted the Draft Reviews as official histories or formal Agency positions.  The CIA has a staff of professional historians who prepare its official histories.  Although the members of the Special Review Team were asked to make judgments about what information might be useful to the CIA's senior leaders, they were not empowered to make decisions on behalf of the entire Agency.  Nor has the CIA subsequently adopted the Draft Reviews as its official position, either directly or by reference.

24.    Third, all of the Draft Reviews were still in draft form when the Special Review Team stopped its work.  Some of the Reviews are patently incomplete: they contain rough notes, half-finished sentences, and unorthodox formatting.  Other Reviews appear more polished.  But those Reviews were not vetted outside the Director's Review Group, and each remained subject to change.  Had the Special Review Team continued its work beyond 2010, even the

most polished Reviews would likely have undergone substantial editing as the team members continued to review new documents and as senior CIA officials provided feedback.  The language at the top of each document makes this clear:  "This document constitutes deliberative work product, protected by the deliberative-process privilege, and is not a final, conclusive, complete, or comprehensive analysis of DRG-RDI or CIA."

25.  Finally, the Draft Reviews reflect the exercise of policy-oriented judgment.  Although the Reviews relate to past events, they do not purport to be a comprehensive account of the historical record.  As the language at the top of each Review notes, "this document selectively summarizes, draws inferences from, or omits information from the sources it cites."  Indeed, that was the whole point of the Reviews: to present senior CIA leaders with a carefully curated selection of a vast body of facts. Members of the Special Review Team attempted to distill the enormous documentary record into a more useful format by distinguishing between what they viewed as significant and insignificant facts.  In doing so, they made judgments about the salience of particular facts in light of the larger policy issues that senior CIA leaders might face in connection with the SSCI's study.  The additional layers of review that the Draft Reviews would have gone through before being relied upon by the Director would have likewise involved countless policy-oriented judgments about what facts should be brought to the attention of senior CIA officials.

26.  I have reviewed the Draft Reviews and determined that they contain no reasonably segregable information.  The entire documents are pre-decisional, deliberative drafts and must be withheld in their entirety. As explained above, to the extent that these Reviews contain factual material, the selection of which facts to include is part and parcel of the deliberative assessment.  Releasing any portion of the documents would reveal privileged material and inhibit the frank communications and the free

exchange of ideas that the deliberative process privilege is designed to protect.

## IV.   FOIA EXEMPTIONS PROTECTING CLASSIFIED AND OTHER INFORMATION

### A.   Exemption (b)(1)

27.   The CIA is also withholding certain classified information contained in the Draft Reviews under Exemption (b)(1).  Exemption (b)(1) provides that the FOIA does not require the production of records that are: "(a) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (b) are in fact properly classified pursuant to such Executive order."

28.   Executive Order 13526 sets forth the procedural and substantive criteria governing classification.  Section 1.1(a) of the Executive Order provides that information may be classified if the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in section 1.4 of Executive Order 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.  The Executive Order also mandates that records be properly marked and requires that records not be classified for an improper purpose.  As explained below, I have determined that the Exemption (b)(1) withholdings here satisfy all the requirements of Executive Order 13526.

29.   The CIA is not asserting Exemption (b)(1) with respect to any information that has been declassified in connection with the December 9, 2014 release of the Executive Summary of the SSCI's report.

### i.   **General Requirements**

30.   <u>Original Classification Authority</u>.   Pursuant to a written delegation of authority in accordance with Executive Order 13526, I hold original classification authority at the TOP SECRET level.   Therefore, I am authorized to conduct classification reviews and to make original classification decisions.   I have determined that certain portions of the Draft Reviews are currently and properly classified.

31.   <u>U.S. Government Information</u>.   The information at issue is owned by the U.S. Government, was produced by or for the U.S. Government, and is under the control of the U.S. Government.

32.   <u>Classification Categories</u>.   Exemption (b)(1) is asserted in this case to protect information that concerns "intelligence activities (including covert action), intelligence sources or methods, or cryptology," pursuant to section 1.4(c) of the Executive Order.   Additionally, Exemption (b)(1) is asserted to protect information pertaining to "foreign relations or foreign activities of the United States" under section 1.4(d) of the Executive Order.

33.   <u>Damage to the National Security</u>.   I have determined that some of the CIA information contained in the records at issue is classified up to the TOP SECRET level because it constitutes information the unauthorized disclosure of which could reasonably be expected to result in exceptionally grave damage to the national security.

34.   <u>Proper Purpose</u>.   With respect to the information for which Exemption (b)(1) is asserted in this case, I have determined that this information has not been classified in order to conceal violations of law, inefficiency, or administrative error; prevent embarrassment to a person, organization, or agency; restrain competition; or prevent or delay the release of information that does not require protection in the interests of national security.

