UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION FOUNDATION,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>CENTRAL INTELLIGENCE AGENCY, *et al.*<br><br>　　　　　　Defendants. | No. 13-cv-01870 (JEB) |

DECLARATION OF ASHLEY GORSKI

　　　　I, Ashley Gorski, a member of the Bar of the State of New York and admitted *pro hac vice* to the Bar of this Court, declare under penalty of perjury as follows:

1.　　I am an attorney with the American Civil Liberties Union Foundation, one of the Plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Opposition to Defendants' Motions to Dismiss and for Summary Judgment, and Plaintiffs' Cross-Motion for Partial Summary Judgment.

2.　　Attached hereto as **Exhibit A** is a true and correct copy of pages S6474 through S6476 of the Congressional Record for December 10, 2014, containing former Senator Mark Udall's Senate floor speech about documents referred to as the "Panetta Review." These Congressional Record pages were downloaded from http://1.usa.gov/1vhQvtj.

* * *

I declare under penalty of perjury that the foregoing is true and correct.

_____
Ashley Gorski

Dated: February 11, 2015
New York, New York

# Exhibit A

by the way, on a partisan basis, even when there are differences. But the aisle sort of disappears when it comes to the Defense authorization bill, and that is the way it should be.

I yield the floor.

Mr. INHOFE. Mr. President, let me reclaim my time just to make one other comment. The two people who are sitting here, Peter Levine on your side and John Bonsell on our side, their compatibility in working together is also unprecedented. It doesn't happen very often. I can't speak for the Senator from Michigan, but I can speak for myself, to say that without these two working together I sure could not have participated in a meaningful way. So I thank them as well.

Mr. LEVIN. The Senator from Oklahoma is speaking for both of us, I can assure him, with his comments and so many other comments he made.

I will yield to the Senator from Colorado, but first I wish to thank him for the great contribution he has made to our committee. I think he is planning on speaking on a different subject. He has played a major role on the Intelligence Committee. I look forward to reading, if not hearing, his remarks on the subject on which I know he has spent a good deal of time. Although he has had perhaps more visibility in terms of the Intelligence Committee, he has been a major contributor on the Armed Services Committee. I can't say we will miss him because I will not be here, but they will miss the Senator from Colorado.

The PRESIDING OFFICER (Ms. HEITKAMP). The Senator from Colorado.

Mr. UDALL of Colorado. Madam President, before I start my remarks on the historic day which was yesterday—when it comes to the publication of our long-in-the-making report on the CIA's torture program—I wish to thank the chairman for his leadership, his mentorship, and his friendship. I also am proud obviously to be a part of the Armed Services Committee and to have chaired the Strategic Forces Subcommittee. Again, I extend my thanks to the good men and women in uniform, as did my good friend from Oklahoma. The NDAA bill is a crucial task in front of us. I look forward to one of my last votes as a Senator from the great State of Colorado, and I look forward to casting a vote in favor of the Defense authorization bill.

Again, I wish to thank my two friends who have mentored me and who have led our committee with great elan and intelligence.

SSCI STUDY OF THE CIA'S DETENTION AND INTERROGATION PROGRAM

Yesterday was a historic day. Almost 6 years after the Senate Intelligence Committee voted to conduct a study of the CIA's detention and interrogation program and nearly 2 years after approving the report, the American people will finally know the truth about a very dark chapter in our Nation's history.

My goal from the start has been twofold. First, I have been committed to correcting the public record on the CIA's multiple misrepresentations to the American people, to other agencies in the executive branch, the White House, and to Congress. Second, my goal has been to ensure that the full truth comes out about this grim time in the history of the CIA and of our Nation so that neither the CIA nor any future administration repeats the grievous mistakes this important oversight work reveals.

The process of compiling, drafting, redacting, and now releasing this report has been much harder than it needed to be. It brings no one joy to discuss the CIA's brutal and appalling use of torture or the unprecedented actions that some in the intelligence community and administration have taken in order to cover up the truth.

