# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN CIVIL LIBERTIES UNION, *et al.,*

Plaintiffs,

v.

CENTRAL INTELLIGENCE AGENCY, *et al.,*          No. 1:13-cv-01870 (JEB)

Defendants.

## PLAINTIFFS' CORRECTED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT, AND PLAINTIFFS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Ave. NW, Suite 434
Washington, D.C. 20008
Phone: (202) 457-0800
Fax: (202) 457-0805
artspitzer@aclu-nca.org

Hina Shamsi (D.C. Bar No. MI0071)
Alex Abdo (pro hac vice)
Ashley Gorski (pro hac vice)
Dror Ladin (pro hac vice)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7321
Fax: (212) 549-2654
hshamsi@aclu.org

*Counsel for Plaintiffs*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................. iii

**PRELIMINARY STATEMENT** ........................................................................................1

**FACTUAL AND PROCEDURAL BACKGROUND** ..................................................2

    A.    Initiation of SSCI investigation into CIA abuses ............................................2

    B.    The SSCI's *Committee Study of the CIA's Detention and Interrogation Program* .......4

    C.    The Panetta Report ..........................................................................................6

    D.    The ACLU's lawsuit and the CIA's representations to the ACLU and the Court .........7

    E.    SSCI's release of the Executive Summary and transmittal of the Final Full Report .....8

    F.    Senator Burr's request for return of the Final Full Report ...........................11

    G.    Defendants' subsequent filings before this Court .......................................13

**ARGUMENT** ....................................................................................................................14

I.    The Final Full Report is an agency record subject to FOIA. ...............................14

    A.    Legal standards and burden of proof. .........................................................14

    B.    The Final Full Report is an "agency record," and Defendants have not met their burden of showing otherwise ......................................................15

        1.    Congress relinquished control over the Final Full Report. .................17

            a.    By its terms, the SSCI-CIA June 2009 agreement does not govern the Final Full Report .......................................18

            b.    The Final Full Report's classification status does not indicate congressional control. ....................................19

            c.    Senator Burr's post-hoc attempt to assert control over the Final Full Report is irrelevant. ....................................23

        2.    Defendants may use the Final Full Report as they see fit. ..................24

II.  The CIA has not shown that any portion of the Panetta Report
     can be withheld under Exemptions 1, 3, or 5....................................................................27

     A.  Legal standards and the burden of proof.....................................................27

     B.  The CIA has not met its burden of showing that the deliberative
         process privilege applies to the Panetta Report. .........................................28

         1.  The CIA has not shown that the Panetta Report
             documents are "predecisional." .........................................................29

         2.  The CIA has not shown that the Panetta Report
             documents are "deliberative."............................................................31

         3.  "Draft" status cannot shield the Panetta Report documents. ............37

     C.  The "official acknowledgment" doctrine precludes the CIA from withholding the
         Panetta Report documents.............................................................................38

     D.  This Court should review the Panetta Report documents *in camera*.........................39

     E.  The CIA has not met its burden of establishing that the Panetta Report is subject to
         Exemptions 1 and 3........................................................................................40

**CONCLUSION** ...................................................................................................................41

# TABLE OF AUTHORITIES

**Cases**

*Access Reports v. Dep't of Justice*,
   926 F.2d 1192 (D.C. Cir. 1991)..................................................................... 27, 29

*ACLU v. Dep't of Defense*,
   339 F. Supp. 2d 501 (S.D.N.Y. 2004) ................................................................. 3

*ACLU v. Dep't of Justice*,
   655 F.3d 1 (D.C. Cir. 2011)............................................................................... 27

*Ameziane v. Obama*,
   699 F.3d 488 (D.C. Cir. 2012)........................................................................... 39

*Ancient Coin Collectors Guild v. Dep't of State*,
   641 F.3d 504 (D.C. Cir. 2011)........................................................................... 34

*Arthur Andersen & Co. v. IRS*,
   679 F.2d 254 (D.C. Cir.1982)............................................................................ 37

*Burka v. U.S. Dep't of Health and Human Servs.*,
   87 F.3d 508 (D.C. Cir. 1996)....................................................................... 15, 16

*Carter v. U.S. Dep't of Commerce*,
   830 F.2d 388 (D.C. Cir. 1987)........................................................................... 40

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854  (D.C. Cir. 1980).......................................................................... 28

*Davis v. Dep't of Justice*,
   968 F.2d 1276 (D.C. Cir. 1992)......................................................................... 38

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976)..................................................................................... 14, 27

*Dudman Commc'ns Corp. v. Dep't of Air Force*,
   815 F.2d 1565 (D.C. Cir. 1987)......................................................................... 34

*EPA v. Mink*,
   410 U.S. 73 (1973)............................................................................................ 32

*Fitzgibbon v. CIA*,
   911 F.2d 755 (D.C. Cir. 1990)...................................................................... 38, 39

iii

*Frugone v. CIA*,
   169 F.3d 772 (D.C. Cir. 1999) ..................................................................... 39

*Goldberg v. Dep't of State*,
   818 F.2d 71 (D.C. Cir. 1987) ....................................................................... 27

*Gordon v. Nat'l Youth Work Alliance*,
   675 F.2d 356 (D.C. Cir. 1982) ..................................................................... 14

* *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*,
   636 F.2d 838 (D.C. Cir. 1980) ............................................................... 17, 23

*I.T. Consultants, Inc. v. Rep. of Pakistan*,
   351 F.3d 1184 (D.C. Cir. 2003) ................................................................... 14

*ITT World Commc'ns, Inc. v. FCC*,
   699 F.2d 1219 (D.C. Cir. 1983) ................................................................... 33

*Jones v. FBI*,
   41 F.3d 238 (6th Cir. 1994) ........................................................................ 37

*Judicial Watch, Inc. v CFPB*,
   --- F. Supp. 2d ---, 2014 WL 1245303 (D.D.C. Mar. 27, 2014) ......................... 30, 31

*Judicial Watch, Inc. v. Dep't of Commerce*,
   34 F. Supp. 2d 28 (D.D.C. 1998) ................................................................. 16

*Judicial Watch, Inc. v. U.S. Postal Serv.*,
   297 F. Supp. 2d 252 (D.D.C. 2004) ............................................................. 37

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ..................................................................... 14

*Larson v. Dep't of State*,
   565 F.3d 857 (D.C. Cir. 2009) ..................................................................... 27

*Mapother v. Dep't of Justice*,
   3 F.3d 1533 (D.C. Cir. 1993) ................................................................. 31, 35

*Mayer, Brown, Rowe & Maw LLP v. IRS*,
   537 F. Supp. 2d 128 (D.D.C. 2008) ............................................................. 37

*Montrose Chemical*,
   491 F.2d 63 (D.C. Cir. 1974) ....................................................................... 34

*Nat'l Ass'n of Home Builders v. Norton,*
    309 F.3d 26 (D.C. Cir. 2002) ........................................................ 27

*Nat'l Sec. Archive v. CIA,*
    752 F.3d 460 (D.C. Cir. 2014) .................................................. 34, 37

*New York Times v. Dep't of Justice,*
    756 F.3d 100 (2d Cir. 2014) ........................................................ 38

*NLRB v. Robbins Tire & Rubber Co.,*
    437 U.S. 214 (1978) ............................................................... 14, 25

*NLRB v. Sears, Roebuck & Co.,*
    421 U.S. 132 (1975) ................................................................... 38

\* *Paisley v. CIA,*
    712 F.2d 686 (D.C. Cir. 1983) ............................................. passim

*Petroleum Info. Corp. v. U.S. Dep't of Interior,*
    976 F.2d 1429 (D.C. Cir. 1992) ............................................... 28, 31

\* *Playboy Enters., Inc. v. Dep't of Justice,*
    677 F.2d 931 (D.C. Cir. 1982) ........................................... 32, 33, 35

\* *Pub. Citizen, Inc. v. OMB,*
    598 F.3d 865 (D.C. Cir. 2009) ........................................... 28, 31, 32

*Quarles v. Dep't of Navy,*
    893 F.2d 390 (D.C. Cir. 1990) ............................................... 32, 36

*Russell v. Dep't of Air Force,*
    682 F.2d 1045 (D.C. Cir. 1982) .................................................. 34

*SafeCard Servs., Inc. v. SEC,*
    926 F.2d 1197 (D.C. Cir. 1991) .................................................. 29

*Scheuer v. Rhodes,*
    416 U.S. 232 (1974) ................................................................... 14

*Senate of Puerto Rico v. Dep't of Justice,*
    823 F.2d 574 (D.C. Cir. 1987) .................................................... 30

*Spirko v. U.S. Postal Serv.,*
    147 F.3d 992 (D.C. Cir. 1998) .................................................... 40

*Tax Analysts v. IRS*,
   117 F.3d 607 (D.C. Cir. 1997) ................................................................................. 38

*U.S. Dep't of Justice v. Tax Analysts*,
   492 U.S. 136 (1989) ..................................................................................... 14, 15

\* *United We Stand Am., Inc. v. IRS*,
   359 F.3d 595 (D.C. Cir. 2004) .............................................................. 16, 17, 23

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ........................................................................ 33, 36

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ................................................................................. 38

**Statutes**

5 U.S.C. § 552 ................................................................................................ passim

**Other Authorities**

5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1350 ................................................. 14

Exec. Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009) ...................................... 19, 20, 21

## PRELIMINARY STATEMENT

The ACLU brought this Freedom of Information Act ("FOIA") lawsuit to vindicate the right of the American public to release of two critically important documents concerning Defendant CIA's now-discontinued program of detention, torture, and other abuse of detainees.

The first document, a 6,963-page report by the Senate Select Committee on Intelligence ("SSCI"), is the product of the SSCI's comprehensive investigation into the CIA's torture program ("Final Full Report"). That report describes widespread and horrific human rights abuses by the CIA. It also details the CIA's evasions and misrepresentations to Congress, the White House, the courts, the media, and the American public. Defendants argue that the report is not an "agency record" subject to FOIA and cannot be released to the public. The issue before this Court, both parties agree, is whether Congress intended to relinquish control of the document and whether the Defendant agencies can use the report as they see fit. D.C. Circuit precedent makes plain that this inquiry boils down to a question of contemporaneous congressional intent, and the record before the Court is clear. The SSCI transmitted the Final Full Report to all Defendant agencies in December 2014; both then and before, the SSCI made clear its intent to relinquish control of the Final Full Report to Defendants. The ACLU respectfully asks the Court to deny Defendants' motion to dismiss.

