**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, and AMERICAN CIVIL LIBERTIES UNION FOUNDATION, ) ) ) ) ) | |
| Plaintiffs, ) | Civil Action No. 1:13-cv-01870 (JEB) |
| ) | |
| v. ) | |
| ) | |
| CENTRAL INTELLIGENCE AGENCY, et al. ) ) | |
| ) | |
| Defendants. ) ) | |

**GOVERNMENT'S REPLY IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' CROSS-MOTION**

As the government explained in its opening brief, what plaintiffs call the "Panetta Report," and what the government refers to as "Draft Reviews," are pre-decisional, deliberative documents appropriately withheld under the deliberative process privilege prong of FOIA's Exemption 5.  Individual CIA employees and contractors prepared the Drafts to help the Director of the CIA and other senior officials make a wide range of policy decisions in connection with a significant congressional investigation.  The Drafts are essentially briefing documents that reflect their individual authors' policy-oriented judgments about what information would be most useful to senior officials; they were not vetted outside the document review team that prepared them, were never finalized, and do not represent the Agency's official position.  They are, accordingly, privileged.

Plaintiffs challenge this conclusion on two grounds: (1) that the Drafts are not pre-decisional because the government does not point to a specific decision-making process to which the Draft Reviews relate; and (2) that they are not deliberative, essentially because they are

factual summaries.  Neither argument has merit.  The government has pointed to a decision-making process to which the Draft Reviews relate, and that process is more than sufficient to support the pre-decisional nature of the Draft Reviews.  Moreover, factual summaries may be protected if the selection or organization of facts is part of an agency's deliberative process, which is the case here.  In addition, the CIA has properly invoked Exemptions 1 and 3 to cover portions of the Draft Reviews.  Accordingly, the Court should grant summary judgment to the government and deny plaintiffs' cross-motion.

## ARGUMENT

### I.   THE DRAFT REVIEWS ARE PRE-DECISIONAL.

As set forth in the government's opening brief, a document is "pre-decisional" if it was "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made."  *Petroleum Information Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  Plaintiffs contend that the CIA has not identified an actual decision-making "process" to which the Draft Reviews contributed, and, thus, has not shown that the Reviews are pre-decisional.

Plaintiffs contend that in order to show that the Draft Reviews are pre-decisional, the government must identify a decision-making process that was "clearly defined" at the time of the creation of the documents.  Pls.' Br. at 29.  But the government has sufficiently explained the decision-making process to which the Draft Reviews were expected to contribute, and the cases that plaintiffs cite do not suggest otherwise.  In *Access Reports v. DOJ*, 926 F.2d 1192 (D.C. Cir. 1991), for example, an agency attorney drafted a memo analyzing application of FOIA amendments proposed by the Department of Justice to information that had previously been

released under FOIA.  The memo was prepared "[i]n the expectation that legislative review of

the Department[] [of Justice's] proposals would likely require some reaction" to a study by the

Congressional Research Service criticizing the proposed amendments, and "to help [the author's]

superiors in the process of defending the legislative package that the Department [of Justice] had

already offered."  *Access Reports*, 926 F.2d at 1193, 1196.  As the *Access Reports* court noted:

> [The memo's author's] chiefs did not ask for the memo to guide them through future
> dispositions of FOIA requests that might be received if the bill were passed.  They sought
> the memo in part as ammunition for the expected fray, in part as advice on whether and
> when to duck.  It was, as a member of the panel suggested at oral argument, somewhat
> like a staffer's preparation of "talking points" for an agency chief about how to handle a
> potentially explosive press conference.

