**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No.  13-1870 (JEB) |
| CENTRAL INTELLIGENCE AGENCY, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

A lightning rod for controversy, the Central Intelligence Agency's former detention and interrogation program has spawned a welter of cases under the Freedom of Information Act demanding access to the inside story.  In this particular suit, the American Civil Liberties Union and the American Civil Liberties Union Foundation seek to compel disclosure of two records relating to the program: the 6,963-page "Final Full Report" drafted by the Senate Select Committee on Intelligence after a comprehensive investigation, and a separate internal CIA study commissioned by former Director Leon Panetta.  Contending that the Final Full Report is a congressional record exempt from the strictures of FOIA, the four defendant agencies move to dismiss that count of the Complaint.  The CIA – the only agency asked to produce the Panetta Review – separately seeks summary judgment on that withholding, invoking FOIA Exemptions 1, 3, and 5.  Concurring in full with the Government, the Court will enter judgment in its favor.

## I.      Background

Given the circumstances surrounding the genesis of the disputed records, an overview of these events and the origins of the FOIA requests here may prove useful to the reader.  In its

explication, the Court first addresses the SSCI Report and the FOIA request pertaining to it, then turns to the Panetta Review and its corresponding request.

A.  The SSCI Report

1.  *Initiation of Investigation*

In March 2009, the Senate Select Committee on Intelligence announced plans to comprehensively review the CIA's former detention and interrogation program.  See Def. Mot. for Summary Judgment, Att. 1 (Declaration of Martha M. Lutz, Chief of the Litigation Support Unit, CIA), ¶ 11.  To fulfill that ambition, Committee personnel required "unprecedented direct access to millions of pages of unredacted CIA documents."  Id.  Wary of freewheeling disclosure of such sensitive information, the CIA negotiated with SSCI to devise accommodations that "respected both the President's constitutional authorities over classified information and . . . Congress's constitutional authority to conduct oversight of the Executive Branch."  Def. Mot. to Dismiss, Att. 1 (Declaration of Neal Higgins, Director of the Office of Congressional Affairs, CIA), ¶ 11.

Those efforts were realized in a June 2, 2009, letter from the SSCI Chairman and Vice Chairman to the CIA Director, in which the Committee agreed that its review of Agency records would take place in a secure electronic reading room at a CIA facility.  See id., ¶¶ 10-11; see also id., Exh. D (June 2, 2009, Letter from SSCI to the CIA), ¶ 2.  The Agency would, in turn, create a segregated network drive there where SSCI members and staffers could "prepare and store their work product . . . in a secure environment."  Higgins Decl., ¶ 11; see also June 2, 2009, SSCI Letter, ¶¶ 5-6.

One key provision of the 2009 letter, and "a condition upon which SSCI insisted," concerned the status of such work product. <u>See</u> Higgins Decl., ¶ 12. More specifically, the letter instructed:

> Any documents generated on the network drive referenced in paragraph 5, as well as any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference. <u>These documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee.</u> As such, these records are not CIA records under the Freedom of Information Act or any other law. . . . If the CIA receives any request or demand for access to these records from outside the CIA under the Freedom of Information Act or any other authority, the CIA will immediately notify the Committee and will respond to the request or demand based upon the understanding that these are congressional, not CIA, records.

June 2, 2009, SSCI Letter, ¶ 6 (emphasis added). The governing terms so defined, SSCI began its Brobdingnagian task.

### 2. *Approval and Transmission of Early Drafts*

More than three years later, on December 13, 2012, SSCI held a closed session in which it approved an initial version of its full investigative report, as well as a stand-alone "Executive Summary." <u>See</u> Higgins Decl., ¶ 15. It then transmitted both drafts to the Executive Branch for review, soliciting "suggested edits or comments" but limiting dissemination to specific individuals identified in advance to the Chairman. <u>See</u> ECF No. 41-1 (December 14, 2012, Letter from Senator Dianne Feinstein to President Barack Obama).

On April 3, 2014, after revising both documents in response to the CIA's feedback, the Committee met again in closed session to determine their proper disposition. <u>See</u> Higgins Decl., ¶ 17. It ultimately voted to approve both documents, but to designate at that time only the

Executive Summary for declassification and eventual public release.  See SSCI, Committee

Study of the CIA's Detention and Interrogation Program: Executive Summary at 8 (Dec. 3,

2014) [hereinafter "Executive Summary"], available at

http://www.intelligence.senate.gov/study2014/executive-summary.pdf; Higgins Decl., Exh. F.

(April 3, 2014, Senator Feinstein Press Release) ("The full 6,200-page full report has been

updated and will be held for declassification at a later time.").  Both documents were transmitted

to the Executive Branch in the summer of 2014.  See Higgins Decl., ¶ 21.

Over the next several months, SSCI and the CIA engaged in further discussions regarding

the processing of the Executive Summary, and the Committee continued to edit that document –

and the Full Report – in light of those conversations.  See Higgins Decl., ¶ 19.  After much

negotiation, the Director of National Intelligence declassified a minimally redacted final version

of the Executive Summary, which SSCI then publicly released on December 9, 2014.  See id., ¶

20.