35.  Marking.  The documents are properly marked in accordance with section 1.6 of the Executive Order.

ii.  **Description of Classified Information**

36.  Although I have determined that the Draft Reviews must be withheld in their entirety pursuant to Exemption (b)(5), I have reviewed the Draft Reviews and determined that they contain discrete pieces of information that are currently and properly classified up to the TOP SECRET level. Specifically, as explained below, I have determined that this information has been properly withheld because its disclosure could lead to the identification of intelligence sources, methods, and activities of the CIA and/or harm foreign relations or foreign activities of the United States within the meaning of sections 1.4(c) and 1.4(d) of Executive Order 13526. As such, disclosure of this information could reasonably be expected to result in damage, including exceptionally grave damage, to national security. I describe the general categories of classified information below and, to the extent possible on the public record, provide examples of the type of information that falls within each category.

37.  Intelligence Sources.  Some of the classified information in the Draft Reviews relates to intelligence sources.  One of the major functions of the CIA is to collect foreign intelligence from around the world for the President and other United States Government officials to use in making policy decisions.  To accomplish this function, the CIA must rely on information from knowledgeable sources that the CIA can obtain only under an arrangement of absolute secrecy.  Intelligence sources will rarely furnish information unless they are confident that they are protected from retribution or embarrassment by the absolute secrecy surrounding the source-CIA relationship.  In other words, intelligence sources must be certain that the CIA can and will do everything in its power to prevent the public disclosure of their association with the CIA forever.

38.   *Human Sources*.  The CIA relies on individuals around the world to collect foreign intelligence, and it does so with the promise that the CIA will keep their identities secret and prevent public disclosure.  This is because the CIA's revelation of this secret relationship could harm the individual.  For example, in the case of a foreign national abroad who cooperates with the CIA, almost always without the knowledge of his or her government, the consequences of the disclosure of this relationship are often swift and far-ranging, from economic reprisals to harassment, imprisonment, and even death.  In addition, such disclosure could place in jeopardy the lives of individuals with whom the foreign national has had contact, including his or her family and associates.

39.   Moreover, the release of information that would or could identify an intelligence source would damage the CIA's credibility with all other current intelligence sources and undermine the CIA's ability to recruit future sources.  As stated previously, most individuals will not cooperate with the CIA unless they have confidence that their identities will remain forever secret.  Additionally, the CIA itself has a primary interest in keeping these identities secret, not only to protect the sources, but also to demonstrate to other sources and future sources that these sources can trust the CIA to preserve the secrecy of the relationship.

40.   If a potential source has any doubts about the ability of the CIA to preserve secrecy -- that is, if he or she were to learn that the CIA had disclosed the identity of another source -- his or her desire to cooperate with the CIA would likely diminish.  In other words, sources, be they present or future, usually will not work for the CIA if they are convinced or believe that the CIA may not protect their identities.  The loss of such intelligence sources, and the accompanying loss of the critical intelligence that they provide, would seriously and adversely affect the national security of the United States.

41.   *Foreign Government Sources*.  The CIA also relies on foreign governments as sources of intelligence.  Both foreign intelligence services and individual foreign government officials provide sensitive information in strict confidence to the CIA on issues of importance to U.S. foreign relations and national security.  These services and officials convey information to the CIA with the CIA's express agreement that the content of the information, as well as the mere fact of the relationship through which they have provided the information, will remain secret.

42.   If the CIA were to violate this express agreement, internal or external political pressure on the foreign government could cause the foreign liaison service or foreign government official to limit or even end the CIA relationship, causing the U.S. Government to lose valuable foreign intelligence.  In fact, this political pressure could compel the foreign government to take defensive actions against the CIA, such as reducing the approved CIA presence in that country, which would further damage CIA's ability to collect intelligence about other countries or persons operating in that country.

43.   Intelligence Methods.  The Draft Reviews also contain classified information relating to intelligence methods.  Generally, intelligence methods are the means by which the CIA accomplishes its mission.  The Director of the CIA has broad authority to protect intelligence methods.

44.   Knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States.  The result of disclosure of a particular method can lead to the neutralization of that method, whether the method is used for the collection of intelligence information, the conduct of clandestine activities, or the analysis and evaluation of intelligence information.

14

45. *Cover*.  One specific intelligence method used by the CIA is cover.  In order to carry out its mission of gathering and disseminating intelligence information, the CIA places individual CIA employees under cover to protect the fact, nature, and details of the CIA's interest in foreign activities and the intelligence sources and methods employed to assist those activities.  The CIA considers the cover identities of individual employees and cover mechanisms both to be intelligence methods.

46. The purpose of cover is to provide a believable, non-threatening reason for a CIA officer to move around and meet individuals of intelligence interest to the United States, and to do so without attracting undue attention.