A number of my colleagues who have come to the floor over the past 24 hours and discussed this report have referred to 9/11. I, too, will never forget the fear, the pain, and the anger we all felt on that day and in the days that followed. Americans were demanding action from our government to keep us safe. Everyone, myself included, wanted to go to the ends of the Earth to hunt down the terrorists who attacked our Nation and to make every effort to prevent another attack. Although we all shared that goal, this report reveals how the CIA crossed a line and took our country to a place where we violated our moral and legal obligations in the name of keeping us safe. As we know now, this was a false choice. Torture didn't keep us safer after all. By releasing the Intelligence Committee's landmark report, we reaffirm we are a nation that does not hide from its past but must learn from it and that an honest examination of our shortcomings is not a sign of weakness but the strength of our great Republic.

From the heavily redacted version of the executive summary first delivered to the committee by the CIA in August, we made significant progress in clearing away the thick, obfuscating fog these redactions represented.

As Chairwoman FEINSTEIN has said, our committee chipped away at over 400 areas of disagreement with the administration on redactions down to just a few.

We didn't make all the progress we wanted to and the redaction process itself is filled with unwarranted and completely unnecessary obstacles. Unfortunately, at the end of the day, what began as a bipartisan effort on the committee did not end as such, even after my colleagues on the other side of the aisle were repeatedly urged to participate with us as partners.

As my friends in the Senate know, I am a legislator who goes out of his way to form bipartisan consensus. However, it became clear that was not possible here and that is regrettable.

But all told, after reviewing this final version of the committee's study, I believe it accomplishes the goals I laid out and it tells the story that needs to be told.

It also represents a significant and essential step for restoring faith in the crucial role of Congress to conduct oversight. Congressional oversight is important to all of government's activities, but it is especially important for those parts of the government that operate in secret, as the Church Committee discovered decades ago. The challenge the Church Committee members discovered are still with us today: how to ensure that secret government actions are conducted within the confines of the law. The release of this executive summary is testament to the power of oversight and the determination of Chairman FEINSTEIN and the members of this committee to doggedly beat back obstacle after obstacle in order to reveal the truth.

There are a number of thank-yous that are in order. I start by thanking the chairman for her courage and persistence. I also thank the committee staff director, David Grannis; the staff lead for the study, Dan Jones; and his core study team, Evan Gottesman and Chad Tanner. They toiled for nearly 6 years to complete this report. They then shepherded it through the redaction process, all the while giving up their nights, weekends, vacations, and precious time with family and friends in an effort to get to the truth of this secret program for the members of the committee, the Senate, and now the American people.

They have been assisted by other dedicated staff, including my designee on the committee, Jennifer Barrett. We would not be where we are today without them. I am grateful, beyond words, for their service and dedication. I want them to know our country is grateful too.

Let me turn to the study itself. Much has been written about the significance of the study. This is the study. It is a summary of the CIA's detention and interrogation program. I want to start by saying I believe the vast majority of CIA officers welcome oversight and believe in the checks and balances that form the very core of our Constitution.

I believe many rank-and-file CIA officers have fought internally for and supported the release of this report. Unfortunately, again and again, these hardworking public servants have been poorly served by the CIA's leadership. Too many CIA leaders and senior officials have fought to bury the truth while using a redaction pen to further hide this dark chapter of the Agency's history.

The document we released yesterday is the definitive, official history of what happened in the CIA's detention and interrogation program. It is based on more than 6 million pages of CIA and other documents, emails, cables, and interviews. This 500-page study, this document, encapsulates the facts drawn from the 6,700-page report, which is backed up by 38,000 footnotes.

This is a documentary that tells of the program's history based on the CIA's own internal records. Its prose is dry and spare, as you will soon see for yourself. It was put together methodically, without exaggeration or embellishment. This study by itself—using the CIA's own words—brings the truth to light, and that is what it was intended to do.

The study looked carefully at the CIA's own claims—most notably that the so-called enhanced interrogation techniques used on detainees elicited unique, otherwise unobtainable intelligence that disrupted terrorist plots and saved lives. It debunks those claims conclusively.