The ACLU also seeks release of the CIA's "Panetta Report," which the agency describes as a series of internal reports on certain CIA records provided to the SSCI for its investigation. According to former Senator Mark Udall, the Panetta Report is a "smoking gun," and it shows that "the CIA repeatedly provided inaccurate information to the Congress, the President, and the public on the efficacy of its coercive techniques." Defending against public release of the Panetta Report, the CIA asserts that it is subject to the deliberative process privilege and may be

withheld in its entirety under FOIA Exemption 5. But to claim that privilege, the CIA must show that the Panetta Report is both (a) "predecisional," meaning that it was generated as part of decision-making process, and (b) "deliberative," because it related to the formulation or exercise of an agency policy. The CIA fails on both counts. It identifies no actual decision-making process to which the Panetta Report contributed, and it likewise fails to show that the Panetta Report makes recommendations or expresses opinions about legal or policy matters. The agency's withholding of the entire Panetta Report is improper for still another reason: the Panetta Report documents likely contain information that has been officially acknowledged or that constitutes the agency's working law, thus waiving any Exemption. The ACLU respectfully asks the Court to review the Panetta Report *in camera* to assure itself of these conclusions, and then to deny Defendants' motion for summary judgment and grant the ACLU's motion for partial summary judgment with a finding that Exemption 5 does not bar the release of the Panetta Report.

Both the Final Full Report and the Panetta Report concern one of the darkest chapters in our nation's history, involving some of the most egregious CIA abuses ever recorded. Release of these reports is necessary to fulfill Congress's purposes in passing the FOIA: to ensure an informed citizenry, to open the government to the sharp eye of public scrutiny, and to hold the government accountable to the governed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Initiation of SSCI investigation into CIA abuses

The SSCI first began to investigate CIA abuses because the CIA destroyed evidence of its coercive interrogations. On December 6, 2007, the SSCI learned from a *New York Times* article that in November 2005, the CIA had destroyed videotapes of certain abusive interrogations, despite the objections of then-President Bush's White House Counsel and the then-Director of

National Intelligence. *See* Press Release, Sen. Feinstein, Statement on Intel Committee's CIA

Detention, Interrogation Report (Mar. 11, 2014), http://1.usa.gov/1GdfNhk ("Sen. Feinstein

Statement").[1] According to Senator Dianne Feinstein, an initial SSCI investigation arising out of

the CIA's destruction of interrogation tapes was "chilling" because it found that "interrogations

and the conditions of confinement at the CIA detention sites were far different and far more

harsh than the way the CIA had described them to us." *Id*. Subsequently, on March 5, 2009, the

SSCI voted 14-to-1 to initiate a comprehensive review of the CIA's detention and interrogation

program. *See id*.

   Although the SSCI had wanted to conduct its investigation in part by reviewing relevant

CIA documents within the SSCI's own offices, the SSCI and the CIA agreed that SSCI staff

would review the agency's documents at a facility in Northern Virginia, subject to "several

conditions and protections to ensure the integrity" of the SSCI's investigation.[2] *See id*. The

---

[1] The CIA destroyed those tapes even though they were covered by a federal district court judge's order to the agency to "produce or identify all responsive documents" to a FOIA request seeking records related to the treatment of detainees apprehended after September 11, 2001 and held in U.S. custody abroad. *See ACLU v. Dep't of Defense*, 339 F. Supp. 2d 501, 505 (S.D.N.Y. 2004).

[2] In 2010, the SSCI learned that on two separate occasions, in violation of the agreement between it and the CIA, agency personnel removed nearly 1,000 pages of documents that had originally been provided to the Committee. In a separate incident, the CIA revoked the SSCI's access to the "Panetta Report" documents, discussed *infra*.

The dispute over the CIA's removal of those documents and a "search" by CIA personnel of SSCI computers raised "grave concerns" about the CIA's violation of "the separation of powers principles embodied in the United States Constitution" and its undermining of "the constitutional framework essential to effective congressional oversight of intelligence activities." Sen. Feinstein Statement; *see also* Press Release, Sen. Leahy, Statement of Sen. Patrick Leahy (D-Vt.), Chairman, Senate Judiciary Committee, On CIA Interference with Senate Select Committee on Intelligence Investigation (Mar. 11, 2014), http://1.usa.gov/15BSaDn; Carolyn Lochhead, *Feinstein Winning Fight with CIA, Obama Over Torture Report*, S.F. Gate, Aug. 9, 2014, http://bit.ly/1opwhPn ("John McCain of Arizona and Lindsey Graham of South Carolina[] sprang to Feinstein's defense in an Aug. 1 press conference. McCain accused the CIA of 'violating the fundamental barriers of constitutional authority' and acting like a 'rogue agency.'").

The CIA's Inspector General conducted an investigation into the agency's actions, and concluded that the CIA improperly monitored SSCI staff. Jonathan S. Landay & Ali Watkins, *CIA Admits It Broke into*

SSCI's investigation involved the review of approximately six million pages of CIA documents and lasted more than three years. *See* Executive Summary, *Committee Study of the CIA's Detention and Interrogation Program*, Dec. 3, 2014, http://1.usa.gov/1wy9dw9 (together with the SSCI's Findings and Conclusions, the "Executive Summary").

**B.      The SSCI's *Committee Study of the CIA's Detention and Interrogation Program***

The SSCI approved an initial version of its full investigative report, *Committee Study of the CIA's Detention and Interrogation Program* ("Initial SSCI Report") on December 13, 2012. Upon the Committee's adoption of the Initial SSCI Report, then-Chairman Feinstein said that the study "uncovers startling details about the CIA detention and interrogation program and raises critical questions about intelligence operations and oversight." Press Release, Sen. Feinstein, Feinstein Statement on CIA Detention, Interrogation Report (Dec. 13, 2012), http://1.usa.gov/SXEWHH.

After adopting the Initial SSCI Report, the Committee sent it to executive branch agencies for review and comment. In a transmittal letter accompanying the report, the SSCI explained that it was soliciting from executive branch agencies "suggested edits or comments." Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 14, 2012, ECF No. 41-1. The Committee required the CIA to provide a list of personnel who would access the report for this limited purpose. *See* Higgins Decl. ¶¶ 15–16, ECF No. 39-1.

---

*Senate Computers; Senators Call for Spy Chief's Ouster*, McClatchy D.C., July 31, 2014, http://bit.ly/WPqgAf. The Inspector General also determined that the CIA had made allegations about SSCI staff's misconduct to the Justice Department based on "inaccurate information." *Id.*

In June 2013, the CIA sent the SSCI an official response to the Initial SSCI Report, which has since been publicly released.[3] *See* CIA, June 2013 Response to the SSCI Study on the Former Detention and Interrogation Program, http://1.usa.gov/1zG0tKI.

Once the SSCI received feedback from the CIA, as well as the views of minority members of the Committee, in April 2014, it revised the Initial SSCI Report, and created an updated version ("First Updated Full Report"). *See* 160 Cong. Rec. S6405–10 (daily ed. Dec. 9, 2014), http://1.usa.gov/1z3Aawf. On April 3, 2014, by a bipartisan vote of 11-to-3, the SSCI voted to send the Executive Summary of the First Updated Full Report to President Obama for declassification and public release. A member of the SSCI described the report as "profoundly disturb[ing]" and observed that "much of what CIA officials have said about the effectiveness of coercive interrogations was simply untrue." Press Release, Sen. Wyden, Wyden Statement on the Senate Intelligence Committee's Vote to Declassify its Interrogation Report (Apr. 3, 2014), http://1.usa.gov/1lEpBeH; *see also* Press Release, Sen. Feinstein, Intelligence Committee Votes to Declassify Portions of CIA Study (Apr. 3, 2014), http://1.usa.gov/1sdy75I (describing the report's exposure of "brutality that stands in stark contrast to our values as a nation").

On April 7, 2014, Chairman Feinstein transmitted the Executive Summary of the First Updated Full Report to the executive branch. Her accompanying letter to the President stated that she would:

---

[3] The CIA's response agreed with several of the SSCI's key conclusions, including the fact that the CIA lacked "core competencies" to undertake a detention and interrogation program; that there were "significant lapses" in the agency's development and monitoring of its detention and interrogation activities; and that the agency detained some individuals under a "flawed interpretation" of the authorities granted to it. *See* Cover Letter from Director Brennan to The Hon. Dianne Feinstein & The Hon. Saxby Chambliss, June 27, 2013, at 2–4, http://1.usa.gov/1yDQe5j. However, the CIA disagreed with other conclusions, such as the SSCI's finding that coercive interrogation methods were ineffective. *See* CIA, June 2013 Response at 12–13, http://1.usa.gov/1yDQe5j.

> transmit separately copies of the full, updated classified report to you and to
> appropriate Executive Branch agencies. . . . This full report should be considered
> as the final and official report from the Committee. I encourage and approve the
> dissemination of the updated report to all relevant Executive Branch agencies . . . .

Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Apr. 7, 2014, ECF No. 41-2. The

Director of National Intelligence, Director of the CIA, Attorney General, Secretary of Defense,

and Secretary of State were copied on the transmittal letter. *See id.*

That April 7, 2014 transmittal letter contained no indication that any SSCI committee

member objected to providing the First Updated Full Report to the executive branch, nor did it

indicate any intent by SSCI to impose restrictions on the dissemination of the First Updated Full

Report either within or outside of the executive branch. *See id.* The CIA received the First Full

Updated Report in the summer of 2014. *See* Higgins Decl. ¶ 21.

## C.      The Panetta Report

When former CIA Director Leon Panetta joined the agency in 2009, he asked agency

personnel to keep him apprised of noteworthy information from the millions of documents that

the CIA provided to the SSCI. *See* Lutz Decl.¶ 13, ECF No. 38-1. In response to this request,

CIA personnel drafted a series of reports concerning some of the materials the CIA shared with

the SSCI (collectively, the "Panetta Report" and also referred to as the "Panetta review"). SSCI

staff first saw portions of the Panetta Report in 2010. *See* Sen. Feinstein Statement.