*Id.* at 1196.  The court further defined the decision-making process to which the memorandum

contributed:  "the Department's study of how to shepherd the FOIA bill through Congress."  *Id.*

The *Access Court's* description of the memorandum and the decision-making process to which it

contributed weigh in favor of applying the deliberative process privilege here.[1]

   In this case, as set forth in the Lutz Declaration, the Draft Reviews were originally

envisioned as providing summaries of the documents being provided to the SSCI that Director

Panetta and other senior CIA leaders could consult to inform policy decisions in connection with

the Committee's multi-year inquiry into the former detention and interrogation program.  Lutz

Decl. ¶ 8.  That decision-making process – how the CIA could (and should) respond to issues

arising in SSCI's study – is similar to the decision-making process articulated in *Access Reports*.

---

[1] The other cases cited by plaintiffs, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1204 (D.C.
Cir. 1991), and *Senate of Puerto Rico v. Dept. of Justice*, 823 F.2d 574, 585 n.38 (D.C. Cir.
1987) are similarly unavailing.  Pls.' Br. at 29.  As is clear from plaintiffs' descriptions of the
cases, the cited passages of both cases describe processes contributing to a specific decision
(rather than just a decision-making process), which plaintiffs acknowledge that the D.C. Circuit
has held unnecessary.  *See* Pls.' Br. at 29 ("It is true that, as the CIA asserts, under D.C. Circuit
law, an agency claiming the privilege need not 'pinpoint' a specific decision to which its
documents *in fact* contributed.") (emphasis in plaintiffs' brief).

Moreover, as in *Access Reports*, the drafts were like "talking points" for senior agency

personnel, intended to inform CIA leaders' decision-making in anticipation of a broad range of

decisions regarding the appropriate agency response to issues expected to arise as a result of a

Congressional inquiry of this significance and magnitude. *Id.*  That the Draft Reviews may

never have been finalized, and that they may never have played an actual role in determining a

response by the Agency has no effect on their pre-decisional nature; they were still intended to

be part of the decision-making process that informed how the Agency would respond to issues

arising as a result of SSCI's inquiry.

    Plaintiffs contend that Director Panetta's interest in being "informed" about the

information the CIA provided to SSCI does not amount to a decision-making process.  Pls.' Br.

at 31.  But all documents prepared for senior leadership are meant to "inform" them – of

strengths and weakness of an agency's position, of analyses of different ways to proceed –

plaintiffs' argument provides no means by which to differentiate between documents that are

covered by the deliberative process privilege and those that are not.  It is established, however,

that compilations of facts involving the exercise of judgment and discretion for the purpose of

"informing" and advising superiors contribute to an agency's deliberative process.  The Draft

Reviews fall squarely within these kinds of factual compilations.  *See* Lutz Declaration ¶ 16 ("In

creating [the Draft Reviews], the team members necessarily had to make judgments about what

information would best inform senior CIA leaders and what information could be omitted. Their

goal was to review the vast number of documents being made available to the SSCI, summarize

what they saw as the most pertinent information from those documents, and organize that

information in a way that would be most useful to senior CIA officials."); *accord Mapother v.*

*DOJ*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("In cases such as this, however, the selection of the facts thought to be relevant clearly involves 'the formulation or exercise of ... policy-oriented judgment' or 'the process by which policy is formulated.'").[2]

## II.   THE DRAFT REVIEWS ARE DELIBERATIVE.

In addition to being pre-decisional, the Draft Reviews are also deliberative.  A document is "deliberative" if it is intended to "facilitate or assist development of the agency's final position on the relevant issue." *Nat'l Security Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014).  That is precisely the case here, where the members of the Special Review Team tasked with the Draft Reviews were asked to review the vast number of documents being made available to SSCI, extract what they saw as the most pertinent information from those documents, and organize that information in a way that would be most useful to senior CIA officials in order ultimately to assist those senior officials' policy judgments and decisions with respect to the SSCI study.  Lutz Decl. ¶¶ 16, 25.