In her foreword to the Summary, Chairman Feinstein described the Full Report,

clarifying that it is "now final and represents the official views of the Committee."  See

Executive Summary, Chairman's Foreword at 5 (Dec. 3, 2014) [hereinafter "Chairman's

Foreword"], available at http://www.intelligence.senate.gov/study2014/foreword.pdf.  She

further expressed her desire that "[t]his and future Administrations should use this Study to guide

future programs, correct past mistakes, increase oversight of CIA representations to

policymakers, and ensure coercive interrogation practices are not used by our government

again."  Id. at 5.  In keeping with the Committee's earlier decision, however, the Final Full

Report was neither sent for declassification nor publicly released.  See id. at 3 ("I chose not to

seek declassification of the full Committee Study at this time.").

### 3.  *Transmission of Final Full Report*

Instead, during the several days immediately following the public release of the

Executive Summary, SSCI sent a copy of the Final Full Report to President Obama and each

Defendant agency.  See Higgins Decl., ¶ 21; Def. Mot. to Dismiss, Att. 2 (Declaration of Julia

Frifield, Department of State), ¶ 7; id., Att. 3 (Declaration of Mark Herrington, Department of

Defense), ¶ 5; id., Att. 4 (Declaration of Peter Kadzik, Department of Justice), ¶ 5.  Chairman

Feinstein's transmittal letter – addressed to the President – stated as follows:

> As you said publicly on August 1, 2014, the CIA's coercive
> interrogation techniques were techniques that "any fair-minded
> person would believe were torture," and "we have to, as a country,
> take responsibility for that so that, hopefully, we don't do it again
> in the future."
>
> I strongly share your goal to ensure that such a program will not be
> contemplated by the United States ever again and look forward to
> working with you to strengthen our resolve against torture.
> Therefore, the full report should be made available within the CIA
> and other components of the Executive Branch for use as broadly
> as appropriate to help make sure that this experience is never
> repeated.  To help achieve that result, I hope you will encourage
> use of the full report in the future development of CIA training
> programs, as well as future guidelines and procedures for all
> Executive Branch employees, as you see fit.

Def. Mot. to Dismiss, Exh. 3 (December 10, 2014, Letter from Senator Dianne Feinstein to

President Barack Obama) at 1.

The decision to share the Final Full Report within the Executive Branch has since drawn

official Senate criticism, in large part due to a shift in Committee leadership that occurred after

the 2014 elections gave the Republicans a Senate majority.  Shortly after his installation as the

new Chairman, Senator Richard Burr sent a letter to the President indicating that he had not been

aware of the Report's transmission at the time it occurred.  See Def. Mot. to Dismiss, Exh. 4

(January 14, 2015, Letter from Senator Richard Burr to President Barack Obama).  He further

advised that he considered the Report to be "a highly classified and committee sensitive document" and therefore requested that "all copies of the full and final report in the possession of the Executive Branch be returned immediately to the Committee." Id. The Chairman added: "If an Executive Branch agency would like to review the full and final report, please have them contact the Committee and we will attempt to arrive at a satisfactory accommodation for such a request." Id.

In response, now-SSCI Vice Chairman Feinstein wrote the President saying that she "do[es] not support" the request that all copies of the Full Report be returned to the Committee. See Def. Mot. to Dismiss, Exh. 5 (January 16, 2015, Letter from Senator Dianne Feinstein to President Barack Obama) at 1. She further reiterated the sentiment of her December 10, 2014, letter and asked that the Final Report be retained "within appropriate Executive branch systems of record, with access to appropriately cleared individuals with a need to know." Id. at 1-2. No action has yet been taken in response to Senator Burr's letter, as Defendants have agreed to retain their respective copies of the Report pending the Court's adjudication of the dispute at hand. See ECF No. 42 (Defendants' Response to Plaintiffs' Emergency Motion for an Order Protecting Jurisdiction).

### 4. *FOIA Request and Initiation of Suit*

In the midst of all this back-and-forth, the ACLU and the ACLU Foundation (jointly, "ACLU" or "Plaintiff") sent a FOIA request to the CIA, seeking "disclosure of the recently adopted [SSCI] report . . . relating to the CIA's post-9/11 program of rendition, detention, and interrogation." Def. Original Mot. to Dismiss, Att. 2 (Affidavit of Neal Higgins), Exh. A (February 13, 2013, FOIA Request). The CIA promptly denied the request, characterizing the Report as a "[c]ongressionally generated and controlled document" exempt from FOIA. See

6

Higgins Aff., Exh. B (February 22, 2013, Letter from Michele Meeks, CIA Information and Privacy Coordinator).  Unconvinced, the ACLU filed suit against the CIA to compel disclosure on November 26, 2013.  Plaintiff also initially sought access to the CIA's official response to the SSCI Report.  See Compl., ¶ 22.  In light of its subsequent public release on December 9, 2014, the ACLU has since withdrawn that portion of its request.  See Pl. Cross-Mot. & Opp. at 7 n.4.