47. Disclosing the identity of an undercover employee could expose the intelligence activities with which the employee has been involved, the sources with whom the employee has had contact, and other intelligence methods used by the CIA.  Compromise of an officer's cover not only reveals his or her intelligence officer status, but also allows hostile intelligence services and terrorist organizations to find out precisely the location in which that person works.  In fact, disclosing the identity of an undercover employee could jeopardize the life of the employee, his or her family, his or her sources, and even innocent individuals with whom he or she has had contact.

48. *Field Installations*.  Another intelligence method used by the CIA is to operate covert installations abroad.  Official acknowledgment that the CIA has or had an installation in a particular location abroad could cause the government of the country in which the installation is located to take countermeasures, either on its own initiative or in response to public pressure, in order to eliminate the CIA presence within its borders, or otherwise to retaliate against the U.S. Government, its employees, or agents. Revelation of this information also could result in terrorists and foreign

intelligence services targeting that installation and persons associated with it.

49.   *Code Words and Pseudonyms*.   The use of code words is an intelligence method whereby words and letter codes are substituted for actual names, identities, or programs in order to protect intelligence sources and other intelligence methods.   Specifically, the CIA uses code words in cables and other correspondence to disguise the true name of a person or entity of operational intelligence interest, such as a source, a foreign liaison service, or a covert program.   The CIA also uses pseudonyms, which are essentially code names, in many of its internal communications.

50.   When obtained and matched to other information, code words and pseudonyms possess a great deal of meaning for someone able to fit them into the proper framework.   For example, the reader of a message is better able to assess the value of its contents if the reader can identify a source, an undercover employee, or an intelligence activity by the code word or pseudonym.   By using these code words, the CIA adds an extra measure of security, minimizing the damage that would flow from an unauthorized disclosure of intelligence information.

51.   The disclosure of code words and pseudonyms -- especially in context or in the aggregate -- can permit foreign intelligence services and other groups to fit disparate pieces of information together and to discern or deduce the identity or nature of the person or project for which the code word or pseudonym stands.

52.   *Foreign Intelligence Relationships*.   As discussed above, the CIA obtains foreign intelligence and assistance through liaison relationships with foreign intelligence and security services and foreign government officials.   The details of these relationships constitute intelligence methods, the disclosure of which could hamper intelligence gathering.

53.  *Dissemination-Control Information.*  The CIA also employs a number of intelligence methods to disseminate intelligence-related information and protect it from unauthorized disclosure.  These methods include procedures for marking documents to indicate the presence of particularly sensitive information contained in the documents.  They also include some internal routing and administrative information that is used to track and control information.  Disclosure of this type of information can reveal or highlight areas of particular intelligence interest, sensitive collection sources or methods, foreign sensitivities, and procedures for gathering, protecting, and processing intelligence

54.  <u>Intelligence Activities</u>.  There is also classified information in the Draft Reviews that relates to intelligence activities.  Intelligence activities refer to the actual implementation of intelligence methods in the operational context.  Intelligence activities are highly sensitive because their disclosure often would reveal details regarding specific intelligence methods which, in turn, could provide America's current adversaries with valuable insight into CIA operations that would impair the effectiveness of CIA's intelligence methods.

55.  If a hostile entity learns that its activities have been targeted by, or are of interest to, the CIA, it can take countermeasures to make future intelligence collection activities less effective and more dangerous. Foreign intelligence services and terrorist organizations also seek to glean from the CIA's interests what information the CIA has received, why the CIA is focused on that type of information, and how the CIA will seek to use that information for further intelligence collection efforts and clandestine intelligence activities.  If foreign intelligence services or hostile groups were to discover what the CIA has learned or not learned about certain individuals or groups, that information could be used against the CIA to

thwart future intelligence operations, jeopardize human sources, and otherwise derail the CIA's intelligence collection efforts.

56.   Foreign Relations or Foreign Activities.  Finally, the Draft Reviews also contain classified information concerning the foreign relations or foreign activities of the United States. The Draft Reviews address confidential discussions between the United States government and various foreign governments, and they contain other confidential information about the foreign relations of the United States.  Public disclosure of this confidential information could disrupt the United States' relations with the countries in question and could generally make it more difficult for the United States to engage in activities abroad.

57.   For all of these reasons, the CIA cannot disclose certain classified information in the Draft Reviews relating to intelligence sources, intelligence methods, intelligence activities, and foreign relations or foreign activities.  That information remains currently and properly classified pursuant to the criteria of Executive Order 13526, as its disclosure could reasonably be expected to cause exceptionally grave damage to the national security of the United States.[1]

**B.   Exemption (b)(3)**

58.   Finally, The CIA is also withholding certain information contained in the Draft Reviews under Exemption (b)(3), which protects information that is specifically exempted from disclosure by statute.  The CIA is relying on two distinct withholding statutes: Section 102A(i)(1) of the National Security Act of 1947 and Section 6 of the Central Intelligence Agency Act of 1949.