The CIA repeatedly claimed that using these enhanced interrogation techniques against detainees was the only way to yield critical information about terrorist plotting. But when asked to describe this critical information and detail which plots were thwarted, the CIA provided exaggerated versions of plots and misattributed information that was obtained from traditional intelligence collection, claiming it came from the use of interrogation techniques that are clearly torture.

This study shows that torture was not effective, that it led to fabricated information, and its use—even in secret—undermined our security and our country more broadly. Our use of torture and I believe the failure to truly acknowledge it continues to impair America's moral leadership and influence around the world, creates distrust among our partners, puts Americans abroad in danger, and helps our enemies' recruitment efforts.

Senior CIA leaders would have you believe their version of the truth—promoted in CIA-cleared memoirs by former CIA Directors and other CIA and White House officials—that while there was some excesses in its detention and interrogation program, the CIA did not torture. Their version would have you believe that the CIA's program was professionally conducted, employing trained interrogators to use so-called enhanced interrogation techniques on only the most hardened and dangerous terrorists.

But as Professor Darius Rejali writes in his book ''Torture and Democracy,'' ''To think professionalism is a guard against causing excessive pain is an illusion. Instead, torture breaks down professionalism'' and corrupts the organizations that use it.

This is exactly what happened with the CIA's detention and interrogation program. Without proper acknowledgement of these truths by the CIA and the White House, it could well happen again.

In light of the President's early Executive order disavowing torture, his own recent acknowledgement that ''we tortured some folks'' and the Assistant Secretary of State Malinowski's statements last month to the U.N. Committee Against Torture that ''we hope to lead by example'' in correcting our mistakes, one would think this administration is leading the efforts to right the wrongs of the past and ensure the American people learn the truth about the CIA's torture program. Not so.

In fact, it has been nearly a 6-year struggle—in a Democratic administration no less—to get this study out. Why has it been so hard for this document to finally see the light of day? Why have we had to fight tooth and nail every step of the way? The answer is simple: Because the study says things that former and current CIA and other government officials don't want the American public to know. For a while I worried that this administration would succeed in keeping this study entirely under wraps.

While the study clearly shows that the CIA's detention and interrogation program itself was deeply flawed, the deeper, more endemic problem lies in the CIA, assisted by a White House that continues to try to cover up the truth. It is this deeper problem that illustrates the challenge we face today: reforming an agency that refuses to even acknowledge what it has done. This is a continuing challenge that the CIA's oversight committees need to take on in a bipartisan way. Those who criticize the committee's study for overly focusing on the past should understand that its findings directly relate to how the CIA operates today.

For an example of how the CIA has repeated its same past mistakes in more recent years, look at the section of the executive summary released yesterday that deals with the intelligence on the courier that led to Osama bin Laden. That operation took place under this administration in May of 2011. After it was over, the CIA coordinated to provide misinformation to the White House and its oversight committees suggesting the CIA torture program was the tipoff information for the courier. That is 100 percent wrong and signifies the Agency leadership's persistent and entrenched culture of misrepresenting the truth to Congress and the American people. This example also illustrates again the dangers of not reckoning with the past. So while I agree with my colleagues on the committee who argue that doing oversight in real time is critical, I believe we cannot turn a blind eye to the past when the same problems are staring us in the face in the present. Oversight by willful ignorance is not oversight at all.

In Chairman FEINSTEIN's landmark floor speech earlier this year, she laid out how the CIA pushed back on our committee's oversight efforts. Thanks to her speech, we know about the history of the CIA's destruction of interrogation videotapes and about what motivated her and her colleagues to begin the broader committee study in 2009. We know about the CIA's insistence on providing documents to the committee in a CIA-leased facility and the millions of dollars the CIA spent on contractors hired to read, multiple times, each of the 6 million pages of documents produced before providing them to the committee staff. We know about the nearly 1,000 documents that the CIA electronically removed from the committee's dedicated database on two occasions in 2010, which the CIA claimed its personnel did at the direction of the White House. Of course we know about the Panetta review.