According to the CIA, the Panetta Report consists primarily of factual "summaries" of

certain information the agency provided to the SSCI. Lutz Decl. ¶¶ 13–16, 25. A Senator who

reviewed portions of the Panetta Report asserted that the documents also include analysis and

conclusions. According to then-Senator Mark Udall, the Panetta Report "acknowledges

significant problems and errors made in the CIA's detention and interrogation program":

6

In my view, the Panetta review is a smoking gun. It raises fundamental questions about why a review the CIA conducted internally years ago and never provided to the Committee is so different from the official [June 2013] response and so different from the public statements of former CIA officials.

. . . .

The Panetta review found that the CIA repeatedly provided inaccurate information to the Congress, the President, and the public on the efficacy of its coercive techniques. The [CIA's June 2013] response, in contrast, continues to insist the CIA's interrogations produced unique intelligence that saved lives. Yet the Panetta review identified dozens of documents that include inaccurate information used to justify the use of torture and indicates that the inaccuracies it identifies do not represent an exhaustive list. The Panetta review further describes how detainees provided intelligence prior to the use of torture against them.

. . . .

I will tell you, the Panetta review is much more than a "summary" and "incomplete drafts," which is the way Mr. Brennan and former CIA officials have characterized it, in order to minimize its significance. I have reviewed this document. It is as significant and relevant as it gets. . . . Director Brennan and the CIA today are continuing to willfully provide inaccurate information and misrepresent the efficacy of torture. In other words, the CIA is lying.

160 Cong. Rec. S6476 (daily ed. Dec. 10, 2014), http://1.usa.gov/1vrj4dw (attached

hereto as Exhibit A to the Gorski Declaration); *see also* Sen. Feinstein Statement.

## D.      The ACLU's lawsuit and the CIA's representations to the ACLU and the Court

In November 2013, the ACLU filed suit for the full SSCI investigative report and the

CIA's official June 2013 response to the SSCI.[4] The ACLU amended its complaint as of right in

January 2014 to enforce a separate FOIA request for the Panetta Report. Following the SSCI's

April 2014 revisions to its report, and with the government's consent, the ACLU filed a second

amended complaint to enforce its FOIA request for the "updated version" of the SSCI's full

report from the CIA, DOD, DOJ, and DOS. *See* Second Amended Compl. ¶ 6 (June 5, 2014),

ECF No. 22-1.

---

[4] The ACLU no longer seeks the CIA's June 2013 response to the SSCI.

Starting in June 2014, counsel for the ACLU asked government counsel on a monthly basis to confirm whether the CIA and other Defendant agencies had received the First Updated Full Report. As ACLU counsel informed the Court during an October 2014 status conference, the ACLU was "told that, in fact, no agencies possessed a full report and that was based on agency's [sic] representations to the Department of Justice. That representation was in addition, Your Honor, made to you on September 4th." Hr'g Tr., Status Conf., Oct. 7, 2014 at 5:5–9. After government counsel's representation to the Court on September 4th, "Senate staff directly urged DOJ" to research "[w]hether the agencies did have the full updated report." *Id.* at 5:24–6:1.

During the October 2014 status conference, government counsel informed the Court and the ACLU that the CIA had indeed received the full report, stating: "after the last status conference [on September 4, 2014], we asked that CIA check for the full report again, and they discovered that they did have it. And there was a miscommunication apparently within the agency as to what they were looking for. In fact, we have learned that the report was conveyed on disk, which may explain some of how 6,000 pages may have—they didn't realize that they had it." *Id.* at 7:12-18.

At the same October status conference, the government agreed that Plaintiffs would not be required to file additional FOIA requests or to further amend the complaint to seek an updated version of the full SSCI investigative report. The Court memorialized this agreement in its Minute Order. *See* Minute Order, *ACLU v. CIA*, No. 13-cv-1870 (Oct. 7, 2014).

**E.      SSCI's release of the Executive Summary and transmittal of the Final Full Report**

The SSCI publicly released the Executive Summary, along with minority views and the additional views of SSCI members, on December 9, 2014. That release generated extensive world-wide public and media attention to the CIA's cruelty towards its prisoners and deceit

towards lawmakers and the American public. *See, e.g.*, Greg Miller, Adam Goldman, & Julie

Tate, *Senate Report on CIA Program Details Brutality, Dishonesty*, Wash. Post, Dec. 9, 2014,

http://wapo.st/1uhd3ty (describing the SSCI's "exhaustive" description of "levels of brutality,

dishonesty and seemingly arbitrary violence that at times brought even agency employees to

moments of anguish," and its cataloguing of "dozens of cases" of alleged CIA deceptions);

Editorial Board, *The Senate Report on the C.I.A.'s Torture and Lies*, N.Y. Times, Dec. 9, 2014,

http://nyti.ms/1uhxqpy ("even after being sanitized by the Central Intelligence Agency itself, [the

Executive Summary] is a portrait of depravity that is hard to comprehend and even harder to

stomach").[5]

President Obama described the Executive Summary as "reinforc[ing] my long-held view

that these harsh methods were not only inconsistent with our values as a nation, they did not

serve our broader counterterrorism efforts or our national security interests." Press Release, The

White House, Statement of the Senate Select Committee on Intelligence (Dec. 9, 2014),

http://1.usa.gov/1Gf7PEp. The public release of the Executive Summary also spurred renewed

calls for reform of the CIA and accountability for its actions. *See, e.g.*, Editorial Board,

*Prosecute Torturers and Their Bosses*, N.Y. Times, Dec. 21, 2014, http://nyti.ms/1wBBMxw

(demanding the investigation and prosecution of the architects of the CIA torture program);

---

[5] As documented in the Executive Summary, the CIA has a history of evasion and misrepresentation in connection with FOIA requests relating to its post-9/11 torture of detainees. Specifically, the Executive Summary refers to CIA efforts to deny FOIA requests for previously acknowledged information and reveals that the CIA prepared a "media campaign" that contemplated "off-the-record disclosures" about the very issues that the CIA was asserting in response to FOIA requests should remain secret. Executive Summary at 404–05. In an internal CIA communication, one agency attorney expressed concern that "'[o]ur Glomar figleaf is getting pretty thin.'" *Id.* at 405. In another communication, a CIA attorney remarked that "the [legal] declaration I just wrote about the secrecy of the interrogation program [is] a work of fiction. *Id.* The DOJ has since said that the declaration referred to in this latter communication did not concern a FOIA lawsuit. *See* Letter, Tara M. La Morte, Assistant United States Attorney, to The Hon. Alvin K. Hellerstein, Jan. 16, 2015, *ACLU v. Dep't of Defense*, No. 04-cv-4151 (AKH), ECF No. 536, http://bit.ly/1BkXu6T.

Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 30,

2014, http://1.usa.gov/1yZy5mE (outlining recommendations for legislative and administrative

reform "to make sure that the United States never again engages in actions that you have

acknowledged were torture").

At the time, Senator Feinstein also described the Final Full Report, which exceeds 6,900

pages and contains over 37,000 footnotes:

> The full Committee Study also provides substantially more detail than what is included in
> the Executive Summary on the CIA's justification and defense of its interrogation
> program on the basis that it was necessary and critical to the disruption of specific
> terrorist plots and the capture of specific terrorists. While the Executive Summary
> provides sufficient detail to demonstrate the inaccuracies of each of these claims, the
> information in the full Committee Study is far more extensive.

Sen. Feinstein, Foreword, Executive Summary at 3. Among the matters more expansively

detailed in the Final Full Report are the CIA's efforts to evade oversight for abusive conduct by

making misrepresentations to Congress, to other executive branch agencies including the

Department of Justice, to the courts, to the media, and to the American public. *See, e.g.*,

Executive Summary at 172–73 n.1050, 177 n. 1058.

Senator Feinstein emphasized in her foreword to the Executive Summary that the SSCI's

full report "is now final and represents the official views of the Committee. This and future

Administrations should use this Study to guide future programs, correct past mistakes, increase

oversight of CIA representations to policymakers, and ensure coercive interrogation practices are

not used by our government again." Sen. Feinstein, Foreword, Executive Summary at 5.

On the same day, the SSCI formally filed the full version of its 6,963-page study with the

Senate. In the SSCI's filing with the Senate, Senator Feinstein's cover letter stated that "[t]he

entire classified report will be provided to the Executive Branch for dissemination to all relevant

agencies. The full report should be used by the Central Intelligence Agency and other

10

components of the Executive Branch to help make sure that the system of detention and

interrogation described in this report is never repeated." Letter, Sen. Dianne Feinstein to Sen.

Patrick Leahy, President Pro Tempore, United States Senate, Dec. 9,

2014, http://1.usa.gov/1wy9dw9.

On December 10, the SSCI sent the Final Full Report to President Obama. Senator

Feinstein's transmittal letter—copying the Director of National Intelligence, the Director of the

CIA, the Attorney General, the Secretary of Defense, the Secretary of State, the Director of the

FBI, and the CIA Inspector General—states that "the full report should be made available within

the CIA and other components of the Executive Branch for use as broadly as appropriate to help

make sure that this experience is never repeated. To help achieve this result, I hope you will

encourage use of the full report in the future development of CIA training programs, as well as

future guidelines and procedures for all Executive Branch employees, as you see fit." Letter, Sen.

Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014, ECF No. 41-3.

The December 10 transmittal letter contained no indication that any SSCI member

objected to SSCI's transmittal of the Final Full Report to Defendants, nor did it indicate that the

SSCI sought to impose any restrictions on the dissemination of the Final Full Report either

within or outside of the executive branch. The SSCI sent the Final Full Report to each of the

Defendants in December 2014. *See* Frifield Decl. ¶ 8, ECF No. 39-2; Herrington Decl. ¶ 5, ECF

No. 39-3; Higgins Decl. ¶ 21, ECF No. 39-1; Kadzik Decl. ¶ 5, ECF No. 39-4.