Plaintiffs contend that because the Draft Reviews are "factual summaries," they do not "make[] recommendations or express[] opinions on legal or policy matters," which, they argue, is required to show that the documents are deliberative.  Pls.' Br. at 31.  But ostensibly "factual" material is privileged when "the selection and organization of facts is part of an agency's deliberative process." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513

---

[2] Plaintiffs contend that *Mapother* is inapposite here, and that the Draft Reviews are similar to the "Chronology" in *Mapother* that was not found to be privileged.  Pls.' Br. at 35.  The D.C. Circuit held that the Chronology was not privileged because it was a "comprehensive" recitation of all the known facts with no omissions; because it was organized "strictly chronologically, not thematically"; and because the "selection of the categories of facts to be recorded in no way betray[ed] the occasion that gave rise to its compilation." *Mapother*, 3 F.3d at 1540.  The Chronology, in other words, was a mechanical compilation of all data on a particular subject. The Draft Reviews, by contrast, contain a selective presentation of facts and are organized with an eye toward the policy goals they were designed to serve.

(D.C. Cir. 2011)).  Here, that is undoubtedly the case.  The Special Review Team was formed in

order to keep CIA Director Leon Panetta and other CIA leaders informed of the noteworthy

information from the documents produced to SSCI in order to inform Agency decision-making.

*See* Lutz Decl. ¶ 8.  Obviously, the very selection of what information was considered to be

"noteworthy," and the organization of that information within a document, involved an "exercise

of judgment as to what issues [would be] most relevant" to the broad policy questions that senior

officials would face.  *Ancient Coin Collectors*, 641 F.3d at 513.  Disclosure of the Draft Reviews

would expose the individual authors' judgments to public scrutiny, which in turn would cause

subordinate officials to think twice before committing their tentative thoughts to writing.  *See*,

e.g., Lutz Decl. ¶¶ 15-16, 25.  Those types of judgments are at the core of what the deliberative

process privilege is designed to protect, and constitute just the expression of opinion on policy

matters that plaintiffs contend is missing here.  *See, e.g., Mapother v. Department of Justice*, 3

F.3d 1533, 1539 (D.C. Cir. 1993) (factual material was properly withheld because it had been

"assembled through an exercise of judgment in extracting pertinent material from a vast number

of documents for the benefit of an official called upon to take discretionary action").

Plaintiffs also contend that the agency has not shown the "give-and-take of the

consultative process."[3]  Pls.' Br. at 31.  But the very nature of the Draft Review assignment, and

its purpose – to identify significant information for CIA leadership – reflect a deliberative give

and take within the Agency.  The Draft Reviews do not lose protection simply because they

"died on the vine," *National Security Archive*, 752 F.3d at 463, and were never circulated more

broadly for comment within the Agency.  The deliberative process privilege attaches when the

_____

[3] Plaintiffs appear to contend that to be deliberative, a record must "weigh[] the pros and cons of
agency adoption of one viewpoint or another."  Pls.' Br. at 31.  That cannot be a requirement,
however; if it was, neither factual information nor draft agency histories could be deliberative.

document is created, and is not "contingent on later events," because the writer "needs to know at the time of writing that the privilege will apply and that the draft will remain confidential, in order for the writer to feel free to provide candid analysis." *Id*. at 463. In addition, as *Access Reports* suggests, the fact that a document is prepared by a more junior author for more senior recipients is indicative of its deliberative nature. *Access Reports*, 926 F.2d at 1195 ("A document from a junior to a senior is likely to reflect his or her own subjective opinions and will clearly have no binding effect on the recipient. By contrast, one moving from senior to junior is far more likely to manifest decisionmaking authority and to be the denouement of the decisionmaking rather than part of its give-and-take.").