By way of an additional FOIA request, amendments to its Complaint, and various status conferences, Plaintiff has since named three additional agencies as defendants – the Department of Defense, the Department of Justice, and the Department of State – and made clear that it seeks the final version of the Full SSCI Report.   See id. at 7.  Each of the agencies has now moved to dismiss the ACLU's claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.  They argue that the Report remains a congressional record notwithstanding its transmittal to the Executive Branch and thus falls outside the scope of FOIA.  Plaintiff opposes, maintaining that the Report should be considered an agency record.

B.  The Panetta Review

The ACLU's case, however, sweeps wider still.  It also seeks an entirely separate set of documents created by the CIA during the early stages of SSCI's investigation, which the media has now dubbed the "Panetta Review."

1.  *Creation of Review*

In 2009, mindful of the magnitude and sensitivity of the records being disclosed to SSCI for its investigation, the CIA formed a "Special Review Team" to review the documents SSCI was accessing and to "prepar[e] summaries of certain key information."  Lutz Decl., ¶ 14.  As this Court has already detailed in a very recent Opinion, Leopold v. CIA, No. 14-48, 2015 WL 1445106 (D.D.C. Mar. 31, 2015), then-Director of the CIA Leon Panetta and other senior CIA

officials wished to remain apprised of "the most noteworthy information contained in the millions of pages of documents being made available to the SSCI" so as to "inform other policy decisions related to the Committee's study."  Lutz Decl., ¶¶ 8, 13.

The SRT carried out its assigned task for approximately a year, producing a series of more than 40 draft documents that are now generally referred to as the Panetta Review.  See Leopold, 2015 WL 1445106, at *2.  Team leaders would assign research topics to team members, who in turn would conduct searches for documents "related to their assigned topic" and review the results to "determine[] whether certain contents of those documents might be relevant to informing senior CIA leaders in connection with the SSCI's study."  Lutz Decl., ¶ 15.  If a team member found information that she "believed was significant" about her topic, she would describe the information in her review.  See id.

In 2010, however, the project was abandoned.  The Agency determined that its "continued work on the Review[] could potentially complicate a separate criminal investigation by the Department of Justice into the detention and interrogation program."  Id., ¶ 18.  As a result, the project was never finished.  Id., ¶ 19.  Indeed, when cast aside, the reviews "covered less than half of the millions of pages of documents that the CIA ultimately made available to the SSCI" and remained in draft form.  Id.  According to the Agency, had the project not been forsaken, the drafts "would likely have been reviewed and edited by a number of senior CIA officials . . . before being presented to the Director as finished products."  Id.

2. *FOIA Request and Procedural History*

Fast-forward several years.  On December 17, 2013, then-Senator Mark Udall publicly referenced an "internal study" that the CIA had allegedly drafted about its former detention and

interrogation program.  Its antennae finely tuned for such statements, Plaintiff quickly submitted

a FOIA request seeking:

> [A] report commissioned by former Central Intelligence Agency
> ("CIA") Director Leon Panetta on the Agency's detention and
> interrogation programs (the "Panetta Report"), which was referred
> to by Senator Mark Udall on December 17, 2013, during the
> confirmation hearing for CIA General Counsel nominee Caroline
> Diane Krass.

Lutz Decl., Exh. A (December 19, 2013, FOIA Request).  The CIA responded within the week,

indicating that it would accept and process the request, but that it would unlikely be able to

respond within 20 working days.  See Lutz Decl, Exh. B (December 24, 2013, Letter from

Michele Meeks, CIA Information and Privacy Coordinator).  On January 27, 2014, still awaiting

a substantive response to its request, Plaintiff amended its Complaint in this case to include a

claim against the CIA for disclosure of the Panetta Review.  See Lutz Decl., ¶ 7; Am. Compl. at

8-9.

   The Agency has now moved for summary judgment on the ground that it properly

withheld the Review, relying on FOIA Exemptions 1, 3, and 5.  Plaintiff cross-moves, arguing

the contrary.

## II.   Legal Standard

### A.  Motion to Dismiss

   Under Federal Rule of Civil Procedure 12(b)(1), a court must dismiss a claim for relief

when the complaint "lack[s] . . . subject-matter jurisdiction."  To survive a motion to dismiss

under Rule 12(b)(1), a plaintiff bears the burden of proving that the Court has subject-matter

jurisdiction to hear its claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992);

U.S. Ecology, Inc. v. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an

"independent obligation to determine whether subject-matter jurisdiction exists, even in the

absence of a challenge from any party." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).

"For this reason 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny

in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."

Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13-14 (D.D.C.

2001) (alterations in original) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss

under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharms. v. FDA,

402 F.3d 1249, 1253 (D.C. Cir. 2005); see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d

359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case – a dismissal under Rule

12(b)(1) on ripeness grounds – the court may consider materials outside the pleadings."); Herbert

v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

    B.  Summary Judgment

       Summary judgment may be granted if "the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v.

Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477

U.S. at 248; Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion" by "citing to particular parts of materials in the record" or

"showing that the materials cited do not establish the absence or presence of a genuine dispute,

or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

FOIA cases typically and appropriately are decided on motions for summary judgment. See Brayton v. Office of U.S. Trade Rep., 641 F.3d 521, 527 (D.C. Cir. 2011). In a FOIA case, the Court may grant summary judgment based solely on information provided in an agency's affidavits or declarations when they "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009) (citation omitted).