---

[1] My description in this public declaration of the potential harm to national security is necessarily general in nature.  If the Court requires more detail, I can provide a supplemental classified declaration for the Court's review in camera and ex parte.  I note, however, that a supplemental classified declaration will be unnecessary if the Court agrees that the Draft Reviews are protected in their entirety under Exemption (b)(5).

59.   The CIA invokes Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024 (the "National Security Act"), in conjunction with Exemption (b)(3).  Section 102A(i)(1) of the National Security Act requires the Director of National Intelligence to protect intelligence sources and methods from unauthorized disclosure.  The National Security Act has been widely recognized to be a withholding statute under Exemption (b)(3).  The National Security Act is asserted here to protect information that would tend to reveal intelligence sources and methods employed by the CIA.  I have already described some of the relevant intelligence sources and methods above in connection with Exemption (b)(1).

60.   The CIA also invokes Section 6 of the Central Intelligence Agency Act of 1949, as amended, 50 U.S.C. § 3507 (the "CIA Act"), in conjunction with Exemption (b)(3).  Section 6 of the CIA Act protects from disclosure (among other things) information that would reveal the names, titles, functions, and other identifying information of CIA personnel.  The CIA Act has been widely recognized to be a withholding statute under Exemption (b)(3).  The CIA Act is asserted here to protect information that would tend to reveal the names, titles, functions, and other identifying information of CIA personnel.

61.   These statutes do not require the CIA to demonstrate harm in order to withhold any applicable material.  However, for the same reasons noted above, release of this information could damage the national security.

## V.   **SEGREGABILITY**

62.   In evaluating the Draft Reviews, I conducted a page-by-page and line-by-line review and determined that there are no reasonably segregable, non-exempt portions that can be released without potentially compromising material protected by the deliberative process privilege.  The entire documents are pre-decisional, deliberative drafts and must be withheld in their entirety.  As explained above, to the extent that these Reviews contain

factual material, the selection of facts is part and parcel of the deliberative assessment. Releasing any portion of the documents would reveal privileged material and inhibit the frank communications and the free exchange of ideas that the deliberative process privilege is designed to protect. Accordingly, each Draft Review is wholly exempt pursuant to Exemption (b)(5). Discrete pieces of information are also exempt pursuant to Exemptions (b)(1) and (b)(3).

*  *  *

   I declare under penalty of perjury that the foregoing is true and correct.

   Executed this 21st day of January 2015.

Martha M. Lutz
Chief, Litigation Support Unit
Central Intelligence Agency

# Exhibit A

F-2014-00480

**ACLU**
AMERICAN CIVIL LIBERTIES UNION

December 19, 2013

Information and Privacy Coordinator
Central Intelligence Agency
Washington, D.C. 20505
Fax: 703.613.3007

*Sent by Fax*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
NATIONAL OFFICE
125 BROAD STREET, 18TH FL
NEW YORK, NY 10004-2400
T/212 549.2500
WWW.ACLU.ORG

Re:  **Request Under Freedom of Information Act /
     Expedited Processing Requested**

To Whom It May Concern:

      This letter constitutes a request ("Request") pursuant to the
Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, and the
Central Intelligence Agency's implementing regulations, *see* 32 C.F.R.
§ 1900. The Request is submitted by the American Civil Liberties Union
and the American Civil Liberties Union Foundation (together, the
"ACLU" or the "Requesters").[1]

      Requesters seek the disclosure of a report commissioned by former
Central Intelligence Agency ("CIA") Director Leon Panetta on the
Agency's detention and interrogation programs (the "Panetta Report"),
which was referred to by Senator Mark Udall on December 17, 2013,
during the confirmation hearing for CIA General Counsel nominee
Caroline Diane Krass.

                              * * *

_____

      [1] The American Civil Liberties Union is a non-profit, 26 U.S.C. § 501(c)(4)
membership organization that educates the public about the civil liberties implications of
pending and proposed state and federal legislation, provides analysis of pending and
proposed legislation, directly lobbies legislators, and mobilizes its members to lobby their
legislators. The American Civil Liberties Union Foundation is a separate 26 U.S.C.
§ 501(c)(3) organization that provides legal representation free of charge to individuals
and organizations in civil rights and civil liberties cases, educates the public about civil
rights and civil liberties issues across the country, provides analyses of pending and
proposed legislation, directly lobbies legislators, and mobilizes the American Civil
Liberties Union's members to lobby their legislators.