I turn to the Panetta review. I have provided more information on the events that led up to the revelation included in the Panetta review in a set of additional views that I submitted for the committee's executive summary, but I will summarize them.

From the beginning of his term as CIA Director, John Brennan was openly hostile toward and dismissive of the committee's oversight and its efforts to review the detention and interrogation program. During his confirmation hearing, I obtained a promise from John Brennan that he would meet with committee staff on the study once confirmed. After his confirmation, he changed his mind.

In December 2012, when the classified study was approved in a bipartisan vote, the committee asked the White House to coordinate any executive branch comments prior to declassification. The White House provided no comment. Instead, the CIA responded for the executive branch nearly 7 months later, on June 27, 2013.

The CIA's formal response to the study under Director Brennan clings to false narratives about the CIA's effectiveness when it comes to the CIA's detention and interrogation program. It includes many factual inaccuracies, defends the use of torture, and attacks the committee's oversight and findings. I believe its flippant and dismissive tone represents the CIA's approach to oversight—and the White House's willingness to let the CIA do whatever it likes—even if its efforts are armed at actively undermining the President's stated policies.

It would be a significant disservice to let the Brennan response speak for the CIA. Thankfully, it does not have to. There are some CIA officials and officers willing to tell it straight. In late 2013, then-CIA General Counsel Stephen Preston answered a series of questions that I asked about his thoughts on the Brennan response as part of his Armed Services Committee nomination hearing to be General Counsel of the Defense Department.

His answers to the questions about the program contrasted sharply with the Brennan response. For instance, he stated matter of factly that from his review of the facts, the CIA provided the committee with inaccurate information regarding the detention and interrogation program. I have posted on line my questions to Mr. Preston, along with his answers.

Stephen Preston was not alone in having the moral courage to speak frankly and truthfully about the CIA's

torture program. There were also other CIA officers willing to document the truth. In March 2009, then-CIA Director Leon Panetta announced the formation of a Director's review group to look at the agency's detention and interrogation program. As he stated at the time, ''The safety of the American people depends on our ability to learn lessons from the past while staying focused on the threats of today and tomorrow.''

The Director's review group looked at the same CIA documents that were being provided to our committee. They produced a series of documents that became the Panetta review. As I discussed in late 2013, the Panetta review corroborates many of the significant findings of the committee's study. Moreover, the Panetta review frankly acknowledges significant problems and errors made in the CIA's detention and interrogation program. Many of these same errors are denied or minimized in the Brennan response.

As Chairman FEINSTEIN so eloquently outlined in her floor speech on March 11 of this year, drafts of the Panetta review have been provided by the CIA unknowingly to our committee staff years before within the 6 million pages of documents it had provided.

So when the committee received the Brennan response, I expected a recognition of errors and a clear plan to ensure that the mistakes identified would not be repeated again. Instead—this is a crucial point—instead, the CIA continued not only to defend the program and deny any wrongdoing but also to deny its own conclusions to the contrary found in the Panetta review.

In light of those clear factual disparities between the Brennan response and the Panetta review, committee staff grew concerned that the CIA was knowingly providing inaccurate information to the committee in the present day, which is a serious offense, and a deeply troubling matter for the committee, the Congress, the White House, and our country.

The Panetta review was evidence of that potential offense. So to preserve that evidence, committee staff securely transported a printed portion of the Panetta review from the CIA-leased facility to the committee's secure offices in the Senate. This was the proper and right thing to do, not only because of the seriousness of the potential crime, but also in light of the fact that the CIA had previously destroyed interrogation videotapes without authorization and over objections of officials in the Bush White House.

In my view, the Panetta review is a smoking gun. It raises fundamental questions about why a review the CIA conducted internally years ago and never provided to the committee is so different from the official Brennan response and so different from the public statements of former CIA officials. That is why I asked for a complete copy of the Panetta review at a December 2013 Intelligence Committee hearing.

Although the committee now has a portion of the review already in its possession, I believed then, as I do now, that it is important to make public its existence and to obtain a full copy of the report. That is why I am here today, to disclose some of its key findings and conclusions on the Senate floor for the public record, which fly directly in the face of claims made by senior CIA officials past and present.