F.      **Senator Burr's request for return of the Final Full Report**

A week before Defendants' responsive filings in this case, Senator Richard Burr, now

Chairman of the SSCI, wrote to the President, requesting the transfer back to the SSCI of all

copies of the Final Full Report in the possession of the executive branch. *See* Mark Mazzetti,

*C.I.A. Report Found Value of Brutal Interrogation Was Inflated*, N.Y. Times, Jan. 20, 2015, http://nyti.ms/1DbxUUv. Senator Burr's letter, dated January 14, 2015, was made public in Defendants' responsive filings. In his letter, Senator Burr indicated that he had only recently become aware that the Final Full Report had been sent to the executive branch on December 10, 2014, and sought the return of copies "immediately." *See* Letter, Sen. Richard Burr to The Hon. Barack Obama, Jan. 14, 2015, ECF No. 41-4. He also requested that the Final Full Report "not be entered into any Executive Branch system of records." *Id.*

Several members of the SSCI and other Senators have criticized Senator Burr's request. Senator Feinstein, now Vice Chairman of the SSCI, wrote to President Obama stating that she did not support Senator Burr's request and disputed assertions made in it. *See* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Jan. 16, 2015, ECF No. 41-5 ("There was never any objection to providing the full, official report to the Executive Branch."). She explained that the purpose of the Final Full Report "is to ensure that nothing like the CIA's detention and interrogation program from 2002 to 2008 can ever happen again. The realization of that goal depends in part on future Executive Branch decision makers having and utilizing a comprehensive record of this program, in far more detail than what we were able to provide in the now declassified and released Executive Summary." *Id.*

Another SSCI member, Senator Martin Heinrich, called Senator Burr's request "unprecedented and misguided," stating, "I've always believed the committee's full report on the CIA detention and interrogation program should be publicly released. But barring that, appropriately cleared U.S. government officials should have access to the full 6,900-page report to better understand what went wrong during that dark period." Press Release, Sen. Heinrich,

Heinrich Statement on Efforts to Cover Up Torture Report (Jan. 21, 2015),

http://1.usa.gov/15D9kkd.

Senator Leahy has also criticized Senator Burr's attempt to seek the return of the Final

Full Report:

> Neither the Senate Intelligence Committee's historic report on the now-defunct CIA detention and interrogation program, nor the shameful truths it contains about the use of torture during the previous administration, can be wiped out of existence. . . . The Senate at its best can act as the conscience of the Nation, and part of that responsibility is ensuring transparency in our government and helping the executive branch learn from past mistakes.

Press Release, Sen. Leahy, On Requests to Return the Senate Intelligence Committee's Torture

Report (Jan. 22, 2015), http://1.usa.gov/1wxT1Lm.[6]

## G.   Defendants' subsequent filings before this Court

All Defendants have moved to dismiss Plaintiffs' FOIA claim for the Final Full Report

on the basis that it is a congressional record. Defs.' Mot. Dismiss 22–23, ECF No. 39. According

to Defendants' declarations in support of their motion to dismiss, the CIA and DOD are the only

agencies that have reviewed the Final Full Report—the remaining Defendants have not opened

the package containing the document.[7]

Defendant CIA has separately moved for summary judgment on Plaintiffs' FOIA claim

for the Panetta Report, contending that the records are protected by the deliberative process

---

[6] On January 27, 2015, the ACLU filed an emergency motion to protect this Court's jurisdiction over the Final Full Report, which the ACLU withdrew after Defendants committed to retaining the Report pending the Court's adjudication of the parties' agency control dispute. *See* Pls.' Notice of Withdrawal of Pls.' Emergency Mot. (Feb. 9, 2015), ECF No. 43.

[7] DOJ's treatment of the Final Full Report now appears inconsistent with its handling of previous versions of the document, which it reportedly opened. *See* Charlie Savage, *U.S. Tells Court That Documents From Torture Investigation Should Remain Secret*, N.Y. Times, Dec. 10, 2014, http://nyti.ms/1qA77zw ("The Justice Department said in a statement on Tuesday that its investigators had looked at the full version of the Senate Intelligence Committee report 'and did not find any new information that they had not previously considered in reaching their determination'" that the DOJ's prior criminal investigation into the CIA's torture program was adequate).

privilege in their entirety and exempt from release under FOIA Exemption 5. *See* Def. Mot. Summ. J. 1–2, ECF No. 38. The CIA also asserts that portions of the Panetta Report documents may be withheld under FOIA Exemptions 1 and 3. *See id.*

## ARGUMENT

## I.     The Final Full Report is an agency record subject to FOIA.

### A.     Legal standards and burden of proof.

Congress enacted FOIA to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). Its basic purpose is "to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976) (internal quotation marks omitted). To that end, in assessing whether the Final Full Report is an "agency record," "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records.'" *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 & n.3 (1989); *see also Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013) (any uncertainty as to whether a document is an agency record "redound[s] to the benefit of" the FOIA requester).

Because Defendants have challenged the factual basis for this Court's subject-matter jurisdiction, the Court may look beyond the pleadings to determine whether the Final Full Report is an agency record. *See, e.g.*, *I.T. Consultants, Inc. v. Rep. of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003); 5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1350. When resolving this jurisdictional question, the Court must draw all reasonable inferences in the ACLU's favor. *See, e.g.*, *Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982) ("Even under Rule 12(b)(1), procedural safeguards equivalent to those in Rule 56 are required, with Rule 56 used selectively as a guide to ensuring fairness."); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974),

*abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Ordinarily, plaintiffs

bear the burden of establishing that a court has subject-matter jurisdiction; however, because the

jurisdictional question here is predicated entirely on whether the Final Full Report is an agency

record, the burden rests with Defendants. *See Tax Analysts*, 492 U.S. at 142 & n.3.

Under Supreme Court and D.C. Circuit precedent, the Final Full Report is an "agency

record," and Defendants have not met their burden of showing otherwise. Accordingly,

Defendants' motion to dismiss for lack of subject-matter jurisdiction should be denied. *See* 5

U.S.C. § 552(a)(4)(B).

> **B.   The Final Full Report is an "agency record," and Defendants have not met
> their burden of showing otherwise.**

Although FOIA does not define the term "agency record," *see* 5 U.S.C. § 552, the

Supreme Court has supplied a clear definition. *See Tax Analysts*, 492 U.S. at 144. A record is an

"agency record" for FOIA purposes if it satisfies two requirements: first, the agency must have

created or obtained the requested material, and second, the agency must be in control of the

material at the time of the FOIA request. *Id.* By "control," the Supreme Court means that "the

materials have come into the agency's possession in the legitimate conduct of its official duties."

*Id.* at 145. Here, it is undisputed that Defendants obtained the Final Full Report and that they

have done so in the legitimate conduct of their official duties. *See* Defs.' Mot. Dismiss 12.

Expanding upon the Supreme Court's test, the D.C. Circuit typically analyzes four factors

to determine whether an agency controls a document. *See Burka v. U.S. Dep't of Health and*

*Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996). If a contested document was created by

Congress, however, the following two factors are "dispositive:" "(1) the intent of the document's

creator to retain or relinquish control over the records;" and "(2) the ability of the agency to use

and dispose of the record as it sees fit." *Judicial Watch*, 726 F.3d at 221; *see* Defs.' Mot. Dismiss 12 (agreeing that these factors are dispositive).[8]

This two-factor test ultimately boils down to congressional intent: if Congress intends to relinquish its control over the document, then the agency can use the document as it sees fit. *See United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004) (court's inquiry must focus on "Congress' intent to control (and not on the agency's)" (internal quotation marks omitted)); *Paisley v. CIA*, 712 F.2d 686, 693–95 (D.C. Cir. 1983) (because the government failed to establish "the requisite express indication of a congressional intent to maintain exclusive control," records were agency records subject to FOIA), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

The bar for establishing congressional intent to maintain control is a high one: Defendants' evidence must show that Congress made a *clear* and *specific* assertion of control over the requested document. *See, e.g.*, *United We Stand*, 359 F.3d at 602 (describing defendants' burden to show "the clear assertion of congressional control that our case law requires"). In addition, Defendants' evidence of congressional control must be contemporaneous with the transmission of the document. *See, e.g.*, *Paisley*, 712 F.2d at 694–95 (because the government failed to point to "*contemporaneous* and *specific* instructions" from the SSCI to agencies limiting the use of documents, the court held that the SSCI lacked the requisite "specific intent" to control documents); *Holy Spirit Ass'n for the Unification of World Christianity v. CIA*,

---

[8] The third and fourth *Burka* factors are: the extent to which agency personnel have read or relied upon the document, and the degree to which the document was integrated into the agency's record system or files. *See Burka*, 87 F.3d at 515. If the Court were to consider these factors, Defendants' treatment of the Final Full Report—whereby some of the agencies have not even opened the package containing the document, in defiance of the SSCI's contemporaneous intent—is a litigation strategy decision entitled to no weight. *See* Defs.' Mot Dismiss 21–22; *cf. Judicial Watch, Inc. v. Dep't of Commerce*, 34 F. Supp. 2d 28, 44 (D.D.C. 1998) (agencies are not permitted "to evade the FOIA by removing documents from their control after the filing of a FOIA request").

636 F.2d 838, 842 (D.C. Cir. 1980) (letter from Clerk of House of Representatives written after transfer of records did not evince congressional control), *vacated in part on other grounds*, 455 U.S. 997 (1982). Defendants fail to meet their burden because Congress's intent to relinquish control is clear from the record.[9]

### 1. Congress relinquished control over the Final Full Report.

The contemporaneous record is clear that the SSCI relinquished control over the Final Full Report when it sent the report to Defendants in April 2014, and certainly in December 2014. Because Congress did not manifest a clear, specific, and contemporaneous intent to exercise control over the document, the Final Full Report is an agency record subject to FOIA. *See United We Stand*, 359 F.3d at 600, 602.

The December 10, 2014 transmittal letter to Defendants is direct evidence of the SSCI's intentions for the Final Full Report. That letter is explicit: "the full report should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated. To help achieve this result, I hope you will encourage use of the full report in the future development of CIA training programs, as well as future guidelines and procedures for all Executive Branch employees, as you see fit."[10] Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014. By encouraging the use and dissemination of the Final Full Report among the executive branch, and

---

[9] Defendants' contention that "policy considerations" provide a separate justification for treating the Final Full Report as a congressional record should be rejected as unnecessary and contrary to precedent. *See* Defs.' Mot. Dismiss 24–25. The Supreme Court's and D.C. Circuit's "agency record" tests are already specifically drawn to accommodate policy considerations. *See, e.g.*, *Judicial Watch*, 726 F.3d at 221 (when Congress's intent to control is clearly and affirmatively expressed, policy factors weigh in favor of due deference to that intent); *see also, e.g.*, *United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 600 (D.C. Cir. 2004) (describing how "policy considerations unique to the congressional context" resulted in the D.C. Circuit's rejection of a simple "agency possession" test for agency records).