Moreover, the fact remains that the documents are drafts, which are by their nature a preliminary stage in the deliberative process. Plaintiffs essentially argue that because the Draft Reviews are not the type of documents that should be covered by the deliberative process privilege, designating them as drafts is insufficient to invoke the privilege's protections. Pls.' Br. at 37. Here, however, the Draft Reviews are, in fact, drafts; thus, they are by definition both preliminary and precede any "final agency decision on the relevant matter," and also deliberative, in that they were intended to "facilitate or assist development of the agency's final position" on the SSCI study and subsequent report. *See Nat'l Security Archive*, 752 F.3d at 463 (because a draft document is preliminary and subject to revision, it necessarily precedes any "final agency decision on the relevant matter."); Govt.'s Br. at 11. As set forth in the government's opening brief and above, the Draft Reviews fall within the core of what the deliberative process privilege was designed to protect. That they are drafts strengthens the argument in favor of the privilege further.

Plaintiffs next contend that this case should be controlled by *Playboy Enterprises, Inc. v. Dep't of Justice*, 677 F.2d 931 (D.C. Cir. 1982), in which the D.C. Circuit held that the factual portions of a report prepared by a Department of Justice task force were not covered by the deliberative process privilege. *Id*. at 934, 937; Pl.'s Br. at 6-7. *Playboy Enterprises* distinguished *Montrose Chemical Corp v. Train*, 491 F.2d 63 (D.C. Cir. 1974), in which factual summaries had been held to be protected from disclosure, because of the purpose for which the documents were prepared. In *Playboy Enterprises*, that purpose was "only to inform the Attorney General of facts which he in turn would make available to members of Congress." *Id.* at 936. In other words, the document in *Playboy Enterprises* was not protected by the deliberative process privilege because it was not prepared to inform any deliberation or decision by the Attorney General. In *Montrose Chemical Corp*., by contrast, the summary documents were prepared for the sole purpose of "assisting" the EPA Administrator "in his study of the record, so that he could make a decision in the administrative case." *Id.* A wide variety of other "factual" documents have been held privileged for similar reasons. *See, e.g., National Security Archive*, 752 F.3d at 463-65 (draft history of Bay of Pigs invasion); *Ancient Coin Collectors Guild*, 641 F.3d at 513-14 ("factual summaries" contained in reports prepared by advisory committee); *Mapother*, 3 F.3d at 1539 (report detailing activities of alleged war criminal). The salient question in each of these cases, including *Playboy Enterprises*, was whether the document's author had selected and organized factual material for the purpose of informing a discretionary agency decision. *See Mapother*, 3 F.3d at 1539.

Unlike in *Playboy Enterprises*, the Draft Reviews here were not prepared "only to inform"; rather, as explained previously, they were prepared in connection with an agency

decision-making process.  The Draft Reviews were created solely to aid internal debate and

policy decisions in connection with the SSCI inquiry into the CIA's former detention and

interrogation program.  Like the compilations of facts discussed in *Montrose Chemical Corp.*,

the Draft Reviews were prepared for internal deliberative use only – to highlight for senior CIA

officials the most pertinent information from the documents made available to SSCI.[4]  That is

more than sufficient to bring them within the ambit of the deliberative process privilege.  *See*

*Electronic Privacy Information Center v. Transportation Security Administration*, 928 F. Supp.

2d 156, 167 (D.D.C. 2013) (holding that deliberative process privilege applied where the purpose

of the documents "was to promote deliberation as to the future of the [Automated Target

Recognition] program" and, "unlike Playboy Enterprises, the factual material here was not

assembled for an agency actor merely to pass along to outsiders, but rather for purely internal

deliberative purposes.").

     Plaintiffs complain that the cases cited by the CIA involve "either (i) a close relationship

between the factual summary and a well-defined agency decision, or (ii) official agency

histories, which entail distinct policy concerns."  Pls.' Br. at 32-33.  Citing to *Dudman*

*Communications Corp. v. Dept. of Air* Force, 815 F.2d 1565, 1569 (D.C. Cir. 1987) in support of