## III.   Analysis

As previously articulated, Plaintiff in this case seeks two discrete documents: the Full SSCI Report and the Panetta Review. The Court will treat each in turn, ultimately concluding that neither is subject to release under FOIA.

### A.   The SSCI Report

FOIA mandates that "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . , shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3)(A). A plaintiff thus states a claim under that Act where it properly alleges that "'an agency has (1) improperly (2) withheld (3) agency records.'" United States Dep't of Justice v. Tax Analysts, 492 U.S. 136, 142 (1989) (quoting Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 150 (1980)) (internal quotation marks omitted); 5 U.S.C. § 552(a)(4)(B) (granting federal district courts

jurisdiction "to order the production of any <u>agency records</u> improperly withheld from the complainant") (emphasis added).

For purposes of FOIA, the definition of an "agency" specifically <u>excludes</u> Congress, legislative agencies, and other entities within the legislative branch.  <u>See</u> 5 U.S.C. §§ 551(1), 552(f); <u>see also</u> <u>United We Stand America, Inc. v. Internal Revenue Serv.</u>, 359 F.3d 595, 597 (D.C. Cir. 2004) ("The Freedom of Information Act does not cover congressional documents."). Neither party, accordingly, disputes that at the time SSCI drafted the Full Report, it constituted a congressional document exempt from FOIA.  The bone of contention, instead, is whether the Report, once transmitted to Defendants, <u>became</u> an "agency record" subject to FOIA.

### 1. *Legal Framework*

As a starting point, "not all documents in the possession of a FOIA-covered agency are 'agency records' for the purpose of that Act."  <u>Judicial Watch, Inc. v. U.S. Secret Serv.</u>, 726 F.3d 208, 216 (D.C. Cir. 2013); <u>see also, e.g.</u>, <u>Kissinger</u>, 445 U.S. at 157 ("mere physical location of papers and materials" does not confer "agency-record" status).  As the Supreme Court instructed in <u>Tax Analysts</u>, the term "agency records" extends only to those documents that an agency both (1) "create[s] or obtain[s]," <u>and</u> (2) "control[s] . . . at the time the FOIA request [was] made." 492 U.S. at 144-45.  Turning briefly to <u>Tax Analysts</u>' first prong, Defendant agencies do not dispute that the Full SSCI Report was delivered to them in December 2014 – *i.e.*, that they obtained it.  <u>See</u> Def. Mot. to Dismiss at 11-12.  Instead, the parties clash over whether the SSCI Report is under agency "control."

In the typical case, this Circuit looks to four factors to determine "whether an agency has sufficient control over a document to make it an agency record."  <u>Judicial Watch</u>, 726 F.3d at 218 (internal quotation marks omitted).  They are:

> [1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files.

Id.; accord United We Stand, 359 F.3d at 599; Burka v. U.S. Dep't of Health & Human Servs., 87 F.3d 508, 515 (D.C. Cir. 1996).

Because the present case concerns documents obtained by the agencies from Congress, however, the usual four-part test does not apply.  See Judicial Watch, 726 F.3d at 221; United We Stand, 359 F.3d 599.  Rather, in such cases, "'special policy considerations . . . counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents.'"  Judicial Watch, 726 F.3d at 221 (quoting Paisley v. CIA, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983)).  As this Circuit has repeatedly emphasized, "Congress exercises over-sight authority over the various federal agencies, and thus has an undoubted interest in exchanging documents with those agencies to facilitate their proper functioning in accordance with Congress' originating intent."  United We Stand, 359 F.3d at 599 (quoting Goland v. CIA, 607 F.2d 339, 346 (D.C. Cir. 1978)).  Failure to heed congressional intent "would force Congress 'either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its oversight role.'"  Id. (quoting Goland, 607 F.2d at 346).  In suits involving congressional documents, consequently, "the first two factors of the standard test" are "effectively dispositive."  Judicial Watch, 726 F.3d at 221.

Yet basic analysis reveals that even this formulation is needlessly cumbersome.  In truth, the first two factors represent two sides of the same coin: that is, if "Congress has manifested its own intent to retain control, then the agency – by definition – cannot lawfully 'control' the documents."  Paisley, 712 F.2d at 693.  Conversely, if Congress intends to relinquish its control

over the document, then the agency may use it as it sees fit.  See id.; see also United We Stand, 359 F.3d at 600 ("Congress's intent to control and the agency's ability to control 'fit together in standing for the general proposition that the agency to whom the FOIA request is directed must have exclusive control of the disputed documents.'") (quoting Paisley, 712 F.2d at 693).  The Court's inquiry, therefore, is a streamlined one: do there exist "sufficient indicia of congressional intent to control," id., the Full SSCI Report?

> ### 2.  *Control of SSCI Report*

Although this case is no slam dunk for the Government, the Court answers that question in the affirmative.  In so doing, it focuses on three pieces of evidence: SSCI's June 2009 letter to the CIA, Senator Feinstein's December 2014 letter transmitting the Final Report, and SSCI's treatment of the Executive Summary.