1

DEC 19 2013

On December 17, 2013, during a confirmation hearing for CIA General Counsel nominee Caroline Diane Krass, Senator Udall referred to a report by the CIA concerning its detention and interrogation program that was commissioned by former CIA Director Panetta. *See* Press Release, Udall Presses CIA Nominee on Brutal Detention, Interrogation Program, Alleged Discrepancies Between Official, Internal Agency Accounts (Dec. 17, 2013) ("Udall Press Release"), http://1.usa.gov/1kWoamC; Mark Mazzetti, *Senate Asks CIA to Share its Report on Interrogations*, N.Y. Times, Dec. 17, 2013, http://nyti.ms/1dLfZYa.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

According to Senator Udall, the Panetta Report "is consistent with" the findings of an investigative report on the CIA's rendition, detention and interrogation program by the Senate Select Committee on Intelligence ("SSCI CIA Report"). Udall Press Release. However, Senator Udall stated that the Panetta Report "amazingly ... conflicts with the official CIA response" to the SSCI CIA Report.[2]

The Panetta Report is of clear and enormous public importance. A fair public debate about the CIA's rendition, detention and interrogation program must be informed by it, as well as the SSCI CIA Report and the CIA response to the SSCI CIA Report. *See, e.g.,* Daniel Klaidman, *Senate Democrats Accuse the CIA of Stonewalling on Torture Policies,* Daily Beast, Dec. 18, 2013, http://thebea.st/19Aw8QM (quoting Senator Mark Heinrich, "I am outraged that the CIA continues to make misleading statements about the committee's study."); Daniel Klaidman, *The Senate has Torture on its Agenda when it Interviews CIA's Legal Counsel Nominee,* Daily Beast, Dec. 17, 2013, http://thebea.st/19RS85W; Mazzetti *supra.*

Release of the Panetta Report is critical to ensure meaningful public access to and debate about the CIA's own assessment of its interrogation and detention practices after 9/11. This significant information will contribute to the record on the United States' intelligence practices and current and future public discussion about the CIA's rendition, detention and interrogation programs.

## I. Record Requested

Requesters seek disclosure of the Panetta Report.

---

[2] Both the SSCI CIA Report and the CIA's 122-page response to that report are the subjects of separate ACLU FOIA requests.

2

With respect to the form of production, *see* 5 U.S.C.
§ 552(a)(3)(B), we request that the Panetta Report be provided
electronically in a text-searchable, static-image format (PDF), in the best
image quality in the agency's possession.

## II. Application for Expedited Processing

We request expedited processing pursuant to 5 U.S.C.
§ 552(a)(6)(E) and 32 C.F.R. § 1900.34(c). There is a "compelling need"
for these records, as defined in the statute and regulations, because the
information requested is urgently needed by an organization primarily
engaged in disseminating information in order to inform the public about
actual or alleged government activity. 5 U.S.C. § 552(a)(6)(E)(v); *see also*
32 C.F.R. § 1900.34(c)(2). In addition, the records sought relate to a
"breaking news story of general public interest." 32 C.F.R.
§ 1900.34(c)(2) (providing for expedited processing when "the
information is relevant to a subject of public urgency concerning an actual
or alleged Federal government activity").

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

> A.    *The ACLU is an organization primarily engaged in
> disseminating information in order to inform the public
> about actual or alleged government activity.*

The ACLU is "primarily engaged in disseminating information"
within the meaning of the statute and relevant regulations. 5 U.S.C.
§ 552(a)(6)(E)(v)(II); 32 C.F.R. § 1900.34(c)(2); *see also ACLU v. Dep't
of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding that a non-
profit, public-interest group that "gathers information of potential interest
to a segment of the public, uses its editorial skills to turn the raw material
into a distinct work, and distributes that work to an audience" is "primarily
engaged in disseminating information" (internal citation omitted)); *see
also Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d
246, 260 (D.D.C. 2005) (finding Leadership Conference—whose mission
is "to serve as the site of record for relevant and up-to-the-minute civil
rights news and information" and to "disseminate[] information regarding
civil rights and voting rights to educate the public [and] promote effective
civil rights laws"—to be "primarily engaged in the dissemination of
information").

Dissemination of information about actual or alleged government
activity is a critical and substantial component of the ACLU's mission and
work. The ACLU disseminates this information to educate the public and
promote the protection of civil liberties. The ACLU's regular means of
disseminating and editorializing information obtained through FOIA
requests include: a paper newsletter distributed to approximately 450,000
people; a bi-weekly electronic newsletter distributed to approximately
300,000 subscribers; published reports, books, pamphlets, and fact sheets;

3

a widely read blog; heavily visited websites, including an accountability microsite, http://www.aclu.org/accountability; and a video series.