For example, as I mentioned earlier, on a number of key matters, the Panetta review directly refutes information in the Brennan response. In the few instances in which the Brennan response acknowledges imprecision or mischaracterization relative to the detention interrogation program, the Panetta review is refreshingly free of excuses, qualifications, or caveats.

The Panetta review found that the CIA repeatedly provided inaccurate information to the Congress, the President, and the public on the efficacy of its coercive techniques. The Brennan response, in contrast, continues to insist the CIA's interrogations produced unique intelligence that saved lives. Yet the Panetta review identified dozens of documents that include inaccurate information used to justify the use of torture and indicates that the inaccuracies it identifies do not represent an exhaustive list. The Panetta review further describes how detainees provided intelligence prior to the use of torture against them.

It describes how the CIA, contrary to its own representations, often tortured detainees before trying any other approach. It describes how the CIA tortured detainees, even when less coercive methods were yielding intelligence. The Panetta review further identifies cases in which the CIA used coercive techniques when it had no basis for determining whether a detainee had critical intelligence at all.

In other words, CIA personnel tortured detainees to confirm they did not have intelligence, not because they thought they did. Again, while a small portion of this review is preserved in our committee spaces, I have requested the full document. Our request has been denied by Director Brennan. I will tell you, the Panetta review is much more than a ''summary'' and ''incomplete drafts,'' which is the way Mr. Brennan and former CIA officials have characterized it, in order to minimize its significance. I have reviewed this document. It is as significant and relevant as it gets.

The refusal to provide the full Panetta review and the refusal to acknowledge facts detailed in both the committee study and the Panetta review lead to one disturbing finding: Director Brennan and the CIA today are continuing to willfully provide inaccurate information and misrepresent the efficacy of torture. In other words, the CIA is lying. This is not a problem of the past but a problem that needs to be dealt with today.

Let me turn to the search of the Intelligence Committee's computers.

Clearly the present leadership of the CIA agrees with me that the Panetta review is a smoking gun. That is the only explanation for the CIA's unauthorized search of the committee's dedicated computers in January. The CIA's illegal search was conducted out of concern that the committee staff was provided with the Panetta review. It demonstrates how far the CIA will go to keep its secrets safe. Instead of asking the committee if it had access to the Panetta review, the CIA searched, without authorization or notification, the committee computers that the agency had agreed were off limits.

In so doing, the agency might have violated multiple provisions of the Constitution as well as Federal criminal statutes and Executive Order 12333.

More troubling, despite admitting behind closed doors to the committee that the CIA conducted the search, Director Brennan publicly referred to ''spurious allegations about CIA actions that are wholly unsupported by the facts.''

He even said such allegations of computer hacking were beyond ''the scope of reason.'' The CIA then made a criminal referral to the Department of Justice against the committee staff who were working on the study. Chairman FEINSTEIN believed these actions were an effort to intimidate the committee staff, the very staff charged with CIA oversight. I strongly agree with her point of view.

The CIA's inspector general subsequently opened an investigation into the CIA's unauthorized search and found, contrary to Director Brennan's public protestations, that a number of CIA employees did, in fact, improperly access the committee's dedicated computers. The investigation found no basis for the criminal referral on the committee staff. The IG also found that the CIA personnel involved demonstrated a ''lack of candor'' about their activities to the inspector general.

However, only a 1-page unclassified summary of the IG's report is publicly available. The longer classified version was only provided briefly to Members when it was first released. I had to push hard to get the CIA to provide a copy for the committee to keep in its own records. Even the copy in committee records is restricted to committee members and only two staff members, not including my staff member.

After having reviewed the IG report myself again recently, I believe even more strongly that the full report should be declassified and publicly released, in part because Director Brennan still refuses to answer the committee's questions about the search.

In March, the committee voted unanimously to request responses from Director Brennan about the computer search. The chairman and vice chairman wrote a letter to Director Brennan, who promised a thorough response