[10] Similarly, the SSCI's April 7, 2014 transmittal letter to the executive branch contains no indication of the SSCI's intent to restrict the executive branch's use or dissemination of the First Updated Full Report.

by leaving to the executive branch the decision as to how "broadly" the report should be used within the agencies, the SSCI relinquished its control over the document. *Id.* Moreover, the letter specifically gave the executive branch authority to "use the full report . . . as you see fit." *Id.*

The publicly released Executive Summary is likewise evidence of the SSCI's intent to relinquish control of the Final Full Report. The foreword to the Executive Summary states, for example, that the Final Full Report "represents the official views of the Committee. This and future Administrations should use this Study to guide future programs, correct past mistakes, [and] increase oversight of CIA representations to policymakers . . . ." Sen. Feinstein, Foreword, Executive Summary at 5; *see also* Letter, Sen. Dianne Feinstein to Sen. Patrick Leahy, President Pro Tempore, United States Senate, Dec. 9, 2014, http://1.usa.gov/1wy9dw9 (stating that the Final Full Report "*should be used*" by the CIA and other agencies "to help make sure that the system of detention and interrogation described in this report is never repeated") (emphasis added). These statements show that the SSCI relinquished control of the Final Full Report.

Faced with this direct, contemporaneous evidence of SSCI's expressed intent with respect to the Final Full Report, Defendants instead seek to rely on irrelevant, indirect evidence of past intent: "the circumstances attending the document's creation." Defs.' Mot. Dismiss 14. But those "circumstances" do not concern the SSCI's intentions for the Final Full Report. *See id.* at 15–18 (discussing (i) a June 2009 agreement; (ii) classification restrictions stemming from the executive branch; and (iii) inapplicable Senate rules.). Plaintiffs address each of Defendants' arguments in turn.

**a. By its terms, the SSCI-CIA June 2009 agreement does not govern the Final Full Report**. The June 2009 agreement applied only to documents residing on the SSCI's network drive at the CIA's secure facility, *see* Higgins Decl., Ex. D ¶¶ 2, 5–6, ECF No. 39-1, and as

Defendants must concede, the Final Full Report was not one of these documents, *see* Defs.' Mot. Dismiss 5. In addition, the concerns the SSCI had in 2009 when it was conducting its investigation are far different from its intent in 2014, when its report was completed and transmitted to the control of Defendants. In 2009, the SSCI's restrictions understandably reflected the underlying purpose and spirit of the SSCI–CIA agreement at that time—to protect the SSCI's work product, which was stored on the computer system of the agency it was overseeing. There is no evidence whatsoever that those five-year-old restrictions—or any others the SSCI imposed before April 2014—have any relevance to the Final Full Report.

**b. The Final Full Report's classification status does not indicate congressional control.** Defendants contend that, because the SSCI did not vote to seek declassification and public release of the Final Full Report, the SSCI must have retained control over the document. *See* Defs.' Mot. Dismiss 18, 21. But this argument wrongly conflates "classification" and "congressional control," and the lack of a Committee vote concerning public release is irrelevant.

For this Court's agency control analysis, the question is not whether Congress asked the executive branch to declassify the document for broad release to the public, but instead, whether Congress relinquished control over the document vis-à-vis the agencies. Classification of the Final Full Report reflects an executive branch construct. As the CIA told this Court, "the Executive Branch does not consider SSCI's control over the document to extend to control over the classification of the information therein." Higgins Decl. ¶ 15 (Feb. 28, 2014), ECF No. 17-2; *see also* Decl. of Leon E. Panetta, Director, CIA ¶ 30, *ACLU v. Dep't of Def.*, No. 04-cv-4151 (S.D.N.Y. Jun. 8, 2009), ECF No. 352 (CIA is responsible for limiting access to information about its "detention and interrogation practices"); Exec. Order No. 13526, 75 Fed. Reg. 707, 708 (Dec. 29, 2009) (Congress is not an "original classification authority").

Thus, the access restrictions on the face of the Final Full Report—such as the "Top Secret/Sensitive Compartmented Information" label, *see, e.g.*, Defs.' Mot. Dismiss 16; Frifield Decl. ¶ 8—reflect the SSCI's acknowledgement of the executive branch's classification decisions; they do not evince independent congressional control over the documents. These markings refer explicitly to the executive branch's own classification scheme, and do not originate in Congress's power to keep its deliberations secret, nor do they indicate any congressional control over the Final Full Report. *Cf. Goland v. CIA*, 607 F.2d 339, 343, 346 (D.C. Cir. 1978) (where the SSCI relied on its *own* constitutional and rule-based authority to designate a transcript as "Secret," and where the transcript could be declassified only by Congress, this weighed in favor of a congressional record finding), *vacated in part on other grounds*, 607 F.2d 367 (D.C. Cir. 1979); *Paisley*, 712 F.2d at 690, 694 (noting in dicta that documents that "had been classified as 'Secret' *by the SSCI*" were congressional records (emphasis added)). As the court noted in *Goland*, congressional authority to keep secret certain records of its proceedings is rooted in the Constitution's Journal clause. *See Goland*, 607 F.2d at 346 n.36. Unlike the defendants in *Goland*, the agencies here have made no showing that the SSCI relied on its own constitutional authority to mark the Final Full Report as "classified." If the SSCI had done so, then *only the SSCI* would have the power to declassify the document. *See Goland*, 607 F.2d at 343. But, of course, the CIA has conceded that the SSCI cannot declassify the Final Full Report. The agency stated plainly to this Court that "the Executive Branch does not consider SSCI's control over the document to extend to control over the classification of the information therein." Higgins Decl. ¶ 15 (Feb. 28, 2014), ECF No. 17-2. Thus, it is indisputable that the TS/SCI designations here derive from the *CIA's* classification decisions under Executive Order 13526 with respect to *agency* documents that form the basis of the Final Full Report. *See*

Defs.' Mot. Dismiss 4 (noting that "compartmented classified information at issue in the Report . . . necessarily came from the CIA"). Classification under the Executive Order is entirely different from Congress's authority to maintain control over the secrecy of transcripts of its closed proceedings. If anything, classification markings are evidence of agency, and not congressional, control.[11]

Defendants attempt to salvage their concession by distinguishing between the SSCI's ability to "seek declassification" and the executive branch's actual exercise of control over the document's classification. *See* Defs.' Mot. Dismiss 21. This distinction fails under its own terms: there is no support for Defendants' claim that the SSCI retains the exclusive ability to "seek declassification" of the document. The Senate rules quoted by Defendants, which specify how the SSCI may disclose information to the *public* and how the Committee may issue measures and recommendations, say nothing about seeking declassification—nor do they purport to provide the SSCI with any residual authority over final documents that have been transmitted to agencies. *See* Defs.' Mot. Dismiss 21. But even if Defendants' assertion were at all grounded in the Senate rules, an ability to "seek declassification" is not remotely tantamount to actual control. The very fact that Congress must seek declassification—from the agencies that actually control the classification decisions—refutes Defendants' argument.[12]

The logic of Defendants' argument would lead to absurd results. In the CIA's view, to properly relinquish control of a classified document to an *agency* for the purposes of FOIA,

---

[11] For the same reasons, the fact the SSCI met in closed session to discuss the Initial SSCI Report and First Updated Full Report is irrelevant to the agency control question. *See* Defs.' Mot. Dismiss 16. Given the executive branch's classification of records on which the SSCI investigation was based, the SSCI would not have opened its discussion of those materials to the public.

[12] Indeed, "members of the public," may seek declassification of information classified by the executive branch under Executive Order No. 13526 § 3.5(a) and 32 C.F.R. 1908. SSCI's ability to seek declassification is not unique to it.

Congress must first seek executive declassification—and perhaps even full public release. *See* Defs.' Mot. Dismiss 20–21. Under Defendants' proposed reading, Congress would somehow maintain implicit control over all documents containing information that the *executive branch* considers classified. At the same time, the agencies that classified documents in the first place, and that possess declassification authority over documents authored by Congress, may pretend that it is instead Congress that has imposed restrictions on the agency's use of those documents. Such a rule would provide an end-run around FOIA, obviating any judicial inquiry into congressional intent to relinquish control over any such documents, unless Congress simultaneously petitioned the agency to declassify them. This would create an illogical double-counting in FOIA, so that an agency's classification of information would be counted both when a court considers whether a document is exempt under § 552(b)(1) (which this Court will do at a later stage) as well as in determining whether a document is an agency record in the first place.[13] Such a rule also has no limiting principle: a document authored by Congress need only contain a single sentence classified under the Executive Order for an agency to claim that Congress in fact controls the document. When, as here, Congress has expressly relinquished control vis-à-vis an agency, there is no basis in law or logic for placing entire documents that happen to be authored by Congress beyond the ambit of the FOIA.

Finally, that the SSCI did not vote to publicly release the Final Full Report, Defs.' Mot. Dismiss 18, is irrelevant. The record is clear that all SSCI members were on notice that the Final Full Report would be transmitted to Defendants, and that no rules were violated by SSCI's transmittal of the document. *See* Sen. Feinstein, Foreword, Executive Summary at 1, 5; Letter,

---

[13] Defendants appear to carve out an exception for records, such as the Executive Summary, that undergo a separate declassification review through the political process. But FOIA and the case law interpreting agency control impose no "political declassification process" requirement.

Sen. Dianne Feinstein to Sen. Patrick Leahy, President Pro Tempore, United States Senate, Dec.

9, 2014; Ali Watkins, *Feinstein Vindicated in Intelligence Committee Spat*, Huffington Post, Feb.

4, 2015, http://huff.to/1ybEztq (Senator Burr confirmed that the Senate Parliamentarian "had

found no rule violation on behalf of his predecessor"). Nothing in the contemporaneous record

indicates that any SSCI member expressed dissent over transmitting the Final Full Report to

Defendants or that the SSCI failed to undertake any required action before transmittal.

Defendants have failed to identify any requirement that SSCI vote to declassify and publicly

release a document when it acts to relinquish control over that document to executive agencies.

Indeed, such a requirement would render FOIA a nullity with regard to congressionally-authored

documents: under such a rule, documents would become agency records only *after* their public

release.