---

[4] Plaintiffs contend that *Montrose Chemical Corp.* is inapplicable here, essentially because they disagree that there was, in fact, an agency process to protect.  But as explained above, the Draft Reviews were, in fact, part of the pre-decisional process of helping the CIA determine how to respond to various policy issues that might have arisen in connection with an important congressional investigation. Thus, *Montrose Chemical Corp.* weighs in favor of a finding that the deliberative process privilege applies here.  *Montrose Chemical Corp.*, 491 F.2d at 68 ("The EPA assistants here were exercising their judgment as to what record evidence would be important to the Administrator in making his decision regarding the DDT registrations. Even if they cited portions of the evidence verbatim, the assistants were making an evaluation of the relative significance of the facts recited in the record; separating the pertinent from the impertinent is a judgmental process, some-times of the highest order; no one can make a selection of evidence without exercising some kind of judgment, unless he is simply making a random selection.").

this argument, plaintiffs argue that this matters because, "in this case, there is no . . . danger of 'chilling' CIA staff because the documents were simultaneously made available to Congress in its oversight function."  Pls.' Br. at 34 n.17.  This contention, however, is unpersuasive.  In *Dudman*, the court noted that the risks associated with exposure of a historian's editorial judgment arose once the agency history was finalized and published.  *See Dudman*, 815 F.2d at 1569. ("The danger of "chilling" arises from disclosure that the Air Force as an institution made changes in a draft at some point – not from disclosure that particular Air Force employees at particular stages in the editorial process made such changes.").  But if that rationale were dispositive, then a draft history that never becomes final would not fall under the deliberative process privilege and *National Security Archives* should have come out the other way.  *National Security Archives*, 752 F.3d at 463 (draft agency history is still pre-decisional and deliberative, even if the "draft died on the vine.").

As the Lutz Declaration explains, the Draft Reviews are not mechanical recitations of all the information in all the documents provided to Congress; rather, they reflect the judgments of individual members of the Special Review Team about what was the most significant information from those documents.  Lutz Decl. ¶ 16.  And as pointed out in the government's opening brief, compulsory disclosure of raw, unvetted draft documents like these would discourage staff members from freely and candidly expressing their views, and could lead to public confusion about an agency's position.  *See Petroleum Information Corp*., 976 F.2d at 1433 n.5; Govt.'s Br. at 11.  While plaintiffs attempt to downplay this chilling effect, *see* Pls.' Br. at 36 and n.19, one can see how public disclosure of the Special Review Team's views of the most significant information provided to Congress could well chill future agency evaluations of

such information – even if Congress had already been provided with the documents containing

that information.  Indeed, the plaintiffs apparently seek the Draft Reviews to argue that the

preliminary drafts prepared by individual staff members contradict the CIA's formal, fully vetted

response to Congress.  *See* Ex. A to Lutz Decl., at p. 2.  The deliberative process privilege is

designed to protect agencies and their employees from precisely this type of public scrutiny.

Finally, plaintiffs contend, weakly, that any analysis in the Draft Reviews is also

unprivileged because it is not "inherently deliberative."  Pls.' Br. at 6-7 (Description of floor

statement by Senator Udall); 36-37.  But analyses and conclusions prepared by subordinate

officials for their superiors are at the core of what the deliberative process privilege protects.

*See, e.g.*, *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 185-86 (1975).

While plaintiffs point out that material cannot be withheld solely to avoid embarrassment, *see*

Pls.' Br. at 37, that is entirely beside the point.  The relevant question is whether the Draft

Reviews are privileged; and the deliberative process privilege turns on whether the material in

question represents a preliminary viewpoint or a final agency position, not on whether its release

would be flattering or embarrassing.  Whatever else might be said of them, the Draft Reviews are

plainly preliminary.  They are accordingly privileged.

## III.    THE CIA HAS NOT WAIVED THE DELIBERATIVE PROCESS PRIVILEGE.

Plaintiffs contend that the Draft Reviews must be disclosed to the extent that the

government has "otherwise disclosed the same or similar information."  Pls.' Br. at 38.  While

plaintiffs cite the Second Circuit case of *New York Times v. Dept. of Justice*, 756 F.3d 100 (2d

Cir. 2014) for this proposition, that is not the law of this Circuit.  Moreover, because the portion

of the *New York Times* case that plaintiffs cite for this proposition concerned classified (and not

deliberative process privileged) information, it is inapplicable here.