> #### a.   SSCI's 2009 Letter

The Court begins with "the circumstances surrounding the . . . creation" of the Report. United We Stand, 359 F.3d at 600.  In its June 2009 letter to the CIA, SSCI expressly stated its intent that the documents it generated during its investigation "remain congressional records in their entirety and disposition," such that "control over these records, even after the completion of the Committee's review," would "lie[] exclusively with the Committee."  June 2, 2009, SSCI Letter, ¶ 6.  Making its wishes even more explicit, it continued, "As such, these records are not CIA records under the Freedom of Information Act, or any other law."  Id.

Such admonitions related to the creation of documents resemble those previously relied on by the D.C. Circuit to sustain an agency withholding.  In United We Stand, the Joint Committee on Taxation sent a letter to the Internal Revenue Service requesting specified categories of documents and information.  The letter concluded: "This document is a

Congressional record and is entrusted to the Internal Revenue Service for your use only." Id. at

600-01.  In response, the IRS prepared and sent to the Joint Committee a seventeen-page letter

with three attachments.  See id. at 597.  Some three years later, United We Stand America

brought suit under FOIA seeking that response in its entirety.  Although the Circuit ultimately

deemed some portions subject to disclosure, it held the remaining portions to be congressional

records not subject to FOIA.  Specifically, it found that the Joint Committee's originating letter

reflected "sufficient . . . intent to control" not only its original request but also those portions of

the IRS's subsequent response "that would reveal that request."  Id. at 600 (emphasizing the

confidentiality directive contained in the Joint Committee's letter).  Here, too, Congress's

previously expressed intent to retain control over the Report militates heavily in Defendants'

favor.

　　　　Plaintiff rejoins that the June 2009 letter bears no relevance to the Full Report, as it

"applied only to documents residing on the SSCI's network drive at the CIA's secure facility."

See Pl. Cross-Mot. & Opp. at 18-19.  According to the ACLU, the letter's restrictions

"understandably reflected the underlying purpose and spirit of the SSCI-CIA agreement at that

time" – i.e., "to protect the SSCI's work product, which was stored on the computer system of

the agency it was overseeing."  Id. at 19.  As Defendants concede, the Final Full Report never

resided on that system; although the Committee used the segregated shared drive to draft early

versions of its Report, those drafts were ultimately transferred to secure facilities at the U.S.

Capitol complex so that SSCI could complete the final drafting process in its own workspaces.

See Higgins Decl., ¶ 13.

　　　　 By its express terms, however, the SSCI-CIA agreement is not so limited.  It applies both

to "documents generated on the network drive" and to "any other notes, documents, draft and

final recommendations, reports or other materials generated by Committee staff or members." June 2, 2009, SSCI Letter, ¶ 6.  That language encompasses the Final Full Report, which by its own title is plainly a "final . . . report[] or other material[] generated by Committee staff or members."  This literal construction is also the more sensible one.  While the ACLU is undoubtedly correct that SSCI had FOIA-related concerns arising from its usage of the CIA's network drive, the Committee was presumably also concerned about maintaining control over any public disclosure of its work product – regardless of which computer systems ultimately housed them.  The letter's expansive language is consistent with such intent.

        One final point bears mention.  Defendants' own characterizations of the scope of the letter vary somewhat in their submissions.  Compare, e.g., Higgins Decl., ¶ 12 ("One key principle necessary to this inter-branch accommodation . . . was that the materials created by SSCI personnel on [the] segregated shared drive would not become 'agency records' even if those documents were stored on a CIA computer system or at a CIA facility.") (emphasis added), with Def. Reply at 5 (explaining that the language of the June 2009 letter "covers the Full Report" as a "final . . . report[] or other material[] generated by Committee staff or members," even though it did not reside on the network drive).  Although these divergent representations are slightly disconcerting, they are ultimately of little consequence.  The United We Stand inquiry focuses on "Congress' intent to control (and not on the agency's)." 359 F.3d at 600 (internal quotation marks omitted; emphasis added).  The agencies' inconsistency in paraphrasing SSCI's June 2009 letter thus cannot undermine the plain import of the language therein.

                        b.  Senator Feinstein's December 10, 2014, Letter

        Undeterred, the ACLU characterizes the 2009 agreement as "irrelevant, indirect evidence of past intent."  Pl. Cross-Mot. & Opp. at 18.  It insists that any evidence of congressional

control "must be contemporaneous with the transmission of the document."  Id. at 16.  And,

according to Plaintiff, "[t]he contemporaneous record is clear that the SSCI relinquished control

over the Final Full Report when it sent the report to Defendants . . . in December 2014."  Id. at

17.

As its *pièce de résistance*, the ACLU seizes on the December 10, 2014, transmittal letter

from Senator Feinstein, claiming it represents "direct evidence of the SSCI's intentions for the

Final Full Report."  Id.  That letter, to recap, states:

> [T]he full report should be made available within the CIA and
> other components of the Executive Branch for use as broadly as
> appropriate to help make sure that this experience is never
> repeated.  To help achieve this result, I hope you will encourage
> use of the full report in the future development of CIA training
> programs, as well as future guidelines and procedures for all
> Executive Branch employees, as you see fit.