The ACLU also regularly issues press releases to call attention to documents obtained through FOIA requests, as well as other breaking news.[3] ACLU attorneys are interviewed frequently for news stories about documents released through ACLU FOIA requests.[4]

The ACLU website specifically includes features on information about actual or alleged government activity obtained through FOIA.[5] For example, the ACLU maintains an online "Torture Database," a compilation of over 100,000 FOIA documents that allows researchers and the public to conduct sophisticated searches of FOIA documents relating to government policies on rendition, detention, and interrogation.[6] The

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

[3] See, e.g., Release, American Civil Liberties Union, *Documents Show FBI Monitored Bay Area Occupy Movement*, Sept. 14, 2012, http://www.aclu.org/node/36742; Press Release, American Civil Liberties Union, *FOIA Documents Show FBI Using "Mosque Outreach" for Intelligence Gathering*, Mar. 27, 2012, http://www.aclu.org/national-security/foia-documents-show-fbi-using-mosque-outreach-intelligence-gathering; Press Release, American Civil Liberties Union, *FOIA Documents Show FBI Illegally Collecting Intelligence Under Guise of "Community Outreach,"* Dec. 1, 2011, http://www.aclu.org/national-security/foia-documents-show-fbi-illegally-collecting-intelligence-under-guise-community; Press Release, American Civil Liberties Union, *FOIA Documents from FBI Show Unconstitutional Racial Profiling*, Oct. 20, 2011, http://www.aclu.org/national-security/foia-documents-fbi-show-unconstitutional-racial-profiling; Press Release, American Civil Liberties Union, *Documents Obtained by ACLU Show Sexual Abuse of Immigration Detainees is Widespread National Problem*, Oct. 19, 2011, http://www.aclu.org/immigrants-rights-prisoners-rights-prisoners-rights/documents-obtained-aclu-show-sexual-abuse; Press Release, American Civil Liberties Union, *New Evidence of Abuse at Bagram Underscores Need for Full Disclosure About Prison, Says ACLU*, June 24, 2009, http://www.aclu.org/national-security/new-evidence-abuse-bagram-underscores-need-full-disclosure-about-prison-says-aclu.

[4] See, e.g., Carrie Johnson, *Delay in Releasing CIA Report Is Sought; Justice Dep't Wants More Time to Review IG's Findings on Detainee Treatment*, Wash. Post, June 20, 2009 (quoting ACLU staff attorney Amrit Singh); Peter Finn & Julie Tate, *CIA Mistaken on 'High-Value' Detainee, Document Shows*, Wash. Post, June 16, 2009 (quoting ACLU staff attorney Ben Wizner); Scott Shane, *Lawsuits Force Disclosures by C.I.A.*, N.Y. Times, June 10, 2009 (quoting ACLU National Security Project director Jameel Jaffer); Joby Warrick, *Like FBI, CIA Has Used Secret 'Letters,'* Wash. Post, Jan. 25, 2008 (quoting ACLU staff attorney Melissa Goodman).

[5] See, e.g., http://www.aclu.org/national-security/predator-drone-foia; http://www.aclu.org/national-security/anwar-al-awlaki-foia-request; https://www.aclu.org/accountability-torture; http://www.aclu.org/mappingthefbi; http://www.aclu.org/national-security/bagram-foia; https://www.aclu.org/search/FOIA?sort=relevance&show=10&cpi=p48&logic=all; http://www.aclu.org/safefree/nsaspying/30022res20060207.html; http://www.aclu.org/patriotfoia; http://www.aclu.org/spyfiles; and http://www.aclu.org/safefree/nationalsecurityletters/32140res20071011.html.

[6] http://www.torturedatabase.org.

4

ACLU also maintains a "Torture FOIA" webpage containing commentary about the ACLU's FOIA request, press releases, and analysis of the FOIA documents.[7] (That webpage also notes that the ACLU, in collaboration with Columbia University Press, has published a book about the documents obtained through FOIA. *See* Jameel Jaffer & Amrit Singh, *Administration of Torture: A Documentary Record from Washington to Abu Ghraib and Beyond* (Columbia Univ. Press 2007)). Similarly, the ACLU's webpage about the Office of Legal Counsel ("OLC") torture memos obtained through FOIA contains commentary and analysis of the memos; an original, comprehensive chart summarizing the memos; links to web features created by ProPublica (an independent, non-profit, investigative-journalism organization) based on the ACLU's information gathering, research, and analysis; and ACLU videos about the memos.[8] In addition to websites, the ACLU has produced an in-depth television series on civil liberties, which has included analysis and explanation of information the ACLU has obtained through FOIA.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The ACLU plans to analyze and disseminate to the public the information gathered through this Request. The record requested is not sought for commercial use, and the Requesters plan to disseminate the information disclosed as a result of this Request to the public at no cost.[9]

    *B.*    *The record sought is urgently needed to inform the public about actual or alleged government activity.*

The Panetta Report is urgently needed to inform the public about actual or alleged government activity; moreover, this document relates to a breaking news story of general public interest, specifically, the CIA's rendition, detention and interrogation program and its authorization of abusive techniques between 2002 and 2009. *See* 32 C.F.R. § 1900.34(c)(2).