    **c. Senator Burr's post-hoc attempt to assert control over the Final Full Report is**

**irrelevant.** Finally, Defendants erroneously rely on evidence that is not contemporaneous with

the transmission of the Final Full Report. Senator Burr's extraordinary post-hoc attempt to assert

control over the Final Full Report has no legal relevance, as Defendants effectively concede. *See*

Defs.' Mot. Dismiss at 21–22 (Senator Burr's letter "underscore[s] the importance of looking to

the Committee's official actions."). In fact, the D.C. Circuit has consistently declined to credit

post-transmittal, post-FOIA-request assertions of control by Congress. *See Holy Spirit*, 636 F.2d

at 842; *United We Stand*, 359 F.3d at 602 (Congress's "post-hoc objections to disclosure cannot

manifest the clear assertion of congressional control that our case law requires"); *cf. Paisley*, 712

F.2d at 695 (citing *Holy Spirit*, 636 F.2d at 842, for the proposition that a letter from the Clerk of

the House of Representatives written after the transfer of records cannot establish congressional

control).[14] This Court should not credit Senator Burr's request as a factor in its agency control analysis.

### 2. Defendants may use the Final Full Report as they see fit.

The second agency control factor—the ability of the agency to use the record as it sees fit—also weighs in Plaintiffs' favor. Again, unlike the SSCI's transmission of the Initial SSCI Report, its December 10, 2014 transmission of the Final Full Report stated that the executive branch is free to use and rely on the document. *Compare* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 14, 2012) (circulating draft version of the document for the purposes of "suggested edits or comments"), *with* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Dec. 10, 2014 (relinquishing control of the Final Full Report for broad executive branch use "as you see fit"). The CIA's filings in this case acknowledge the distinction. When the CIA described the Initial SSCI Report, it declared that it "would not be free to disseminate or otherwise dispose of it without approval of the SSCI," even after redacting classified information. *See* Higgins Decl. ¶ 15 (Feb. 28, 2014), ECF No. 17-2. In addition, the CIA emphasized that before the SSCI transferred the Initial SSCI Report, it required the agency to provide a list of personnel who would access the document for the limited purpose of providing suggested edits and comments. *See id.* ¶ 14. However, the CIA has made no such assertions with respect to the Final Full Report—nor could it, in light of Senator Feinstein's December 2014 transmittal letter.

---

[14] Senator Burr's statement that he considers the Final Full Report to be a "committee sensitive" document, and Defendants' suggestion that Senator Feinstein's transmittal of the Final Full Report could not constitute a release of control over the document, are belied by the record. *See* Letter, Sen. Dianne Feinstein to The Hon. Barack Obama, Jan. 16, 2015; Senate Intelligence Committee Rule 9.7, http://1.usa.gov/1DcH2Z2 ("Committee members and staff do not need prior approval to disclose classified or committee sensitive information to persons in the Executive branch," provided that certain conditions are satisfied). Defendants have not suggested that these conditions were not satisfied here.

Moreover, for the purposes of the FOIA, the agencies' unilateral decision to treat or label the document as a "congressional record" is irrelevant. Agencies cannot ipse dixit themselves into an exemption. What matters instead is the express language of the transmittal letter ceding control of the report to the executive branch. In analogous circumstances, courts have rejected defendants' reliance on post-hoc expressions of agency understandings because they "simply indicate[d] the *agencies'* belief that the documents now at issue are congressional in nature." *Paisley*, 712 F.2d at 695. Indeed, because Defendants have no basis to treat the Final Full Report as a congressional record, their actions suggest that they are simply seeking to maintain their litigation posture in this case—in defiance of congressional intent. The Court should grant no deference to Defendants' arguments that they cannot use the Final Full Report as they see fit when it is the agencies that have made their own decision not to do so.

\* \* \*

Defendants accuse the ACLU of "seeking to use FOIA to circumvent the political process." Defs.' Mot. Dismiss 24. This assertion betrays Defendants' fundamental misunderstanding of their statutory obligations. FOIA was enacted by Congress "to ensure an informed citizenry" and "to hold the governors accountable to the governed," *NLRB*, 437 U.S. at 242. In this case, the political process resulting in the Final Full Report proceeded for seven years, and eventually resulted in the SSCI relinquishing control of the report to Defendants. At that point, pursuant to FOIA, the ACLU and the American public acquired a legal right to the non-exempt portions of the Report. As the ACLU has shown, it is Defendants who are seeking to circumvent their statutory duty to release an agency record.

Because Defendants have failed to present clear, contemporaneous, and specific evidence of Congress's intent to maintain control over the Final Full Report, the ACLU respectfully asks

the Court to hold that the Final Full Report is an agency record, and deny Defendants' motion to dismiss.

II.    **The CIA has not shown that any portion of the Panetta Report can be withheld under Exemptions 1, 3, or 5.**

A.    **Legal standards and the burden of proof.**

FOIA requires executive branch agencies to disclose records unless a specific exemption applies. *See* 5 U.S.C. § 552(a), (b). Because "disclosure, not secrecy, is the dominant objective of the Act," *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976), the statutory exemptions are given a "narrow compass," *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1265 (2011). "At all times[,] courts must bear in mind that FOIA mandates a 'strong presumption in favor of disclosure.'" *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (quoting *Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)).

On a motion for summary judgment, the burden is on the defendant agency to justify its withholding of any requested records. *See, e.g.*, *ACLU v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011). "[C]onclusory affidavits that merely recite statutory standards, or are overly vague or sweeping will not . . . carry the government's burden." *Larson v. Dep't of State*, 565 F.3d 857, 864 (D.C. Cir. 2009). Rather, courts review the claimed withholdings *de novo*, resolving all doubts in favor of disclosure. *See Goldberg v. Dep't of State*, 818 F.2d 71, 77 (D.C. Cir. 1987).

The CIA has withheld the Panetta Report documents in their entirety pursuant to Exemption 5, which exempts "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 covers "intra-agency memoranda that would routinely be shielded from discovery in private litigation because of the government's 'executive privilege,' which protects the 'deliberative or policymaking processes' of government agencies." *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). Because the CIA invokes the deliberative process privilege under Exemption 5, the agency has the burden of establishing

"what deliberative process is involved, and the role played by the documents in issue in the course of that process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 868 (D.C. Cir. 1980).[15]

> **B.**     **The CIA has not met its burden of showing that the deliberative process privilege applies to the Panetta Report.**

Under the deliberative process privilege, an agency may withhold a document only if it is both "predecisional" and "deliberative." *Coastal States*, 617 F.2d at 866. Predecisional documents are those "generated before the adoption of an agency policy." *Id.* at 866. Deliberative documents "reflect[] the give-and-take of the consultative process," "weighing the pros and cons of agency adoption of one viewpoint or another." *Id.* To qualify as "deliberative," a document must "make[] recommendations or express[] opinions on legal or policy matters . . . . A document that does nothing more than explain an existing policy cannot be considered deliberative." *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 876 (D.C. Cir. 2009) (internal quotation marks and citation omitted). In other words, "to fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). The privilege is "centrally concerned with protecting the process by which *policy* is formulated." *Id.*

According to the CIA, the Panetta Report documents are largely or entirely factual summaries of information the agency provided to the SSCI. *See* Lutz Decl. ¶ 14. According to the Lutz Declaration, "The [CIA] team members searched for documents provided to the SSCI related to their assigned topic, reviewed those documents, and determined whether certain

---

[15] The only privilege that the CIA has invoked under Exemption 5 is the deliberative process privilege. The CIA does not claim that the Panetta Report is subject to the attorney–client privilege or work-product protection. *See* Def. Mot. Summ. J. 8.

contents of those documents might be relevant to informing senior CIA leaders in connection

with the SSCI's study. When the team members identified information they believed was

significant on a given topic, they described that information in their Draft Review." *Id.* ¶ 15.

However, at least one Senator who has reviewed the Panetta Report documents describes

them quite differently. According to former Senator Udall, the Panetta Report "acknowledges

significant problems and errors made in the CIA's detention and interrogation program," "found

that the CIA repeatedly provided inaccurate information to the Congress, the President, and the

public on the efficacy of its coercive techniques," and is "much more than a 'summary' and

'incomplete drafts.'" *See* 160 Cong. Rec. S6476 (daily ed. Dec. 10, 2014) (statement of Sen.

Udall), Gorski Decl., Ex. A. Regardless of whether the Panetta Report primarily or only contains

factual information, or also includes analysis and conclusions, the deliberative process privilege

does not apply, and the documents cannot be withheld under Exemption 5.

### 1. The CIA has not shown that the Panetta Report documents are "predecisional."

The CIA's failure to identify an actual decision-making "process" to which the Panetta

Report contributed is fatal to its assertion of the deliberative process privilege. It is true that, as

the CIA asserts, under D.C. Circuit law, an agency claiming the privilege need not "pinpoint" a

specific decision to which its documents *in fact* contributed. *Access Reports*, 926 F.2d at 1196.

But the agency does bear the burden of identifying a decision-making "process" that was clearly

defined at the time of the creation of the documents. *See id.* (memo drafted by agency employee

to further agency decision-making about "how to shepherd [a] FOIA bill through Congress" was

"predecisional"); *see also, e.g.*, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C. Cir.

1991) (to satisfy its burden, agency needed to "explain such matters as how decisions like those

in issue are reached; the role that staff discussion and memoranda play in such decisions; [and]

the manner in which such decisions are memorialized"); *Senate of Puerto Rico v. Dep't of*

*Justice*, 823 F.2d 574, 585 n.38 (D.C. Cir. 1987) (agency process leading to a decision to initiate or forego prosecution is "squarely within" the scope of the privilege).