In order to waive the deliberative process privilege in this Circuit, there must be a release of information identical to that otherwise withheld. *In re Sealed Case*, 121 F.3d 729, 741 (D.C. Cir. 1997) (discussing waiver of deliberative process privilege: "release of a document only waives these privileges for the document or information specifically released, and not for related materials."). A court should not infer waiver lightly. *Id.* Plaintiffs bear the burden of showing that such a waiver has occurred. *Electronic Frontier Foundation v. Dept. of Justice*, 890 F. Supp. 2d 35, 46 (D.D.C. 2012).

Thus, in order for the CIA to have waived the deliberative process privilege over any information, it is not enough that the information withheld be *similar* to information previously disclosed; it must be *identical*. *See In re Sealed Case*, 121 F.3d at 741. In the context of the deliberative process privilege, this requirement is important; that is why drafts may be protected, even if they are similar to a final version that is officially released. Indeed, if the plaintiffs' argument were correct, the *National Security Archives* case, in which a draft agency history was held to be protected, would have come out the other way, as much of the information in the draft agency history had almost certainly been officially disclosed over the years. As the D.C. Circuit pointed out in *National Security Archives*, penalizing agencies that release some information by requiring them to release all "similar" information "would discourage them from voluntarily releasing information, which would thwart the broader objective of transparent and open government." *National Security Archives*, 752 F.3d at 463-64. The same argument holds here: the CIA should not be penalized by the public release either of its response to the SSCI Report, or by SSCI's release of the Executive Summary. And to the extent that the identical information

has already been publicly released, it does not matter here because the Draft Reviews are, in any case, drafts, and remain privileged in their entirety.

## IV.     IN CAMERA REVIEW IS UNNECESSARY.

Because the CIA has demonstrated that the Draft Reviews are draft documents precedent to anticipated deliberations within the Agency, and the supporting declaration is sufficient to justify the withholding in full of the documents, *in camera* review is unnecessary.  *See Lam Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C. Cir. 1991) ("*In camera* inspection may be appropriate in two circumstances:  when agency affidavits are insufficiently detailed to permit meaningful review of exemption claims, and when evidence of agency bad faith is before the court.").  Here, as set forth above, the CIA's affidavits are sufficient to justify withholding of the Draft Reviews under Exemption 5.  Moreover, while plaintiffs' Factual Background section is replete with one-sided characterizations, those characterizations – aside from being unfounded – are irrelevant to whether the Draft Reviews are covered by the deliberative process privilege.  Thus, *in camera* review is unwarranted here.

## V.     THE CIA HAS PROPERLY INVOKED EXEMPTIONS 1 AND 3.

Because the Draft Reviews are covered in full by the deliberative process privilege, the Court need not reach the propriety of the CIA's Exemption 1 and 3 withholdings.  If the Court, however, determines that Exemption 5 does not apply to allow the CIA to withhold the Draft Reviews in full, the CIA reserves the right to re-review and re-process the Draft Reviews for information exempt from release under Exemptions 1 and 3.

## **CONCLUSION**

For the foregoing reasons, this Court should find that the Panetta Report is exempt from disclosure under FOIA, grant the government's motion for summary judgment and deny plaintiffs' motion.

Dated: March 4, 2015

Respectfully submitted,

BENJAMIN C. MIZER
Acting Assistant Attorney General

RONALD C. MACHEN, Jr.
United States Attorney

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division

 _/s/ Vesper Mei_____
VESPER MEI (D.C. Bar 455778)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 514-4686
Fax:  (202) 616-8470
E-mail: vesper.mei@usdoj.gov

**Counsel for the Government**