December 10, 2014, Feinstein Letter.  "By encouraging the use and dissemination of the Final

Full Report among the executive branch, and by leaving to the executive branch the decision as

to how 'broadly' the report should be used within the agencies," claims Plaintiff, "SSCI

relinquished its control over the document."  Pl. Cross-Mot. & Opp. at 17-18.

As a threshold matter, the ACLU's attempt to unduly narrow the universe of relevant

evidence ignores on-point precedent.  The D.C. Circuit specifically rejected an analogous

argument in Holy Spirit Association for the Unification of World Christianity v. CIA, 636 F.2d

838 (D.C. Cir. 1980), which likewise dealt with congressional documents in the possession of an

agency.  Although ultimately holding that the relevant documents constituted agency records, the

court there explicitly declared that it was "not adopt[ing] appellant's position that Congress must

give contemporaneous instructions when forwarding congressional records to an agency."  Id. at

842 (emphasis added).  Similarly, in Judicial Watch – which applied the United We Stand

inquiry to documents created at the behest of the Office of the President – the court relied

heavily on a Memorandum of Understanding executed "well before the creation and transfer of

the documents at issue" in that case.  See 726 F.3d at 223 & n.20.  The Court, therefore, need not

confine its consideration to the moment of transmission.  On the contrary, SSCI's 2009 letter sets

the appropriate backdrop against which Senator Feinstein's 2014 letter can be properly

understood.

So teed up, her letter does not evince congressional intent to surrender substantial control

over the Full SSCI Report.  While it does bestow a certain amount of discretion upon the

agencies to determine how broadly to circulate the Report, such discretion is not boundless.

Most significantly, the dissemination authorized by the letter is limited to the Executive Branch

alone.  It plainly does not purport to authorize the agencies to dispose of the Report as they wish

– e.g., to the public at large.

This distinction is critical.  Congress "has undoubted authority to keep its records secret,

authority rooted in the Constitution, longstanding practice, and current congressional rules."

Goland, 607 F.2d at 346.  Yet Congress also "exercises oversight authority over the various

federal agencies, and thus has an undoubted interest in exchanging documents with those

agencies to facilitate their proper functioning in accordance with Congress' originating intent."

Id.; see also Paisley, 712 F.2d at 694 n.30 (emphasizing Congress's "vital function as overseer of

the Executive Branch").  As a result, it frequently transmits documents to the Executive Branch

with the understanding that relevant agencies should make appropriate internal use of the

information.  See Goland, 607 F.2d at 346.  Such tender should not be readily interpreted to

suggest more wholesale abdication of control.  See id. at 347-48 (holding that CIA's possession

of congressional hearing transcript "for internal reference purposes" did not convert document to

an agency record).  Especially here, where SSCI's 2009 letter affirmatively manifests its intent to

retain control of its work product, the Court declines to assume the contrary "absent a more

convincing showing of self-abnegating congressional intent."  Id. at 346.

### c.  SSCI's Handling of Executive Summary

This conclusion is further reinforced by SSCI's divergent treatment of the Executive

Summary.  On April 3, 2014, when the Committee met to determine the proper disposition of the

Executive Summary and Full Report, it voted to approve the updated versions of both, but to

send only the former to the President for declassification and eventual public release.  See

Executive Summary at 9; see also, e.g., April 3, 2014, Feinstein Press Release ("The full 6,200-

page full report has been updated and will be held for declassification at a later time.").  After the

Executive Summary underwent further editing, a minimally redacted version was declassified by

the Director of National Intelligence and publicly released by SSCI on December 9, 2014.  See

Higgins Decl., ¶¶ 19-20.  In the foreword to the publicly released summary, Chairman Feinstein

explained, "I chose not to seek declassification of the full Committee Study at this time.  I

believe that the Executive Summary includes enough information to adequately describe the

CIA's Detention and Interrogation Program. . . .  Decisions will be made later on the

declassification and release of the full 6,700 page Study."  Chairman's Foreword at 3.  SSCI's

deliberate decision not to publicly release the Full Report, combined with its assertion that it

would consider that course of action in the future, serve to further undermine Plaintiff's theory

that Congress intended to relinquish control over the document only days later.

### d.  Remaining Arguments

Given the Court's decision, it need not wrestle with two other arguments Defendants

raise – namely, that SSCI's closed sessions and marking of the Full Report "TOP SECRET," as

well as now-Chairman Burr's January 14, 2015, letter seeking return of all copies of the Report,

signify abiding congressional control over the document.  See Def. Mot. to Dismiss at 16-17, 21.

These arguments would not likely gain much traction.  See Pl. Cross-Mot. & Opp. at 20

(persuasively arguing on first point that such indicia of confidentiality merely reflect SSCI's

acknowledgement of "the CIA's classification decisions . . . with respect to [A]gency documents

that form the basis of the Final Full Report" and thus fail to reflect Congress's intent); Holy

Spirit, 636 F.2d at 842 (letter from House of Representatives written after transfer of records did

not establish congressional control); United We Stand, 359 F.3d at 602 (Congress's "post-hoc

objections to disclosure cannot manifest the clear assertion of congressional control that our case

law requires.").  The Court need not, however, definitively resolve these final points.  Even

excluding them from the Government's side of the ledger, it has made the requisite showing of

congressional intent to retain control.