We make this Request to further the public's understanding of the CIA's program and the role of senior officials in conceiving of and authorizing the use of abusive interrogation techniques in the wake of September 11, 2001. The public has and continues to manifest an abiding interest in the conduct of the CIA and other executive agencies with

---

[7] https://www.aclu.org/national-security/aclu-v-department-defense.

[8] https://www.aclu.org/accountability-torture-timeline.

[9] In addition to the national ACLU offices, there are 53 ACLU affiliate and national chapter offices located throughout the United States and Puerto Rico. These offices further disseminate ACLU material to local residents, schools, and organizations through a variety of means, including their own websites, publications, and newsletters. Further, the ACLU makes archived materials available at the American Civil Liberties Union Archives at Princeton University Library.

respect to individuals seized, detained, and interrogated for counterterrorism purposes.

Especially given that the Panetta Report reportedly differs from the CIA's response to the SSCI CIA Report, the Panetta Report is a critical part of the record and the subject of urgent and ongoing public debate. Release of the Panetta Report will enhance public discourse by providing the agency's own perspective on, "one of the more controversial programs in its history." Greg Miller and Julie Tate, *CIA Report Refutes Senate Panel's Criticism of Agency's Harsh Interrogation Methods,* Wash. Post, June 27, 2013, http://wapo.st/17Dtquw.

Thus, the ACLU's request for expedited processing should be granted.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### III. Application for Waiver or Limitation of Fees

A.     *Release of the record is in the public interest.*

We request a waiver of search, review, and reproduction fees on the grounds that disclosure of the requested record is in the public interest because it is likely to contribute significantly to the public understanding of the United States government's operations or activities and is not primarily in the commercial interest of the requester. 5 U.S.C. § 552(a)(4)(A)(iii); 32 C.F.R. § 1900.13(b)(2).

The Panetta Report will significantly contribute to public understanding of the government's operations or activities. Moreover, disclosure is not in the ACLU's commercial interest. Any information obtained by the ACLU as a result of this FOIA request will be available to the public at no cost. *See* 32 C.F.R. § 1900.13(b)(2).

Thus, a fee waiver would fulfill Congress's legislative intent in amending FOIA. *See Judicial Watch Inc. v. Rossotti,* 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters." (internal quotation marks and citation omitted)); OPEN Government Act of 2007, Pub. L. No. 110-175, § 2, 121 Stat. 2524 (finding that "disclosure, not secrecy, is the dominant objective of the Act," quoting *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1992)).

B.     *The ACLU qualifies as a representative of the news media.*

A waiver of search and review fees is warranted because the ACLU qualifies as a "representative of the news media" and the Panetta Report is not sought for commercial use. 5 U.S.C. § 552(a)(4)(A)(ii); *see*

*also* 32 C.F.R. § 1900.02(h)(3). Accordingly, fees associated with the processing of this request should be "limited to reasonable standard charges for document duplication."

The ACLU meets the statutory and regulatory definitions of a "representative of the news media" because it is an "entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." 5 U.S.C. § 552(a)(4)(A)(ii)(II); *see also Nat'l Sec. Archive v. Dep't of Def.*, 880 F.2d 1381, 1387 (D.C. Cir. 1989); *cf. Am. Civil Liberties Union v. Dep't of Justice*, 321 F. Supp. 2d 24, 30 n.5 (D.D.C. 2004) (finding non-profit public interest group to be "primarily engaged in disseminating information"). The ACLU is a "representative of the news media" for the same reasons that it is "primarily engaged in the dissemination of information." *See Elec. Privacy Info. Ctr. v. Dep't of Def.*, 241 F. Supp. 2d 5, 10–15 (D.D.C. 2003) (finding non-profit public interest group that disseminated an electronic newsletter and published books was a "representative of the news media" for FOIA purposes).[10] Indeed, the ACLU recently was held to be a "representative of the news media." *Serv. Women's Action Network v. Dep't of Defense*, No. 3:11CV1534 (MRK), 2012 WL 3683399, at *3 (D. Conn. May 14, 2012). *See also Am. Civil Liberties Union of Wash. v. Dep't of Justice*, No. C09–0642RSL, 2011 WL 887731, at *10 (W.D. Wash. Mar. 10, 2011) (finding ACLU of Washington to be a