Here, the CIA has failed to meet its burden to identify a specific, defined decision-making process that the Panetta Report furthered. The CIA's arguments might have some traction if it claimed the Panetta Report contributed to a decision-making process that is actually reflected in the record: the one resulting in the CIA's official June 2013 response to the SSCI. The agency makes no such claim. Instead, the agency concedes that "it is not possible to isolate a single, discrete agency decision to which the Reviews contributed." Def. Mot. Summ. J. 10. It then invokes vague, hypothetical processes, which are insufficient to justify the deliberative process privilege. *See id.* (the Panetta Report "would have contributed to the CIA's process of deciding how to respond to various policy issues that *might have* arisen" (emphasis added)). According to the Lutz Declaration, "the Reviews were generated to help the Director of the CIA and other senior Agency leaders make policy decisions related to the SSCI's ongoing study. For example, senior leaders *could have* used the Reviews to prepare an accurate and timely response to the Committee's eventual report; to anticipate developments that might arise in connection with the Committee's study; to inform interactions with the Committee; and to prepare for interagency discussions within the Executive Branch regarding the study." Lutz Decl. ¶¶ 13, 22 (emphasis added). But the CIA has presented no evidence that, at the time of the creation of the Panetta Report documents, senior leaders intended to rely on the documents to further any particular decision-making process.[16]

---

[16] The CIA cites to *Judicial Watch, Inc. v CFPB*, --- F. Supp. 2d ---, 2014 WL 1245303 (D.D.C. Mar. 27, 2014), in support of its claim that it has identified a decision-making process. *See* Def. Mot. Summ. J. 10. But *Judicial Watch* illustrates precisely why the CIA's "process" is inadequate. There, relying on the deliberative process privilege, the Consumer Financial Protection Bureau withheld (i) "question-and-answer" talking points for the Deputy Secretary of the Treasury, and (ii) an email from a White House

To accept the CIA's interpretation of "predecisional" would mean that *any* document upon which a senior leader "could have" relied at some point to "anticipate developments," "inform interactions," and "prepare for . . . discussions" could be withheld. Lutz Decl. ¶ 22. In short, Director Panetta's interest in being "informed" about the information CIA provided to the SSCI, Lutz Decl. ¶ 13, does not amount to a decision-making process. *See Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (reports prepared "only to inform" are not subject to the deliberative process privilege (quoting *Playboy Enterprises v. Dep't of Justice*, 677 F.2d 931, 936 (D.C. Cir. 1982))). Because the CIA has failed to show a clear decision-making process to which the Panetta Report contributed, the documents cannot be withheld under Exemption 5.

### 2. The CIA has not shown that the Panetta Report documents are "deliberative."

Even if this Court were to find that the Panetta Report documents are predecisional, the documents are not privileged and may not be withheld because the CIA has failed to show that they are deliberative. Nowhere in the agency's own descriptions of the Panetta Report documents is there evidence that the documents "make[] recommendations or express[] opinions on legal or policy matters." *Pub. Citizen*, 598 F.3d at 876 (finding these factors necessary to establish a document is deliberative) (internal quotation marks and citations omitted). Nor has the agency shown that the documents reflect the "give-and-take of the consultative process" and "weigh[] the pros and cons of agency adoption of one viewpoint or another." *See Coastal States*, 617 F.2d at 866; *see also Petroleum Info. Corp.* 976 F.2d at 1435. If the Panetta Report documents consist

---

staffer to a CFPB employee comprising "a request of the White House for advice regarding a Congressional hearing and [to] discuss suggestions for responding to that request." *Judicial Watch*, 2014 WL 1245303, at *5. By contrast, in this case, the Panetta Report documents were not drafted to respond to any concrete, particular request requiring agency decision-making—and did not in fact contribute to one.

largely or entirely of factual summaries, the agency's failure to make the requisite showing is unsurprising.

Under Supreme Court precedent, factual information is typically not "deliberative" and cannot be shielded from disclosure by the deliberative process privilege. *EPA v. Mink*, 410 U.S. 73, 88–92 (1973). This is in part because "the prospect of disclosure [of factual material] is less likely to make an advisor omit or fudge raw facts, while it is quite likely to have just such an effect on 'materials reflecting deliberative or policy-making processes.'" *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990). Thus, "agencies must disclose those portions of predecisional and deliberative documents that contain factual information that does not 'inevitably reveal the government's deliberations.'" *Pub. Citizen, Inc.*, 598 F.3d at 876 (internal quotation marks and citations omitted).

The CIA asserts that the selection and organization of facts in the Panetta Report documents was *itself* deliberative. Def. Mot. Summ. J. 12. But the D.C. Circuit has previously rejected this exact argument. *See Playboy Enters., Inc. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982) (declining to accept that the "very narration of the facts" reflects an exercise of judgment about the "evidence selected and credited" in that narration). The court in *Playboy Enterprises* reasoned that this argument lacked a limiting principle:

> Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material. If this were not so, *every factual report would be protected as a part of the deliberative process.*

*Id.* (emphasis added). In holding that the agency report at issue in *Playboy Enterprises* was not covered by the deliberative process privilege, the court emphasized that the report "was prepared only to inform the Attorney General of facts which he would in turn make available to members

of Congress." *Playboy Enters.*, 677 F.2d at 936. It distinguished this scenario from one in which

a report is designed to aid a decision-nmaker in resolving a complex, difficult question. *See id.*

Because the Panetta Report, like the report in *Playboy Enterprises*, was an inventory of

facts "prepared only to inform," *see id.*, the agency's assertion of the privilege fails. *See* Lutz

Decl. ¶ 15 ("The team members searched for documents provided to the SSCI related to their

assigned topic, reviewed those documents, and determined whether certain contents of those

documents might be relevant to informing senior CIA leaders in connection with the SSCI's

study."); *see also*, *e.g.*, *Paisley*, 712 F.2d at 699; *ITT World Commc'ns, Inc. v. FCC*, 699 F.2d

1219, 1239 (D.C. Cir. 1983) (rejecting application of privilege to "straightforward factual

narrations" where agency "presented no evidence that the notes are evaluative in nature"),

*reversed on other grounds*, 466 U.S. 463 (1984); *Vaughn v. Rosen*, 523 F.2d 1136, 1143–45

(D.C. Cir. 1975) (evaluative reports that provided "the raw data upon which decisions can be

made" were "not themselves a part of the decisional process").

In rare circumstances, the D.C. Circuit has held that the deliberative process privilege

applies to portions of documents containing factual material. However, the narrow holdings of

these cases, cited by the CIA, are distinguishable and should not be extended here. As the D.C.

Circuit cautioned in *Paisley*, "this exception cannot be read so broadly as to undermine the basic

rule; in most situations factual summaries prepared for informational purposes will not reveal

deliberative processes and hence should be disclosed." *See Paisley*, 712 F.2d at 699. All of the

cases cited by the CIA involve either (i) a close relationship between the factual summary and a

well-defined agency decision, or (ii) official agency histories, which entail distinct policy

concerns.[17] *See* Def. Mot. Summ. J. 14 & n.3. The Panetta Report belongs to neither category.

In particular, the CIA's reliance on *Montrose Chemical Corporation v. Train* is

misplaced. *See* Def. Mot. Summ. J. 13 (citing *Montrose Chemical*, 491 F.2d 63 (D.C. Cir.

1974)). There, the FOIA requester sought documents designed to aid an EPA administrator's

findings concerning whether pesticide registrations conformed to statutory requirements. *See* 491

F.2d at 65. The requested documents, prepared by EPA staff, summarized administrative hearing

evidence that was already public. *See id.* In holding that the documents were protected by the

deliberative process privilege, the D.C. Circuit emphasized that the summaries were analogous to

a law clerk's factual summary for a judge: they were specifically designed to assist the

administrator in resolving a "difficult, complex question." *Id.* at 68. Furthermore, because all the

facts related to the hearing were already in the public domain, the court concluded that the

purpose of the FOIA request was to "prob[e] the decision-making process itself." *Id.* Here,

unlike the summaries in *Montrose Chemical*, the Panetta Report documents were not prepared to

help resolve any complex agency policy question, but to "inform[]" Director Panetta about the

---

[17] *See, e.g.*, *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 465 (D.C. Cir. 2014) (official history); *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987) (official history); *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1049 (D.C. Cir. 1982) (official history); *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 512–14 (D.C. Cir. 2011) (deliberative process privilege applied to factual information in reports prepared for the State Department's decision-making about whether to approve or deny import restriction requests).

The CIA has made clear that the Panetta Review documents "were not, and were never intended to be, official agency histories." Def. Mot. Summ. J. 10. The application of the deliberative process privilege in *National Security Archive* and other "official history" cases is based upon concerns that are unique to that context. For example, in *Dudman*, 815 F.2d at 1569, the court placed great weight on the risks associated with the exposure of a historian's editorial judgment. Disclosure of factual material in a historian's draft risks that future historians will seek to conform to what they perceive to be the views of their editors, thus stifling "the creative thinking and candid exchange of ideas necessary to produce good historical work." *Id.* By contrast, in this case, there is no similar danger of "chilling" CIA staff because the documents were simultaneously made available to Congress in its oversight function.

documents provided to the SSCI. *See* Lutz Decl. ¶ 13; *cf. Playboy Enters.*, 677 F.2d at 936. And

unlike the plaintiff in *Montrose Chemical*, the ACLU is not seeking to probe into a decision-

making process—particularly because there was no CIA decision-making process to probe. *See*

Lutz Decl. ¶ 22. Instead, the ACLU seeks release of the relevant facts, many of which are likely

not in the public domain.

For similar reasons, the CIA's reliance on *Mapother v. Department of Justice* is also

inapposite. *See* Def. Mot. Summ. J. 13 (citing *Mapother*, 3 F.3d 1533 (D.C. Cir. 1993)). The

FOIA requesters in *Mapother* sought a Department of Justice report concerning Kurt Waldheim,

a former President of Austria who was alleged to be a Nazi war criminal. *See* 3 F.3d at 1535.

DOJ prepared the report in furtherance of a clearly defined decision-making process—

specifically, to determine whether Waldheim's World War II activities "rendered him ineligible

to enter the United States." *Id.* at 1536. In holding that most of the report was privileged,

notwithstanding its factual content, the court underscored that the summaries were written "to

assist the making of a discretionary action" and to further a "process by which *policy*" is

formulated. *Id.* at 1539.[18] By contrast, according to the CIA, the Panetta Report documents did

not make recommendations on a policy matter, nor did they contribute to a defined decision-

making process. Indeed, the Panetta Report documents are similar to the portion of the

Waldheim report that was *not* privileged: they are "a comprehensive collection of the essential

facts" of the CIA's torture program. *See id.* at 1540.

---

[18] In *Mapother*, the court also observed that "the key to *Montrose Chemical* was not the relationship
between the requested summaries and the public record, but that between the summaries and the decision
announced by the EPA Administrator." *See* 3 F.3d at 1539. Even if *Mapother*'s reading of *Montrose
Chemical* is correct, the critical import of both opinions—the court's need to focus on the "relationship
between the summaries and the decision announced"—requires this court to reject the CIA's assertion of
the privilege, because there was no "decision" here, and the relevant decision-making "process" is so ill-
defined. *See id.*

Faced with this contrary precedent, the CIA asserts that disclosure of the Panetta Report documents might lead staff members "to portray the facts in the most flattering light, or to gloss over unfavorable facts." Def. Mot. Summ. J. 14. But this argument has no limiting principle: disclosure of any factual material could pose the same risk. Furthermore, because the default rule in cases interpreting the deliberative process privilege is that facts may not be withheld, the case law takes into account that this "risk" is ever-present, and rejects it as a basis for expanding the scope of the privilege. *See Quarles*, 893 F.2d at 392 (one of the reasons that factual information is not typically protected by the deliberative process privilege is that disclosure of facts— compared to the disclosure of materials reflecting agency deliberations—is far less likely to result in a chilling effect).