* * * *

At the end of the day, the ACLU asks the Court to interject itself into a high-profile

conversation that has been carried out in a thoughtful and careful way by the other two branches

of government.  As this is no trivial invitation, it should not be blithely accepted.  Absent more

convincing evidence that the SSCI Report has "passed from the control of Congress and become

property subject to the free disposition of the agenc[ies] with which the document resides,"

Goland, 607 F.2d at 347, the Court must hold that it remains exempt from disclosure under

FOIA.  To be sure, Plaintiff – and the public – may well ultimately gain access to the document

it seeks.  But it is not for the Court to expedite that process.

B.  Panetta Review

 The Court now directs its attention to the ACLU's request for the Panetta Review – i.e.,

the series of "more than forty draft documents" created by the SRT.  The CIA maintains that

such documents are entirely exempt from disclosure under FOIA Exemption 5's deliberative-process privilege or, in the alternative, that portions of the Review are protected by Exemption 1 (which covers materials classified by Executive Order) and Exemption 3 (which covers materials specifically exempted from disclosure by statute).

      1.  *Prior Decision*

In the immortal words of Yogi Berra, "It's *déjà vu* all over again."  The Court's recent decision in <u>Leopold v. Central Intelligence Agency</u>, No. 14-48, 2015 WL 1445106, at *1 (D.D.C. Mar. 31, 2015), issued while this Motion was pending, addressed precisely this withholding. The plaintiff in that case – journalist Jason Leopold – likewise demanded release of the Panetta Review, and the CIA, in turn, refused, citing Exemptions 1, 3, and 5.  <u>See</u> <u>id.</u> at 3-4.  Concluding that "Exemption 5 acts as a complete shield" over the contested documents – and that it therefore need not address the other exemptions – the Court granted summary judgment to the Agency. <u>See</u> <u>id.</u> at 6.

In so holding, the Court first outlined the parameters of Exemption 5, which protects from disclosure "documents that would ordinarily be unavailable to an opposing party through discovery," including those that fall within the deliberative-process privilege.  <u>See</u> <u>United States v. Weber Aircraft Corp.</u>, 465 U.S. 792, 800 (1984); <u>Martin v. Office of Special Counsel</u>, 819 F.2d 1181, 1184-85 (D.C. Cir. 1987).  To come under that umbrella, documents must be both "'predecisional'" and "'deliberative.'"  <u>Mapother v. Dep't of Justice</u>, 3 F.3d 1533, 1537 (D.C. Cir. 1993).

Drawing on relevant precedent, the Court found that the Panetta Review met both criteria.  The "predecisional" component, it explained, is satisfied where material is "prepared . . . to assist an agency decisionmaker in arriving at his decision," rather than "to support a decision

already made." Petroleum Info. Corp. v. Dep't of Interior, 976 F.2d 1429, 1434 (D.C. Cir.

1992). An agency need not, however, "identify a specific decision to which withheld materials

contributed," as the exemption is "aimed at protecting [an agency's] decisional process."

Leopold, 2015 WL 1445106, at *9 (internal quotation marks omitted). Observing that the

Panetta Review was generated by lower-level employees "to aid senior agency officials'

deliberations about how to respond" to SSCI's ongoing investigation into the CIA's former

detention and interrogation program, as well as "how to deal with other policy issues that might

arise therefrom," the Court found that the CIA had sufficiently defined a forward-looking

"decisionmaking process" to which the documents were designed to contribute. Leopold, 2015

WL 1445106, at *4, *9, *11.

It then turned to the "deliberative" prong, which asks whether material "reflects the give-

and-take of the consultative process." Coastal States Gas Corp. v. U.S. Dep't of Energy, 617

F.2d 854, 866 (D.C. Cir. 1980). Although Leopold argued that the draft reviews contained

"purely factual material" – which ordinarily cannot be withheld under Exemption 5 – the Court

explained that such material can be exempt where "it reflects an exercise of discretion and

judgment calls" and "where its exposure would enable the public to probe an agency's

deliberative processes." Leopold, 2015 WL 1445106, at *6 (internal quotation marks omitted).

"[T]he legitimacy of withholding," accordingly, "does not turn on whether the material is purely

factual in nature or whether it is already in the public domain, but rather on whether the selection

or organization of facts is part of an agency's deliberative process." Ancient Coin Collectors

Guild v. Dep't of State, 641 F.3d 504, 513 (D.C. Cir. 2011).

The Review, found the Court, was compiled in just such fashion. "[I]ntended to facilitate

or assist development of the agency's final position on the relevant issue[s]," the drafts were

neither "comprehensive, matter-of-fact summaries" nor "rote recitations of facts." Leopold, 2015 WL 1445106, at *8 (internal quotation marks omitted). On the contrary, "the authors strove to write briefing materials that would aid senior officials' decisionmaking," "ma[king] judgments about the salience of particular facts in light of the larger policy issues that senior CIA leaders might face in connection with the SSCI's study" and "organiz[ing] that information in a way that would be most useful to senior CIA officials." Id. (internal quotation marks omitted). In light of the significant discretion exercised by the authors, the Court concluded that requiring disclosure of the draft reviews would "cause the sort of harm that the deliberative-process privilege was designed to prevent – i.e., inhibiting frank and open communications among agency personnel." Id. at *9. The Panetta Review, consequently, merited protection under the deliberative-process privilege.