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[10] On account of these factors, fees associated with responding to FOIA requests are regularly waived for the ACLU. In June 2011, the National Security Division of the Department of Justice granted a fee waiver to the ACLU with respect to a request for documents relating to the interpretation and implementation of a section of the PATRIOT Act. In October 2010, the Department of the Navy granted a fee waiver to the ACLU with respect to a request for documents regarding the deaths of detainees in U.S. custody. In January 2009, the CIA granted a fee waiver with respect to the same request. In March 2009, the State Department granted a fee waiver to the ACLU with regard to a FOIA request submitted in December 2008. The Department of Justice granted a fee waiver to the ACLU with regard to the same FOIA request. In November 2006, the Department of Health and Human Services granted a fee waiver to the ACLU with regard to a FOIA request submitted in November of 2006. In May 2005, the U.S. Department of Commerce granted a fee waiver to the ACLU with respect to its request for information regarding the radio-frequency identification chips in United States passports. In March 2005, the Department of State granted a fee waiver to the ACLU with regard to a request regarding the use of immigration laws to exclude prominent non-citizen scholars and intellectuals from the country because of their political views, statements, or associations. In addition, the Department of Defense did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in April 2007, June 2006, February 2006, and October 2003. The Department of Justice did not charge the ACLU fees associated with FOIA requests submitted by the ACLU in November 2007, December 2005, and December 2004. Finally, three separate agencies—the Federal Bureau of Investigation, the Office of Intelligence Policy and Review, and the Office of Information and Privacy in the Department of Justice—did not charge the ACLU fees associated with a FOIA request submitted by the ACLU in August 2002.

7

"representative of the news media"), *reconsidered in part on other grounds*, 2011 WL 1900140 (W.D. Wash. May 19, 2011).

\* \* \*

Pursuant to applicable statute and regulations, we expect a determination regarding expedited processing within ten (10) calendar days. *See* 5 U.S.C. § 552(a)(6)(E)(ii)(I); 32 C.F.R. § 1900.21(d).

If the request is denied in whole or in part, we ask that you justify all withholdings by reference to specific exemptions to the FOIA. We also ask that you release all segregable portions of otherwise exempt material.

We reserve the right to appeal a decision to withhold any information or to deny a waiver of fees.

Please furnish the applicable records to:

Marcellene Hearn
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Thank you for your prompt attention to this matter.

I hereby certify that the foregoing is true and correct to the best of my knowledge and belief. *See* 5 U.S.C. § 552(a)(6)(E)(vi).

Marcellene Hearn
American Civil Liberties Union
Foundation
125 Broad Street
18th Floor
New York, NY 10004
Tel: 212.549.2622
Fax: 212.549.2654
Email: mhearn@aclu.org

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

8

# Exhibit B

Central Intelligence Agency



Washington, D.C. 20505

24 December 2013

Ms. Marcellene Hearn
American Civil Liberties Union
125 Broad Street
18th Floor
New York, NY 10004

Reference:  F-2014-00480

Dear Ms. Hearn:

On 19 December 2013, the office of the Information and Privacy Coordinator received your 19 December 2013 Freedom of Information Act (FOIA) request, submitted on behalf of the American Civil Liberties Union, for **the disclosure of a report commissioned by former Central Intelligence Agency (CIA) Director Leon Panetta on the Agency's detention and interrogation program (the "Panetta Report").** We have assigned your request the reference number above. Please use this number when corresponding so that we can identify it easily.

You have requested expedited processing. We handle all requests in the order we receive them; that is, "first-in, first-out." We make exceptions to this rule only when a requester establishes a compelling need in accordance with the FOIA, 5 U.S.C. § 552, as amended. Your request does not demonstrate a "compelling need" and, therefore, we deny your request for expedited processing.

The CIA Information Act, 50 U.S.C. § 431, as amended, exempts CIA operational files from the search, review, publication, and disclosure requirements of the FOIA. To the extent your request seeks information that is subject to the FOIA, we accept your request, and we will process it in accordance with the FOIA, 5 U.S.C. § 552, as amended. We will search for records up to and including the date the Agency starts its search. Because we believe fees will be minimal, in accordance with our regulation, as a matter of administrative discretion, the Agency has waived the fees for this request.

The large number of FOIA requests CIA receives has created unavoidable delays making it unlikely that we can respond within the 20 working days the FOIA requires. You have the right to consider our honest appraisal as a denial of your request and you may appeal to the Agency Release Panel. A more practical approach would permit us to continue processing your request and respond to you as soon as we can. You will retain your appeal rights and, once you receive the results of our search, can appeal at that time if you wish. We will proceed on that basis unless you object.

Sincerely,

Michele Meeks
Information and Privacy Coordinator