Given the facts of this particular case, the CIA's argument is especially weak. The Panetta Report documents are no ordinary summaries of information in the agency's possession; they are summaries of information that the CIA had already provided to Congress. Under these circumstances, there is no risk that disclosure would encourage CIA staff to gloss over unfavorable facts when those very facts were provided to the congressional committee charged with oversight of the CIA. To withhold the Panetta Report documents on this ground would expand Exemption 5 beyond the limits courts have recognized, undermining the very purpose of the FOIA.[19] *See Vaughn*, 523 F.2d at 1143–44.

Finally if the Panetta Review documents contain analysis, this analysis is not inherently deliberative, *see, e.g.*, *id.*, and the CIA has not carried its burden to show otherwise. It appears that any analysis would show that the CIA provided "inaccurate information to the Congress, the

---

[19] Similarly, the CIA's argument that disclosure would "lead to public confusion about an agency's position" is simply not tenable. Def. Mot. Summ. J. 11. It is difficult to imagine public confusion concerning *facts* provided to Congress.

President, and the public on the efficacy of its coercive techniques." 160 Cong. Rec. S6476 (daily ed. Dec. 10, 2014) (statement of Sen. Udall), Gorski Decl., Ex. A. But the FOIA does not permit the CIA to withhold documents to conceal unlawful activity, prevent embarrassment, or obscure its historical failures. *See* 5 U.S.C. § 552; *cf. Jones v. FBI*, 41 F.3d 238, 243 (6th Cir. 1994) (greater scrutiny of agency affidavits appropriate "where it becomes apparent that the subject matter of a request involves activities which, if disclosed, would publicly embarrass the agency").

### 3. "Draft" status cannot shield the Panetta Report documents.

The CIA also asserts that the Panetta Report is subject to Exemption 5 because "as drafts, the Draft Reviews fall entirely within the deliberative process privilege." Def. Mot. Summ. J. 15. This is not so. "[D]rafts are not presumptively privileged." *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 261 (D.D.C. 2004). The D.C. Circuit made clear more than thirty years ago that "[t]he designation of . . . documents . . . as 'drafts' does not end the inquiry." *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir.1982). Indeed, "*Coastal States* forecloses the . . . argument that any document identified as a 'draft' is per se exempt." *Id.* The CIA's effort to rely on a contrary rule fails as a matter of law. *See Mayer, Brown, Rowe & Maw LLP v. IRS*, 537 F. Supp. 2d 128, 139–40 (D.D.C. 2008) (recognizing that the D.C. Circuit "has made it clear that simply designating a document as a 'draft' does not automatically make it privileged" and ordering production of certain drafts because they "are not the type of documents that are a direct part of the deliberation process and they do not make recommendations or express opinions on legal or policy matters.'" (quotation and alteration marks omitted)).[20]

---

[20] *National Security Archive* in no way upended the D.C. Circuit's established rule. *See* 752 F.3d at 465. That decision held only that, "in the narrow confines of this case, which involves a draft agency history,"

### C.     The "official acknowledgment" doctrine precludes the CIA from withholding the Panetta Report documents.

Even if this Court were to conclude that the deliberative process privilege applies to all

the Panetta Report documents in their entirety, the withheld documents must be disclosed to the

extent the government has otherwise disclosed the same or similar information.[21] "[T]he

government cannot rely on an otherwise valid exemption claim to justify withholding

information that has been 'officially acknowledged.'" *Davis v. Dep't of Justice*, 968 F.2d 1276,

1279 (D.C. Cir. 1992). "When information has been 'officially acknowledged,' its disclosure

may be compelled even over an agency's otherwise valid exemption claim." *Wolf v. CIA*, 473

F.3d 370, 378 (D.C. Cir. 2007) (internal quotation marks and citation omitted).

For information to be "officially acknowledged," it must satisfy three criteria:

> First, the information requested must be as specific as the information previously
> released. Second, the information requested must match the information
> previously disclosed . . . . Third, . . . the information requested must already have
> been made public through an official and documented disclosure.

*Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990). Notably, the Second Circuit has recently

stated that the "matching" requirement of the *Fitzgibbon* test need not require "absolute

identity," and that such a requirement would make "little sense." *New York Times v. Dep't of*

*Justice*, 756 F.3d 100, 119–20 & n.19 (2d Cir. 2014).

---

a particular draft of an official history volume was exempt from disclosure in spite of the fact that no final
document was ultimately created. *Id.*

[21] Likewise, the withheld documents must be disclosed to the extent that they contain discussions of the
CIA's historical working law or policies. Under the "working law" or "adoption" doctrine, agencies must
disclose the rules and interpretations that constitute their formal or informal policies. This includes an
agency's opinion about "what the law is" and "what is not the law and why it is not the law." *Tax
Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997); *see also NLRB v. Sears, Roebuck & Co.*, 421 U.S.
132, 153 (1975).

At least some of the information contained within the Panetta Report documents has almost certainly been officially acknowledged by the CIA in its June 2013 response to the Initial SSCI Report—among other public disclosures—as well as by the SSCI in its publicly released Executive Summary. The apparent purpose of the Panetta Report, according to the CIA itself, makes this plain. Because the Panetta Report documents were created to "highlight[] the most noteworthy information contained in the millions of pages of documents being made available to the SSCI," Lutz Decl. ¶ 8, it is a near certainty that the Panetta Report contains information that has been revealed publicly.[22]

### D.      This Court should review the Panetta Report documents *in camera*.

The Court should review the Panetta Report documents *in camera* to assess the applicability of Exemption 5 and the segregability of non-exempt material, including material that has been officially acknowledged or that constitutes the agency's working law. FOIA gives district courts the discretion to review the contents of requested agency records *in camera* "to determine whether such records or any part thereof shall be withheld." 5 U.S.C. § 552(a)(4)(B). Courts often do so where (1) the government seeks to exempt entire documents but provides only vague or conclusory justifications; or (2) there is evidence of "agency bad faith—for example, if information contained in agency affidavits is contradicted by other evidence in the record."

---

[22] To the extent the Panetta Report includes information acknowledged by the SSCI and not the CIA, any applicable FOIA exemptions are nevertheless waived. While the D.C. Circuit has stated that it does not "deem 'official' a disclosure made by someone other than the agency from which the information is being sought," *Frugone v. CIA*, 169 F.3d 772, 774 (D.C. Cir. 1999), this is not a categorical rule. *See, e.g.*, *Ameziane v. Obama*, 699 F.3d 488, 493 (D.C. Cir. 2012) (representations by a lawyer to his client at Guantánamo Bay "would be tantamount to, and a sufficient substitute for, official acknowledgment by the U.S. government"). Here, because of the CIA's extensive involvement in the Executive Summary's declassification process, for the purposes of the official acknowledgment doctrine, representations in the Executive Summary are tantamount to representations by the CIA. Furthermore, crediting the Executive Summary as a source of official acknowledgment would in no way interfere with the executive branch's authority to control access to classified information. *Cf. Fitzgibbon*, 911 F.2d at 765.

*Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987); *see also, e.g.*, *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) ("A judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt that he wants satisfied before he takes responsibility for a de novo determination." (internal quotation marks and citation omitted)). Both conditions are present here. The CIA's assertions in the Lutz Declaration about the "deliberative" nature of the Panetta Report and the agency's decision-making "process" are conclusory at best, *see, e.g.*, Lutz Decl. ¶¶ 13, 22, and the record in this case is replete with indications of bad faith on the part of the CIA. *See, e.g.*,160 Cong. Rec. S6476 (daily ed. Dec. 10, 2014) (statement of Sen. Udall), Gorski Decl., Ex. A ; *see generally* Factual Background, *supra* (describing CIA misrepresentations and evasions relating to its torture program).

      **E.**    **The CIA has not met its burden of establishing that the Panetta Report is subject to Exemptions 1 and 3.**

     The CIA has also withheld portions of the Panetta Review documents pursuant to Exemptions 1 and 3. *See* Def. Mot. Summ. J. 15–26. Under Exemption 1, FOIA does not require disclosure of records that are (i) specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign policy, and (ii) are in fact properly classified pursuant to Executive Order. *See* 5 U.S.C. § 552(b)(1). Exemption 3 applies to information that is:

> specifically exempted from disclosure by statute (other than section 552b of this title) if that statute (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

5 U.S.C. § 552(b)(3).

     Because the CIA assumes that the entire Panetta Report may be withheld under Exemption 5, it has only identified broad categories of information that it is withholding pursuant to Exemptions 1 and 3; it has not yet attempted to identify, in context, the precise

material it is withholding under these Exemptions. Accordingly, any dispute over the

applicability of these Exemptions is premature. If the Court holds that the Panetta Report

documents may not be withheld under Exemption 5, the CIA will be required to produce

redacted versions of the documents and/or a *Vaughn* index. Plaintiffs reserve the right to brief the

applicability of Exemptions 1 and 3 following that production.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that the Court (i) deny

Defendants' motion to dismiss Plaintiffs' claim for the Final Full Report; (ii) deny the CIA's

motion for summary judgment as to the Panetta Report; (iii) grant the ACLU's cross-motion for

partial summary judgment on the grounds that the Panetta Report may not be withheld pursuant

to Exemption 5; (iv) direct Defendants to produce the Final Full Report and the Panetta Report

documents, together with *Vaughn* indices for any withheld portions of those documents, within

45 days of the Court's order.

Respectfully submitted,

 */s/ Hina Shamsi*

Hina Shamsi (D.C. Bar No. MI0071)
Alex Abdo (*pro hac vice*)
Ashley Gorski (*pro hac vice*)
Dror Ladin (*pro hac vice*)
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 284-7321
Fax: (212) 549-2654
hshamsi@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
   of the Nation's Capital
4301 Connecticut Ave. NW, Suite 434
Washington, D.C. 20008

Phone: (202) 457-0800
Fax: (202) 457-0805
artspitzer@aclu-nca.org

*Counsel for Plaintiffs*

Dated: February 11, 2015