The arguments raised by the ACLU in the present suit echo those already rejected by the Court in Leopold. Its attack on the "predecisional" prong, for instance, centers on the claim that the CIA failed to sufficiently identify a decisionmaking process to which the Panetta Review was designed to contribute. See Pl. Cross-Mot. & Opp. at 29-31. Likewise, in claiming that the documents are not "deliberative," it principally argues that the drafts "consist largely or entirely of factual summaries" and are thus subject to disclosure. See id. at 31-37. Plaintiff's rehashing of Leopold's arguments – although at times more developed – is no more persuasive. The Court sees no reason to disturb its prior conclusion: the Panetta Review is properly characterized as both predecisional and deliberative.

### 2. *Novel Arguments*

The Court will, however, briefly address two ancillary points raised by the ACLU, neither of which the prior Opinion had occasion to consider. First, Plaintiff highlights certain

statements made by former Senator Mark Udall, who claims to have read portions of the Review. According to him – notwithstanding the manner in which various CIA officials have characterized it – "the Panetta review is much more than a 'summary' and 'incomplete drafts.'" Pl. Cross-Mot. & Opp., Att. 1 (Declaration of Ashley Gorski), Exh. A (Senator Mark Udall's December 10, 2014, Floor Speech) at 3.  In point of fact, it is "a smoking gun" that "acknowledges significant problems and errors made in the CIA's detention and interrogation program." Id.  In particular, says the Senator, the Report concludes that "the CIA repeatedly provided inaccurate information to the Congress, the President, and the public on the efficacy of its coercive techniques." Id. He asserts that "the CIA is lying" about the Report's contents in order to "minimize its significance." Id.

These statements are deeply troubling, to say the least.  That a United States Senator believes the CIA is dissembling as to the true nature of the Panetta Review is a heady accusation. The Court notes, however, that Senator Udall's statements on the Senate floor were not a point-by-point rebuttal intended to discredit the declaration submitted by the CIA in this case (or the similar one proffered in Leopold).  Instead, his speech was intended to respond more broadly to statements made outside the litigation context by CIA Director John Brennan and other Agency officials, and his allegations must be viewed in that light.

More fundamentally, however, the ACLU's reliance on his statements is noticeably half-hearted.  Although its briefing is long on his allegations, it is decidedly short as to the conclusion to be drawn from them.  Such reticence is unsurprising.  If Senator Udall's statements are correct, they serve to confirm, rather than undermine, the Panetta Review's privileged status. That is, insofar as he asserts that the draft reviews contain analyses and conclusions rather than primarily facts, their deliberative nature is only bolstered.  See Playboy Enterprises, Inc. v. Dep't

of Justice, 677 F.2d 931, 937 (D.C. Cir. 1982) ("The report may contain conclusions, recommendations, or opinions . . . . These parts of the report are not subject to disclosure.").  His statements thus do little to advance Plaintiff's case.

The ACLU next argues that even if the Panetta Review falls within the ambit of the deliberative-process privilege, the "official-acknowledgment" doctrine precludes the CIA from withholding the documents in their entirety.  As Plaintiff notes, "[W]hen information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim."  Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007) (internal quotation marks omitted).  According to the ACLU, "[I]t is a near certainty that the Panetta report contains information that has been revealed publicly."  Pl. Cross-Mot. & Opp. at 39.  More specifically, "[a]t least some of the information contained within the Panetta Report documents has almost certainly been officially acknowledged by the CIA in its June 2013 response to the Initial SSCI Report – among other public disclosures – as well as by the SSCI in its publicly released Executive Summary."  Id.

Although it may well be that some of the facts contained within the Panetta Review have been otherwise disclosed, the Court does not believe that the official-acknowledgement doctrine has resonance in this case.  As courts in this Circuit have recognized, "Even if the information sought is exactly the same as the information which was acknowledged, . . . 'the very fact that a known datum appears in a certain context or with a certain frequency may itself be information that the government is entitled to withhold.'"  Pub. Citizen v. Dep't of State, 787 F. Supp. 12, 14 (D.D.C. 1992) (quoting Afshar v. Dep't of State, 702 F.2d 1125, 1130 (D.C. Cir. 1983)).  Such is the case here.  As the Court's prior Opinion emphasized, the Panetta Review's protection under the deliberative-process privilege derives from the "judgments" its authors needed to make

"about the salience of particular facts in light of the larger policy issues that senior CIA leaders might face in connection with the SSCI's study." Leopold, 2015 WL 1445106, at *8.  Divulging which facts were culled for inclusion, or even the topics that agency officials selected for the Review, would risk "expos[ure] [of] their internal thought processes."  Id.  This logic retains its force even if the underlying facts have been otherwise shared with the public, for it is their inclusion in the Review that warrants protection as deliberative.  Application of the official-acknowledgement doctrine under the circumstances here thus cannot defeat the CIA's proper invocation of the privilege.

## IV.   Conclusion

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss and the CIA's Motion for Summary Judgment.  A contemporaneous Order so stating shall issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: May 20, 2015